# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

| | | |
|---|---|---|
| THE STATE OF TENNESSEE; THE STATE OF INDIANA; THE STATE OF ALABAMA; THE STATE OF ALASKA; THE STATE OF ARIZONA; THE STATE OF ARKANSAS; THE STATE OF GEORGIA; THE STATE OF KANSAS; THE COMMONWEALTH OF KENTUCKY; THE STATE OF LOUISIANA; THE STATE OF MISSISSIPPI; THE STATE OF MISSOURI; THE STATE OF MONTANA; THE STATE OF NEBRASKA; THE STATE OF OHIO; THE STATE OF OKLAHOMA; THE STATE OF SOUTH CAROLINA; THE STATE OF SOUTH DAKOTA; THE STATE OF TEXAS; THE STATE OF UTAH; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WEST VIRGINIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | Case No. 3:22-cv-00257 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; CINDY LONG, in her official capacity as Administrator of Food and Nutrition Service at the United States Department of Agriculture; ROBERTO CONTRERAS, in his official capacity as Director of the Food and Nutrition Service Civil Rights Division at the United States Department of Agriculture, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.     President Biden directed federal agencies to rewrite federal law to implement the Administration's policy of "prevent[ing] and combat[ing] discrimination on the basis of gender identity or sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg. 7023-25 (Jan. 20, 2021). In response, the United States Department of Agriculture ("USDA" or "Department"), ignoring procedural requirements, issued directives and rules that misconstrue the law and impose unlawful requirements on Plaintiffs.

2.     First, the Department issued a memorandum updating the Food and Nutrition Services complaint-processing policy related to claims of discrimination based on gender identity or sexual orientation. USDA, CRD 01-2022, Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing – Policy Update (May 5, 2022), https://bit.ly/3NuXnSx ("Memorandum") (attached as Exhibit A). The Memorandum purports to impose new requirements on States, forcing them to adopt the Department's flawed understanding of what constitutes sex discrimination under Title IX. *Id.* at 2-3.

3.     The cover letter for the Memorandum stated that the Department's new policy "applies to prohibitions against discrimination based on sex in all FNS programs," recognizing that "these changes may impact [State and local] operations." USDA, Cover Letter to CRD 01-2022, Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing – Policy Update (May 5, 2022) ("Cover Letter") (attached as Exhibit B).

4.     Attached to the Memorandum was a "questions and answers" document, which, among other commands, directs States to "update their program discrimination complaint processing procedures for allegations related to service and activities receiving federal financial assistance from the USDA to ensure discrimination complaints alleging sexual orientation and

gender identity discrimination are processed as complaints of prohibited sex discrimination." USDA, CRD 02-2022, Questions and Answers Related to CRD 01-2022 Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing – Policy Update (May 5. 2022), https://bit.ly/3yzKpyG ("Memorandum Q&A") (attached as Exhibit C).

5.      The Department provided "[a]dditional guidance" a short time later, which made plain the extent of federal overreach.  While purporting to explain the Memorandum, the agency separately directed State-level SNAP administrators—which include public primary schools, secondary schools, and universities—to "update[]" their "documents, pamphlets, websites, etc." with the following "Nondiscrimination Statement":

> In accordance with federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, this institution is prohibited from discriminating on the basis of race, color, national origin, sex (including gender identity and sexual orientation), religious creed, disability, age, political beliefs, or reprisal or retaliation for prior civil rights activity.

Supplemental Memoranda at 1 (citing Technical Assistance & Guidance, FNS Nondiscrimination Statement (May 5, 2022), https://bit.ly/3nZTc6W ("Nondiscrimination Statement")).

6.      This was immediately followed with a directive ordering Plaintiffs to update various posters and policies with immediate effect.  *See* USDA, Memorandum Regarding Revised Nondiscrimination Statement and "And Justice for All" Posters; Timelines and Guidance for Implementation (May 5, 2022) ("Supplemental Memorandum") (attached as Exhibit D) (collectively with the Cover Letter, Memorandum, and Memorandum Q&A, the "Memoranda").

7.      The Department compounded its errors by ignoring procedural requirements and issuing a final rule to formalize a new policy misapplying *Bostock*. Supplemental Nutrition Assistance Program: Civil Rights Update to the Federal-State Agreement, 87 Fed. Reg. 35,855 (June 14, 2022), https://bit.ly/3bDC4RA ("Final Rule") (attached as Exhibit

3

E). Instead of going through the legal process mandated by the Administrative Procedure Act ("APA"), the Department coopted a previously discarded proposed regulation from 2016 to issue the new Final Rule. Supplemental Nutrition Assistance Program: Civil Rights Update to the Federal-State Agreement, 81 Fed. Reg. 81,015 (Nov. 17, 2016) https://bit.ly/3aMNXVf ("Proposed Rule") (attached as Exhibit F).

8. Collectively, the Memoranda and Final Rule inappropriately expand the law far beyond what statutory text, regulatory requirements, judicial precedent, and the U.S. Constitution permit.

9. The Department claims that the interpretations in the Memoranda and Final Rule are required by the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). But *Bostock* was a narrow decision. The Court held only that terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of . . . sex" under Title VII of the Civil Rights act of 1964, 42 U.S.C. § 2000e-2. *Bostock*, 140 S. Ct. at 1737-38 (quoting 42 U.S.C. § 2000e-2(a)(1)).

10. The Department's Memoranda and Final Rule concern highly controversial and localized issues of enormous importance to the States, their subdivisions, affiliates, and citizens. The Department has no power to settle such issues, let alone by executive fiat without providing any opportunity for public comment.

11. Plaintiffs—the States of Tennessee, Indiana, Alabama, Alaska, Arizona, Arkansas, Georgia, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and West Virginia sue to prevent the Department from usurping authority that properly belongs to Congress, the States, and

4

the people and to eliminate the nationwide confusion and upheaval that the Department's Guidance has inflicted on States and regulated entities.

12.     To be clear, the States do not deny benefits based on a household member's sexual orientation or gender identity. But the States do challenge the unlawful and unnecessary new obligations and liabilities that the Memoranda and Final Rule attempt to impose—obligations that apparently stretch as far as ending sex-separated living facilities and athletics and mandating the use of biologically inaccurate preferred pronouns.

## PARTIES

13.     Plaintiff the State of Tennessee is a sovereign State and an employer subject to the requirements of the Memoranda and Final Rule.

14.     Tennessee is home to political subdivisions and other entities that are subject to the requirements of the Memoranda and Final Rule.

15.     Tennessee has entered into a Federal-State Agreement to operate the Supplemental Nutrition Assistance Program ("SNAP") within Tennessee and is thus subject to the requirements of the Memoranda and Final Rule.

16.     Tennessee operates programs and activities that receive funding and are thus subject to the Food and Nutrition Act.  7 U.S.C. §§ 2011-2036.

17.     In fiscal year 2020-2021, Tennessee received approximately $2,600,264,708 in federal funding to operate SNAP under the Food and Nutrition Act.  This includes approximately $102,192,555 for SNAP administration and $2,498,072,153 for SNAP benefits.

5

18.     Plaintiff the State of Indiana likewise has entered into a Federal-State Agreement to operate SNAP programs under the Food and Nutrition Act and thus is subject to the requirements of the Memoranda and Final Rule.

19.     Plaintiffs the States of Alabama, Alaska, Arizona, Arkansas, Georgia, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and West Virginia likewise have entered into Federal-State Agreements to operate SNAP programs under the Food and Nutrition Act and thus are subject to the requirements of the Memoranda and Final Rule.

20.     Each of the States receives significant federal funding for its SNAP-related programs.  The Department's own reporting shows that in Fiscal Year 2020, the Plaintiff States, combined, received approximately $28,675,549,470 in funding for SNAP benefits.  USDA Food and Nutrition Service Supplemental Nutrition Assistance Program, *Supplemental Nutrition Assistance Program State Activity Report Fiscal Year 2020*, at 8 (March 2022) https://bit.ly/3ouappp (attached as Exhibit G).

21.     These benefits were distributed to approximately 15,478,511 persons residing within the Plaintiff States. *Id*. at 6.

22.     Tennessee, Indiana, Alabama, Alaska, Arizona, Arkansas, Georgia, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and West Virginia would also incur various administrative and compliance costs if forced to comply with the requirements of the Memoranda and Final Rule.

6

23. Defendant United States Department of Agriculture is an executive agency of the federal government responsible for enforcement and administration of SNAP under the Food and Nutrition Act. 7 U.S.C. §§ 2011 et seq.

24. Defendant Thomas J. Vilsack is the United States Secretary of Agriculture responsible for the operation of the USDA. 7 U.S.C. § 2013. He is sued in his official capacity.

25. Defendant Cindy Long is the Administrator of the Food and Nutrition Service at the USDA and responsible for the operation of programs under the Food and Nutrition Act. She is sued in her official capacity.

26. Defendant Roberto Contreras is Director of the Food and Nutrition Service Civil Rights Division at the USDA. He is sued in his official capacity.

## JURISDICTION AND VENUE

27. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this case concerns whether the Department and its officials acted in compliance with the Administrative Procedure Act and other federal laws.

28. This Court has jurisdiction under 28 U.S.C. § 1346 because this case involves a claim against agencies and employees of the federal government.

29. This Court has jurisdiction under 28 U.S.C. § 1361 because the Court has jurisdiction over any case "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

30. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (1) Plaintiff Tennessee resides in this District; (2) Tennessee's agencies and employees subject to the agency actions at issue reside in the District; and (3) "a substantial part of the events or omissions giving rise to [Tennessee's] claim occurred" in this District.

7

31.     This Court has the authority to grant Plaintiffs the relief they request under the Administrative Procedure Act, 5 U.S.C. §§ 705-06; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; and 28 U.S.C. § 1361.

## FACTUAL ALLEGATIONS

**A. The Cooperative-Federalist Operation of the Supplemental Nutrition Assistance Program and The Department's Regulatory Changes to SNAP Federal-State Agreements.**

32.     Under the Food and Nutrition Act, SNAP provides support for vulnerable groups, including low-income working families, the elderly, those with physical or intellectual developmental disabilities, and others.  7 U.S.C. § 2014.

33.     The purpose of SNAP is to raise the "levels of nutrition among low-income households" because "establishing and maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of the Nation's agricultural abundance and will strengthen the nation's agricultural economy."  *Id.* § 2011.  For these reasons, and "to alleviate such hunger and malnutrition," Congress established SNAP to "permit low-income households to obtain a more nutritious diet through normal channels of trade."  *Id.*

34.     To effectuate SNAP, States enter into a Federal-State Agreement with the Department, outlining how States will administer SNAP.  7 U.S.C. § 2020; *see also* 7 C.F.R. Part §§ 272.2 et seq.  The Federal-State Agreement is the "legal agreement between the State and the Department of Agriculture" and "is the means by which the State elects to operate SNAP and to administer the program in accordance with the Food and Nutrition Act of 2008."  7 C.F.R. § 272.2(a)(2).

35.     The basic language and requirements of the Federal-State Agreements are set out in statute, 7 U.S.C. § 2020(d)-(e), and in regulation, 7 C.F.R. § 272.2(b).

8

36.    Federal-State Agreements must be signed by "the Governor of the State or authorized designee" and "be submitted" to the Department "within 120 days after publication of these regulations in final form." *Id.* § 272.2(e)(1).

37.    SNAP funding is also utilized for various ancillary work such as planning, outreach, and educational programs, which require similar agreements or State plans to be submitted to and approved by the Department and include requirements to adopt the Department's nondiscrimination policy. *See* 7 C.F.R. § 272.2(d)(1)-(2).

38.    States are already obligated to comply with and enact a nondiscrimination policy that prohibits "discriminat[ion] against any applicant or participant in any aspect of program administration, including, but not limited to, the certification of households, the issuance of coupons, the conduct of fair hearings, or the conduct of any other program service for reasons of age, race, color, sex, disability, religious creed, national origin, or political beliefs." 7 C.F.R. § 272.6(a). "Discrimination in any aspect of program administration is prohibited." *Id.*

39.    The Food and Nutrition Act itself specifies that State agencies are responsible for conducting SNAP programs on Indian reservations unless the tribal organization has, among other requirements, "ensure[d] that there shall be no discrimination in the operation of the program on the basis of . . . sex." 7 U.S.C. § 2020(d).

40.    States—including the Plaintiff States—do not discriminate in the distribution of SNAP-funded assistance based on age, race, color, sex, disability, religious creed, national origin, or political beliefs. Nor do the States deny SNAP certification of applicant households based on household members' sexual orientation or gender identity.

9

41.     Revisions to the Federal-State Plan, from the State or as required by the Department "shall be prepared and submitted for approval" in the same manner as the original planning documents.  7 C.F.R. § 272.2(f).

42.     States must also set up a complaint process, publicize these procedures and policies, collect data for the Department, and report that data.  *Id.* § 272.6(c)-(h).

43.     Moreover, State agencies and their affiliates administering SNAP must publish and abide by a "Nondiscrimination Statement," which the Department crafts and distributes.  *See* 7 C.F.R. § 272.6(f)(2).

44.     If the Department determines that a State is not compliant with the statutes or regulations governing SNAP, "the Secretary shall immediately inform such State agency of such failure and shall allow the State agency a specified period of time for the correction of such failure."  7 U.S.C. § 2020(g).

45.     "If the State agency does not correct such failure within that specified period" the Department may refer the matter to the Department of Justice to seek injunctive relief and "shall proceed to withhold from the State such funds . . . as the Secretary determines to be appropriate."  *Id.*

46.     One week after the 2016 Presidential Election, the outgoing Administration published the Proposed Rule to update the civil rights assurance language contained in the SNAP regulations contained in the Federal-State Agreement (FSA).  *See* Proposed Rule, 81 Fed. Reg. at 81,015.

47.     The original Proposed Rule merely amended the boilerplate language of the SNAP Federal-State Agreements to "comply with . . . Title IX of the Education Amendments of 1972 (42 U.S.C. 2000d *et seq.*)" so that "no person in the United States shall, on the grounds of

sex, race, color, age, political belief, religious creed, disability, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under SNAP." *Id.* at 81,017.

48. The original Proposed Rule also included new references to other civil rights laws already applicable to SNAP, including the Age Discrimination Act of 1975, 42 U.S.C. § 6101 et seq; Title II and Title III of the Americans with Disabilities Act of 1990 (ADA), as amended by the ADA Amendments Act of 2008, 42 U.S.C. §§ 12131-12189; and Executive Order 13166, "Improving Access to Persons with Limited English Proficiency." *Id.* at 81,017.

49. There is no mention of discrimination based on sexual orientation or gender identity in the Proposed Rule.

50. The public comment period was opened for sixty (60) days, during which only five (5) comments were submitted—two of which were beyond the scope of the regulation.

51. The public comment period closed on January 17, 2017, over five years ago.

52. None of the public comments addressed the issue of discrimination based on sexual orientation or gender identity because this change was not included in the Proposed Rule.

53. The only commenter who mentioned "sex" merely stated her understanding that "[t]he proposed rule will codify all of the civil rights language within Title IX of the Education Amendments of 1972 prohibiting discrimination based on sex for federally funded programs." Comment to Proposed Rule by Brittany Jones, FNS-2016-0078-0005 (Posted on Feb. 5, 2017), https://bit.ly/3Phippw.

54. The Proposed Rule was withdrawn from the unified regulatory agenda on June 23, 2017. *See* Office of Information and Regulatory Affairs, RIN 0584-AE51, Summary of

11

the Proposed Rule, https://bit.ly/3PiVv0T (last visited July 18, 2022) (indicating that the Proposed Rule was "withdrawn" on June 23, 2017).

**B. The Supreme Court Narrowly Held in *Bostock v. Clayton County* That Terminating an Employee Simply for Being Homosexual or Transgender Constitutes Sex Discrimination.**

55.     Three years later, the U.S. Supreme Court held in *Bostock* that Title VII's prohibition on employment discrimination "because of [an] individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), includes terminating that individual simply for being homosexual or transgender, because—under Title VII's precise wording—"[s]ex plays a necessary and undisguisable role" in such decisions, 140 S. Ct. at 1737.

56.     "[O]ther federal or state laws that prohibit sex discrimination," such as Title IX and the Food and Nutrition Act, were not "before" the Court. *Id.* at 1753.  The Court thus expressly declined to "prejudge" whether its decision in *Bostock* would "sweep beyond Title VII" to those other laws.  *Id.*

57.     The Court further specifically declined to consider whether employer conduct other than terminating an employee simply because the employee is homosexual or transgender—for example, "sex-segregated bathrooms, locker rooms, and dress codes"—would constitute actionable discrimination under Title VII.  *Id.*

58.     The Court assumed that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 1739.

59.     The Court did not consider or decide what the statutory phrase "on the basis of sex" means in Title IX or in the Food and Nutrition Act. 20 U.S.C. § 1681(a); 7 U.S.C. § 2020(d).

12

60.     Nor did the Court address Title IX's safe harbor for sex-separated living facilities.  *See* 20 U.S.C. § 1686; 34 C.F.R. § 106.33.

61.     Nor did the Court consider or decide questions about any other statute or any other form of alleged discrimination.

### C. President Biden's Administration Uses *Bostock* to Justify Its Misinterpretation of Title IX and Other Statutes and Threatens States with Enforcement Action.

62.     As one of his first official acts as President, President Biden declared that *Bostock*'s analysis changed the meaning of federal law regarding sex discrimination: "Under *Bostock*'s reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 *et seq.*), the Fair Housing Act, as amended (42 U.S.C. 3601 *et seq.*), and section 412 of the Immigration and Nationality Act, as amended (8 U.S.C. 1522), along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary."  Exec. Order No. 13,988, 86 Fed. Reg. 7023-25 (Jan. 20, 2021).

63.     Accordingly, President Biden directed federal agencies to "review all existing orders, regulations, guidance documents, policies, programs, or other agency actions" that either "(i) were promulgated or are administered by the agency under Title VII or any other statute or regulation that prohibits sex discrimination, including any that relate to the agency's own compliance with such statutes or regulations" or "(ii) are or may be inconsistent with the policy set forth" in the Executive Order.  *Id.*

64.     President Biden further directed that the "head of each agency shall, as soon as practicable, also consider whether there are additional actions that the agency should take to ensure that it is fully implementing the policy" set forth in the Executive Order.  *Id.*

65. Finally, President Biden directed that, within "100 days of the date of this order, the head of each agency shall develop, in consultation with the Attorney General, as appropriate, a plan to carry out actions that the agency has identified." *Id.*

66. On March 26, 2021, the Civil Rights Division of the Department of Justice ("DOJ") released a memorandum concluding that Title IX "prohibit[s] discrimination on the basis of gender identity and sexual orientation." DOJ, Memorandum Regarding Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), https://bit.ly/2WpV5zq ("DOJ Memorandum").

67. The DOJ Memorandum relied primarily on two post-*Bostock* cases. In the first, a divided panel of the U.S. Court of Appeals for the Fourth Circuit held that a school district violated Title IX by using sex-separated bathrooms. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied* 141 S. Ct. 2878 (with Justices Thomas and Alito noting that they would have granted the petition for writ of certiorari).

68. The second opinion the DOJ Memorandum relied on was *Adams v. School Board of St. Johns County*, 968 F.3d 1286 (11th Cir. 2020), but it is no longer of any effect. It was subsequently replaced by the panel with a narrower one that "d[id] not reach the Title IX question," *Adams v. School Board of St. Johns County*, 3 F.4th 1299, 1304 (11th Cir. 2021). The Eleventh Circuit then granted rehearing en banc and vacated even the narrower opinion. *Adams v. Sch. Bd. of St. Johns Cnty.*, 9 F.4th 1369 (11th Cir. 2021).

69. The DOJ Memorandum was contrary to what the author of the DOJ Memorandum, Pamela Karlan, told the U.S. Supreme Court during oral argument in *Bostock*: that sex-separated bathrooms are "not discriminatory because" no one is "subjected to a disadvantage."

Tr. of Oral Arg. at 12-13, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) (Nos. 17-1618, 17-1623).

70.    Despite her representation of private parties in *Bostock*, Pamela Karlan did not recuse herself from authoring the DOJ Memorandum.  Karlan recently resigned from DOJ amid reports that she was earning nearly $1 million a year from Stanford University while employed at DOJ.  Steven Nelson, *Anti-Trump Stanford law prof Pamela Karlan quietly leaves DOJ amid attacks on 'unethical' $1M salary*, N.Y. Post (July 12, 2022), https://bit.ly/3Pm9OBV.

71.    The U.S. Department of Education has also engaged in at least two agency actions to implement President Biden's executive order.

72.    *First*, on June 22, 2021, the Department of Education published an interpretation of Title IX in the Federal Register.  *See* Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021) ("Department of Education Interpretation").

73.    The Department of Education acknowledged that it "at times has stated that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity."  *Id.*

74.    Earlier in 2021, the Department of Education concluded that *Bostock* did *not* apply to Title IX or require a different interpretation of Title IX.  *See* U.S. Dep't of Educ., Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re: *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) (Jan. 8, 2021), https://bit.ly/3mwKI7H.

15

75.     The Department of Education's current view, however, is that "Title IX Prohibits Discrimination Based on Sexual Orientation and Gender Identity."   Department of Education Interpretation, 86 Fed. Reg. at 32,637.

76.     The Department of Education applied *Bostock's* Title VII interpretation to Title IX. *See id.* at 32,638 ("*Bostock*'s Application to Title IX"); *see also id.* ("[T]he Department has determined that the interpretation of sex discrimination set out by the Supreme Court in *Bostock*—that discrimination 'because of . . . sex' encompasses discrimination based on sexual orientation and gender identity—properly guides the Department's interpretation of discrimination 'on the basis of sex' under Title IX and leads to the conclusion that Title IX prohibits discrimination based on sexual orientation and gender identity.").

77.     The Department of Education first concluded that "[t]here is textual similarity between Title VII and Title IX." *Id.*

78.     The texts of Title VII and Title IX are materially different:

- **Title VII:** "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[] . . . ; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a).

- **Title IX:** "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

79.     Nevertheless, the Department of Education concluded that the phrase "on the basis of sex" in Title IX has the same meaning as the phrase "because of . . . sex" in Title VII. Department of Education Interpretation, 86 Fed. Reg. at 32,638.

16

80.     The Department of Education also cited decisions from federal courts of appeals that "recognize that Title IX's prohibition on sex discrimination encompasses discrimination based on sexual orientation and gender identity." *Id.* at 32,639 (collecting cases).

81.     The Department of Education omitted any mention of or citation to decisions from federal courts of appeals recognizing that "Title VII differs from Title IX in important respects" and that "principles announced in the Title VII context [do not] automatically apply in the Title IX context." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (noting that, "under Title IX, universities must consider sex in allocating athletic scholarships, 34 C.F.R. § 106.37(c), and may take it into account in 'maintaining separate living facilities for the different sexes.' 20 U.S.C. § 1686."); *cf. Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself.").

82.     The Department of Education further "conclude[d] that the interpretation set forth in this document is most consistent with the purpose of Title IX, which is to ensure equal opportunity and to protect individuals from the harms of sex discrimination." Department of Education Interpretation, 86 Fed. Reg. at 32,639.

83.     The Department of Education also noted that the "U.S. Department of Justice's Civil Rights Division has concluded that *Bostock*'s analysis applies to Title IX." *Id.*

84.     The Department of Education failed to mention that, just two months before the DOJ reached that conclusion about *Bostock*, it had reached the exact opposite conclusion. DOJ, Memorandum for the Civil Rights Division Regarding Application of *Bostock v. Clayton County* 4 (Jan. 17, 2021) ("*Bostock* does not require any changes to . . . sex-specific facilities or policies.").

17

85.     Finally, the Department of Education declared that it "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." Department of Education Interpretation, 86 Fed. Reg. at 32,638.

86.     The Department of Education also declared that its Interpretation "will guide the Department in processing complaints and conducting investigations." *Id.* at 32,639.

87.     *Second*, on June 23, 2021, Acting Assistant Secretary Suzanne B. Goldberg issued a "Dear Educator" Letter notifying Title IX recipients of the Department of Education Interpretation and reiterating that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." U.S. Dep't of Educ., Letter to Educators on Title IX's 49th Anniversary (June 23, 2021), https://bit.ly/3ksLLDj ("Dear Educator Letter").

88.     The Dear Educator Letter was accompanied by a "fact sheet" issued by the Civil Rights Division of the DOJ and the Office for Civil Rights ("OCR") at the Department of Education. DOJ & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools (June 2021), https://bit.ly/3sQjZnM ("Fact Sheet").

89.     The Fact Sheet purports to provide examples of what constitutes discrimination under Title IX.

90.     *Bostock* did not address any of the examples of purported discrimination identified in the Fact Sheet.

91.     In particular, the Fact Sheet indicates that preventing a transgender high school girl (a biological male) from using the girls' restroom would constitute discrimination. *See*

Fact Sheet at 1. *Bostock* expressly declined to resolve any questions about bathrooms, locker rooms, or the like. 140 S. Ct. at 1737.

92.     The Fact Sheet also indicates that preventing a transgender high school girl (a biological male) from "try[ing] out for the girls' cheerleading team" would constitute discrimination. Fact Sheet at 1. *Bostock* did not address athletics.

93.     The Fact Sheet suggests that failing to use a transgender student's preferred name or pronouns would constitute discrimination. *See id. Bostock* did not address that issue.

94.     Plaintiffs operate and are home to programs and activities subject to Title IX, and thus the Department of Education has pledged to enforce its Title IX interpretation against Plaintiffs.

95.     On June 17, 2021, for example, the Department of Education and DOJ filed a statement of interest in which they took the position that Title IX prohibits West Virginia from "categorically exclud[ing] transgender girls from participating in single-sex sports restricted to girls." Statement of Interest of the United States at 1, *B.P.J. v. W.V. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D. W. Va. June 17, 2021), ECF No. 42 (footnote omitted).

96.     In response, States sued to enjoin these and other unlawful regulatory actions of President Biden's Administration. *See Tennessee. v. U.S. Dept. of Educ.*, No. 3:21-cv-308 (E.D. Tenn.) (States' preliminary injunction motion granted and federal government's motion to dismiss denied on July 15, 2022); *Texas v. EEOC*, No. 2:21-CV-194-Z (N.D. Tex.) (federal government's motion to dismiss denied on May 26, 2022).

97.     The U.S. District Court for the Eastern District of Tennessee has preliminarily enjoined the Department of Education from enforcing its Interpretation, Dear Educator Letter, and Fact Sheet against Tennessee, Indiana, and 18 other States because those

documents violated the APA by "creat[ing] rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity that appear nowhere in *Bostock*, Title IX, or its implementing regulations." *Tennessee v. Dep't of Educ.*, No. 3:21-cv-308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022).

98. While those cases remain pending, President Biden continues to threaten States if they do not capitulate to the Federal Government's rewriting of Title IX and other statutes.

99. For example, a few months ago, the Biden Administration emphasized its commitment to "combatting" what it calls "legislative attacks on transgender kids at the state level." White House, *Fact Sheet: Biden-Harris Administration Advances Equality and Visibility Transgender Americans* (Mar. 31, 2022), https://bit.ly/3PeX5Rh.

100. President Biden has told the American public that "the onslaught of anti-transgender laws . . . is simply wrong" and that his "administration is standing up . . . against all these hateful bills." White House, *President Biden on Transgender Day of Visibility 2022* (Mar. 31, 2022), https://bit.ly/3OIfJRt.

101. Because Congress has declined the Biden Administration's call to rewrite Title IX and other statutes, Defendants are "expanding Federal non-discrimination protections" through acts such as these regulations masquerading as mere guidance. White House, *A Proclamation on Transgender Day of Visibility, 2022* (Mar. 30, 2022), https://bit.ly/3yea26Z.

102. According to President Biden, people are "made in the image of God" as "transgender, nonbinary, and gender nonconforming." *Id.*

103. In June 2022, President Biden released yet another executive order. *See* Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals, Exec. Order No. 14,075, 87 Fed. Reg. 37,189 (June 15, 2022).

104.    The executive order was designed to combat what it misleadingly calls "unrelenting political and legislative attacks at the State level—on LGBTQI+ children and families in particular"—that "threaten the civil rights gains of the last half century and put LGBTQI+ people at risk." *Id.* at 37,189; *see also* White House, *Remarks by President Biden at a Pride Month Reception and Signing of an Executive Order on Advancing LGBTQI+ Individuals* (June 15, 2022), https://bit.ly/3nu2Q1w (alleging that "[t]hree hundred discriminatory bills introduced in states across the country" are part of "the ultra-MAGA agenda attacking families and our freedoms").

105.    The Biden Administration's sweeping rhetoric treats normal practices, such as sex-separated bathrooms and athletics, as "discriminatory" even though DOJ and the Department of Education treated those as legal, nondiscriminatory practices as recently as last year.

106.    As part of the new executive order, President Biden has directed the Department of Education to "use the Department of Education's authorities to support LGBTQI+ students, their families, educators, and other school personnel targeted by harmful State and local laws and practices, and shall promote the adoption of promising policies and practices to support the safety, well-being, and rights of LGBTQI+ students." Exec. Order No. 14,075, 87 Fed. Reg. at 37,190. "Within 200 days of the date of this order, the Secretary of Education shall develop and release sample policies for supporting LGBTQI+ students' well-being and academic success in schools and educational institutions." *Id.*

**D. The USDA's Unlawful Actions.**

107.    Because the Department of Education has so far not prevailed in the States' lawsuits against its Interpretation, Dear Educator Letter, and Fact Sheet, President Biden's

Administration seemingly decided to use the USDA to accomplish its rewriting of Title IX through other means. In early May 2022, the Department issued the Memorandum directing States to incorporate its misapplication of *Bostock* into their Federal-State Agreements with USDA. *See* Memorandum at 1-2, https://bit.ly/3NuXnSx. In doing so, the Department relied on its misreading of *Bostock* and Executive Order 13,988 to determine "that discrimination based on gender identity and sexual orientation can constitute prohibited sex discrimination under Title IX and the Food and Nutrition Act." *Id.* at 2.

108. In the Memorandum, the USDA expressly adopts the DOJ's and the Department of Education's analyses "concluding that Title IX's prohibition on sex discrimination includes a prohibition on discrimination on the basis of gender identity and sexual orientation." *Id.* (citing DOJ Memorandum; now-enjoined Department of Education Interpretation).

109. The USDA directed state agencies and program operators to "expeditiously review their program discrimination complaint procedures and make any changes necessary to ensure complaints alleging discrimination on the basis of gender identity and sexual orientation are processed and evaluated as complaints of discrimination on the basis of sex" and directed that States "distribute this memorandum to local agencies, Program Operators and Sponsors, and all other subrecipients of Federal financial assistance." Memorandum at 3.

110. Attached to the Memorandum was a "questions and answers" document, which directs States to "update their program discrimination complaint processing procedures for allegations related to service and activities receiving federal financial assistance from the USDA to ensure discrimination complaints alleging sexual orientation and gender identity discrimination are processed as complaints of prohibited sex discrimination." Memorandum Q&A at 2.

111.     The Memorandum Q&A also asserted that these regulatory changes were "effective immediately" and that "additional guidance is forthcoming."  *Id.*

112.     Soon after issuing the Memorandum and Memorandum Q&A, the Department issued its "additional guidance" in the form of a Supplemental Memorandum, which imposed new obligations going far above and well beyond the "complaint procedure" requirements.

113.     Those obligations, which related to program posters and "Nondiscrimination Statements," laid bare the Department's novel and expansive new view of SNAP governance.  Consistent with its other pronouncements, the Department would prohibit discrimination on the basis of "gender identity" and "sexual orientation," not just "sex."  But more importantly, where the old policy prohibited discrimination only "in any program or activity conducted or funded by USDA," the new policy seemingly applies to each program-administering "institution" as a *whole*.

114.     Though there is a grace period of not issuing findings related to a state agency's inability to display the new posters and statements, there is no grace period for "accepting and processing discrimination complaints based on sexual orientation and gender identity" in SNAP or other Food and Nutrition Service programs.  Memorandum Q&A at 3.

115.     Perhaps in recognition of the procedural flaws with the Memoranda, the Department decided to dust off the long-shelved Proposed Rule.  The Department repurposed the Proposed Rule and used it to address issues nowhere contemplated in the original notice.  *See* Final Rule, 87 Fed. Reg. at 35,855, https://bit.ly/3bDC4RA.

116.     The Proposed Rule, which went through the notice and comment process over five years ago, was promulgated in 2016 and never went into effect.  As noted above, the

Proposed Rule received only five public comments, none of which addressed sexual orientation or gender identity. *See* Comments to Proposed Rule, FNS-2016-0078-0002 to -0006, (posted Feb. 5, 2017), https://bit.ly/3v5Iv6Y.

117.   The Department, using the 2016 Proposed Rule, inserted new language defining sex discrimination under Title IX as including sexual orientation and gender identity when it issued the Final Rule.  Final Rule, 87 Fed. Reg. at 35,857.  The Department made this change without providing an opportunity for public comment on this new language.

118.   In the process of recycling the Proposed Rule, the Department made a substantive change to the Final Rule requiring States to adopt language in their Federal-State Agreements to "[c]omply with . . . Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . to the effect that, no person in the United States shall, on the grounds of sex, *including gender identity and sexual orientation*, race, color, age political belief, religious creed, disability or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under SNAP."  Final Rule, 87 Fed. Reg. at 35,857 (emphasis added).

119.   States were provided with neither notice nor an opportunity to provide public comment on the Final Rule's expansion of Title IX and the Food and Nutrition Act to include discrimination based on sexual orientation or gender identity.

120.   The expansion of Title IX and the Food and Nutrition Act will affect the States' administration of SNAP.

**E.  The USDA Memoranda and Final Rule Irreparably Harm Plaintiff States**

121.   The USDA's Memorandum requires "State agencies" to "expeditiously review their program discrimination complaint procedures and make any changes necessary to ensure complaints alleging discrimination on the basis of gender identity and sexual orientation

are processed and evaluated as complaints of discrimination on the basis of sex." Memorandum at 3.

122. The USDA's Memorandum Q&A reiterates that "State agencies . . . have to update their program discrimination complaint processing procedures for allegations related to services and activities receiving federal financial assistance from the USDA to ensure discrimination complaints alleging sexual orientation and gender identity discrimination are processed as complaints of prohibited sex discrimination." Memorandum Q&A at 2. And it states that "there will not be a grace period." *Id.* at 3.

123. The USDA's Final Rule states that, to enter into any SNAP agreement, States must agree to prevent discrimination "on the grounds of sex, including gender identity and sexual orientation." Final Rule, 87 Fed. Reg. at 35,857.

124. Plaintiffs face an immediate requirement ("120 days after the publication of the regulations in final form") to accept the Final Rule's terms in SNAP Federal-State Agreements.

125. Plaintiffs also face an imminent deadline for the 2023 Supplemental Nutrition Assistance Program – Nutrition Education (SNAP-Ed). That program requires State entities to make incorporate the new USDA non-discrimination statement and policies to various projects and requires inclusion of certain non-discrimination statements to use federal funds. *See* FY 2023 Supplemental Nutrition Assistance Program Education Plan Guidance, U.S. Department of Agriculture Food and Nutrition Service, at 77, 159 (May 10, 2022), https://bit.ly/3IJLWWu (adopting the new USDA nondiscrimination statement and providing general guidance for FY 2023 and setting the deadline for submission as August 15, 2022).

126. Plaintiffs thus face an immediate threat that the USDA will enforce the Final Rule against Plaintiffs.

127. The Memoranda Q&A state that "there will not be a grace period" for changing discrimination complaint procedures. Memorandum Q&A at 3.

128. Plaintiffs thus face an immediate threat that the USDA will enforce the Memoranda against Plaintiffs.

129. The USDA stated that it would "ensur[e] consistent and robust enforcement of Title IX and the Food and Nutrition Act." Memorandum at 2.

130. Plaintiff the State of Tennessee maintains laws or policies that at least arguably conflict with the USDA's Memoranda and Final Rule. *See, e.g.*, Tenn. Code Ann. § 49-6-310 (providing that "[a] student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth"); *id.* § 49-2-805 (giving public school students, teachers, and employees a private right of action against a school that "intentionally allow[s] a member of the opposite sex to enter [a] multi-occupancy restroom or changing facility while other persons [are] present"); *id.* § 49-6-2904(b)(2) (providing students a right to "[e]xpress religious viewpoints in a public school"); *id.* § 49-7-2405(a)(2), (a)(10) (providing, with certain limitations, that public higher educational institutions in Tennessee "shall be committed to giving students the broadest possible latitude to speak, write, listen, challenge, learn, and discuss any issue" and that "no faculty will face adverse employment action for classroom speech").

131. Other Plaintiff States also maintain laws or policies that at least arguably conflict with Memoranda and Final Rule. *See, e.g.*, Ala. Code § 16-1-52(a)(2) (providing that "[a] public K-12 school may not allow a biological female to participate on a male team if there is a female team in a sport" or "allow a biological male to participate on a female team"); Alaska Stat. § 14.18.040 (allowing schools to provide "[s]eparate school-sponsored teams . . . for each sex");

Ark. Code Ann. § 6-1-107(c) (providing that sex designations for school-sponsored "athletic teams or sports" must be "based on biological sex"); Gender Integrity Reinforcement Legislation for Sports (GIRLS) Act, 2021 Ark. Act 953 (Apr. 29, 2021) (creating Ark. Code Ann. § 16-129-101 et seq.) (chapter number subject to change in final codification) (similar); Ariz. Rev. State § 15-120.02 (requiring that school athletic teams be designed based on biological sex, effective as of Sept. 24, 2022); Ind. Code § 20-33-13-4 (providing that "[a] male, based on a student's biological sex at birth…may not participate on an athletic team or sport…as being a female"); Ky. Rev. Stat. Ann. § 156.070(2)(g) (defining the sex of a student as the student's biological sex and prohibiting male students from competition on female teams); La. Stat. Ann. § 23:332 (prohibiting discrimination based on "sex" which Louisiana courts have confirmed includes only discrimination based on biological sex, not sexual orientation or gender identity, *see Louisiana Dep't of Justice v. Edwards*, 2017-0173 (La. App. 1 Cir. 11/1/17), 233 So. 3d 76, 81); Save Women's Sports Act, 2021 Mont. Laws, ch. 405 (similar); Neb. Rev. Stat. § 79-2,124 (providing that the "Nebraska Equal Opportunity in Education Act does not prohibit any educational institution from maintaining separate toilet facilities, locker rooms, or living facilities for the different sexes"); Okla. Stat. tit. 51, § 253(B) (prohibiting government entities from "substantially burden[ing] a person's free exercise of religion" unless the burden is the "least restrictive means of furthering [a] compelling governmental interest"); Okla. Stat. tit. 70, § 2119.2(B) (similar prohibition with respect to "public institution[s] of higher education"); Okla. Stat. tit. 70, § 2120 (protecting freedom of expression in public higher educational institutions); Okla. Admin. Code § 335:15-3-2(b)(5) (providing, in the employment context, that "Oklahoma Law may require that separate restroom facilities be provided employees of each sex"); W. Va. Code Ann. § 18B-20-2 (providing for freedom of expression in higher education); W. Va. Code Ann. § 21-3-12 (providing

27

for sex-separated water closets in workplaces and specifying that "[n]o person or persons shall be allowed to use the closets assigned to the opposite sex"); W. Va. Code Ann. § 21-3-13 (providing for separate dressing rooms and washing facilities in workplaces "for each sex"); W. Va. Const. art. 3, § 15 (guaranteeing religious liberty).

132.    Enforcement of the USDA's Memoranda or a refusal to accept the Final Rule's terms could cause Plaintiff States to lose significant federal funds from the USDA.

133.    Because the Memoranda and Final Rule appear to stretch beyond compliance with the Food and Nutrition Act and may impact Plaintiff States' Title IX policies more generally, the USDA's actions could trigger Title IX enforcement action by the Department of Education, which also enforces Title IX.

134.    The Memoranda and Final Rule, with their rewriting of Title IX, could cause Plaintiff States to lose significant federal funds.

135.    Plaintiffs adopted their laws and policies, and established sex-separated restrooms, locker rooms, showers, residence halls, and other living facilities in reliance on their understanding that Title IX does not (and could not) prohibit those laws, policies, and practices. This understanding was based on the text of Title IX itself, longstanding federal regulations, and prior guidance—including initial post-*Bostock* guidance from the Department of Education and the DOJ.

136.    The Memoranda and Final Rule undermine Plaintiffs' reliance interests and create regulatory uncertainty for Plaintiffs and other regulated entities.

137.    Adopting the Memoranda and Final Rule just weeks before the beginning of the new school year would also undermine Plaintiffs' reliance interests and create significant

28

logistical obstacles to ensure compliance. Plaintiffs would incur significant administrative and compliance costs if forced to comply with the Memoranda and Final Rule.

138. The Memoranda and Final Rule interfere with Plaintiffs' sovereign authority to enforce and administer their laws and to carry out important government functions.

139. The Memoranda and Final Rule impose immediate administrative and compliance costs and burdens on Plaintiffs and other regulated entities.

140. The Memoranda and Final Rule violate the protections of the First Amendment, and it is well settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quotation marks omitted).

**COUNT I**
**USDA Memoranda Are**
**Agency Action Without Observance of Procedures Required by Law**
**5 U.S.C. § 706**

141. The allegations in all preceding Paragraphs are reincorporated herein.

142. The Administrative Procedure Act (APA) requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

143. The USDA's Memoranda are final agency actions subject to judicial review. *Id.* § 706(2)(A)-(D).

144. The USDA's Memoranda impose "rules" under the APA. *Id.* § 701(b)(2).

145. The USDA is an "agency" under the APA. *Id.* § 701(b)(1).

29

146. The APA requires agencies to engage in "notice and comment" for legislative rules. *Id.* § 553(b).

147. The USDA's Memoranda are legislative rules because they "intend[] to create new law, rights or duties" and thus should have been subject to notice and comment. *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (quoting *Michigan v. Thomas*, 805 F.2d 176, 183 (6th Cir. 1986)).

148. The Memoranda "seek[] to amend, rather than merely clarify," what Title IX requires. *Id.* at 1043.

149. The Memoranda "effec[t] a substantive change in the regulations" the USDA has already issued—and any agency action that "adopt[s] a new position inconsistent with any of the Secretary's existing regulations" is a legislative rule requiring notice and comment. *Id.* at 1042 (first alteration in original) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)).

150. Because the Memoranda are legislative rules that were adopted without the required notice-and-comment procedures, they are unlawful and should be "set aside." 5 U.S.C. § 706(2).

## COUNT II
## USDA Final Rule Is
## Agency Action Without Observance of Procedures Required by Law
## 5 U.S.C. § 706

151. The allegations in all preceding Paragraphs are reincorporated herein.

152. The APA requires an agency engaging in notice-and-comment rulemaking to publish in its notice of proposed rulemaking "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

30

153.     To satisfy that requirement, an agency's final action must be a logical outgrowth of its proposed rule.

154.     The USDA's Proposed Rule made no mention of gender identity or sexual orientation.

155.     The USDA's Proposed Rule did not provide notice that it intended to impose requirements related to "discrimination" on the basis of gender identity or sexual orientation.

156.     The USDA's Final Rule imposes non-discrimination requirements that include "discrimination" on the basis of "gender identity and sexual orientation."  Final Rule, 87 Fed. Reg. at 35,857.

157.     The USDA's Final Rule is not a logical outgrowth of its notice of proposed rulemaking.

158.     The USDA failed to provide adequate notice and a fair opportunity for comment as required by the APA.

159.     Because the Final Rule failed to properly comply with the required notice-and-comment procedures, it is unlawful and should be vacated or "set aside."  5 U.S.C. § 706(2).

## COUNT III
### USDA Memoranda Are
### Agency Action That Is Arbitrary and Capricious
### 5 U.S.C. § 706

160.     The allegations in all preceding Paragraphs are reincorporated herein.

161.     The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

31

162.    An "arbitrary and capricious regulation . . . is itself unlawful and receives no *Chevron* deference." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

163.    "When an agency changes its existing position, it . . . must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* at 2125-26 (quoting *FCC*, 556 U.S. at 515). An "'[u]nexplained inconsistency' in agency policy 'is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* (alteration in original) (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

164.    The USDA's Memoranda are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the USDA concurs with and adopts the DOJ's and Department of Education's analyses of Title IX with no explanation.

165.    The USDA's Memoranda are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the USDA failed to consider the Memoranda's effect on the reliance and religious interests of the regulated parties, alternatives that would avoid a rushed enforcement time before the new school year begins, and federalism interests of States, among other things.

166.    The USDA's Memoranda are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the USDA fails to acknowledge that those analyses were changes in position from existing regulations and initial post-*Bostock* guidance. Moreover, the USDA fails to acknowledge that the States are challenging those DOJ and Department of Education analyses of Title IX in the federal courts or that the authority cited in those analyses has been weakened.

32

167.     The USDA's Memoranda are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because their purported clarifications are premised on a misreading and unwarranted extension of *Bostock*.  The USDA cannot point to *Bostock* to justify its interpretations because *Bostock* concerned only Title VII; *Bostock* expressly disclaimed application to "other federal or state laws that prohibit sex discrimination"—like Title IX and the Food and Nutrition Act—and expressly did not "prejudge any such questions."  140 S. Ct. at 1753. Since "Title VII differs from Title IX in important respects," "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context."  *Meriwether*, 992 F.3d at 510 n.4.

168.     Because the USDA's Memoranda are arbitrary and capricious, they are unlawful and should be "set aside."  5 U.S.C. § 706(2).

**COUNT IV**
**USDA Final Rule Is**
**Agency Action That Is Arbitrary and Capricious**
**5 U.S.C. § 706**

169.     The allegations in all preceding Paragraphs are reincorporated herein.

170.     The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

171.     An "arbitrary and capricious regulation . . . is itself unlawful and receives no *Chevron* deference."  *Encino Motorcars*, 136 S. Ct. at 2126.

172.     "When an agency changes its existing position, it . . . must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* at 2125-26 (quoting *FCC*, 556 U.S. at 515). An "'[u]nexplained inconsistency' in agency policy

33

'is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* (alteration in original) (quoting *Brand X*, 545 U.S. at 981).

173. The USDA's Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the USDA incorporates the DOJ's and Department of Education's analyses of Title IX with no explanation.

174. The USDA's Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the USDA failed to consider its effect on the reliance and religious interests of the regulated parties, alternatives that would avoid a rushed enforcement time before the new school year begins, and federalism interests of States, among other things.

175. The USDA's Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the USDA fails to acknowledge its change in position from existing regulations and initial post-*Bostock* guidance. Moreover, the USDA fails to acknowledge that the States are challenging the DOJ's and Department of Education's analyses of Title IX in the federal courts or that the authority cited in those analyses has been weakened.

176. The USDA's Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because it is premised on a misreading and unwarranted extension of *Bostock*. The USDA cannot point to *Bostock* to justify its interpretations because *Bostock* concerned only Title VII; *Bostock* expressly disclaimed application to "other federal or state laws that prohibit sex discrimination"—like Title IX and the Food and Nutrition Act—and expressly did not "prejudge any such questions." 140 S. Ct. at 1753. And since "Title VII differs from Title IX in important respects," "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether*, 992 F.3d at 510 n.4.

177.    Because the USDA's Final Rule is arbitrary and capricious, it is unlawful and should be "set aside."  5 U.S.C. § 706(2).

## COUNT V
### USDA Memoranda Are
### Agency Action That Is Contrary to Title IX
### 5 U.S.C. § 706

178.    The allegations in all preceding Paragraphs are reincorporated herein.

179.    The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

180.    The USDA's Memoranda are contrary to law and exceed the Department's statutory authority because *Bostock*'s interpretation of Title VII's language is inapplicable to Title IX's materially different language.

181.    The USDA's Memoranda are contrary to law and exceed the Department's statutory authority because, properly interpreted, Title IX's prohibition of discrimination "on the basis of sex" does not encompass discrimination based on sexual orientation or gender identity.

182.    The USDA's Memoranda are contrary to law and exceed the Department's statutory authority because, properly interpreted, Title IX and longstanding Department regulations expressly permit distinctions based on biological sex in certain circumstances.

183.    Because the USDA's Memoranda are contrary to Title IX and exceed the Department's statutory authority, they are unlawful and should be "set aside."

## COUNT VI
### USDA Memoranda
### Agency Action That Is Contrary to the Food and Nutrition Act
### 5 U.S.C. § 706

184.    The allegations in all preceding Paragraphs are reincorporated herein.

185.     The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

186.     The USDA's Memoranda are contrary to law and exceed the Department's statutory authority because *Bostock*'s interpretation of Title VII's language is inapplicable to the Food and Nutrition Act.

187.     Because the USDA's Memoranda are contrary to the Food and Nutrition Act and exceed the Department's statutory authority, they are unlawful and should be "set aside."

**COUNT VII**
**USDA Final Rule Is**
**Agency Action That Is Contrary to Title IX**
**5 U.S.C. § 706**

188.     The allegations in all preceding Paragraphs are reincorporated herein.

189.     The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

190.     The USDA's Final Rule is contrary to law and exceeds the Department's statutory authority because *Bostock*'s interpretation of Title VII's language is inapplicable to Title IX's materially different language.

191.     The USDA's Final Rule is contrary to law and exceeds the Department's statutory authority because, properly interpreted, Title IX's prohibition of discrimination "on the basis of sex" does not encompass discrimination based on sexual orientation or gender identity.

36

192.     The USDA's Final Rule is contrary to law and exceeds the Department's statutory authority because, properly interpreted, Title IX and longstanding Department regulations expressly permit distinctions based on biological sex in certain circumstances.

193.     Because the USDA's Final Rule is contrary to Title IX and exceeds the Department's statutory authority, it is unlawful and should be "set aside."

## COUNT VIII
## USDA Final Rule Is
## Agency Action That Is Contrary to the Food and Nutrition Act
## 5 U.S.C. § 706

194.     The allegations in all preceding Paragraphs are reincorporated herein.

195.     The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

196.     The USDA's Final Rule is contrary to law and exceeds the Department's statutory authority because *Bostock*'s interpretation of Title VII's language is inapplicable to the Food and Nutrition Act.

197.     Because the USDA's Final Rule is contrary to the Food and Nutrition Act and exceeds the Department's statutory authority, it is unlawful and should be "set aside."

## COUNT IX
## USDA Memoranda Are
## Agency Action That Violates the Spending Clause
## 5 U.S.C. § 706, U.S. Const. art. I, § 8

198.     The allegations in all preceding Paragraphs are reincorporated herein.

199.     The USDA's Memoranda are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction,

authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because they violate the Spending Clause of the U.S. Constitution.

200. The Spending Clause authorizes Congress to "attach conditions on the receipt of federal funds," but the "spending power is of course not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987).

201. One such limit is that, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (cleaned up) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

202. Another limit is that Congress may not use its spending power to "indirectly coerce[] a State to adopt a federal regulatory system as its own." *NFIB v. Sebelius*, 567 U.S. 519, 578 (2012) (opinion of Roberts, C.J.).

203. The Memoranda violate the Spending Clause because they purport to impose obligations on Plaintiffs that Congress did not clearly impose when it enacted Title IX or the Food and Nutrition Act, contrary to the requirement that Congress must "unambiguously" notify the States of any conditions attached to the funds. *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).

204. The Memoranda also violate the Spending Clause because they place in jeopardy a significant amount of Plaintiffs' federal funding if they refuse or otherwise fail to comply with the Department's new interpretation of Title IX and the Food and Nutrition Act, leaving Plaintiffs with "no real option but to acquiesce" in the interpretation. *See NFIB*, 567 U.S. at 587 (opinion of Roberts, C.J.).

205. Because the USDA's Memoranda violate the Spending Clause, they are unlawful and should be "set aside." 5 U.S.C. § 706(2).

**COUNT X**
**USDA Final Rule Is**
**Agency Action That Violates the Spending Clause**
**5 U.S.C. § 706, U.S. Const. art. I, § 8**

206. The allegations in all preceding Paragraphs are reincorporated herein.

207. The USDA's Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the Spending Clause of the U.S. Constitution.

208. The Spending Clause authorizes Congress to "attach conditions on the receipt of federal funds," but the "spending power is of course not unlimited." *Dole*, 483 U.S. at 206-07.

209. One such limit is that, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (cleaned up) (quoting *Pennhurst*, 451 U.S. at 17).

210. Another limit is that Congress may not use its spending power to "indirectly coerce[] a State to adopt a federal regulatory system as its own." *NFIB*, 567 U.S. at 578 (opinion of Roberts, C.J.).

211. The Final Rule violates the Spending Clause because it purports to impose obligations on Plaintiffs that Congress did not clearly impose when it enacted Title IX and the Food and Nutrition Act, contrary to the requirement that Congress must "unambiguously" notify

the States of any conditions attached to the funds. *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).

212.    The Final Rule also violates the Spending Clause because it places in jeopardy a significant amount of Plaintiffs' federal funding if they refuse or otherwise fail to comply with the Department's new interpretation of Title IX or the Food and Nutrition Act, leaving Plaintiffs with "no real option but to acquiesce" in the interpretation. *See NFIB*, 567 U.S. at 587 (opinion of Roberts, C.J.).

213.    Because the Final Rule violates the Spending Clause, it is unlawful and should be "set aside." 5 U.S.C. § 706(2).

### COUNT XI
### USDA Memoranda Are
### Agency Action That Violates the Spending Clause and First Amendment
### 5 U.S.C. § 706, U.S. Const. art. I, § 8, U.S. Const. amend. I

214.    The allegations in all preceding Paragraphs are reincorporated herein.

215.    The USDA's Memoranda are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because they violate the First Amendment to the U.S. Constitution, condition the receipt of federal funds on recipients violating the First Amendment rights of others, and condition existing funding on new and unexpected restrictions on recipients' First Amendment rights.

216.    The Sixth Circuit has held that requiring a state university professor to use a transgender student's preferred pronouns violates the professor's First Amendment rights. *See Meriwether*, 992 F.3d at 511-12.

217.    The Memoranda also conflict with the First Amendment's protection of religious liberty.

218.     The Memoranda infringe on Plaintiffs' sovereign authority to enact and enforce laws that protect the First Amendment rights of their citizens.

219.     To the extent the Memoranda require Plaintiffs to adopt policies or engage in conduct that would infringe on First Amendment rights, the Memoranda impose unconstitutional conditions on Plaintiffs' receipt of federal funds. *See, e.g., Dole*, 483 U.S. at 210 (explaining that the spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional").

220.     Plaintiffs also have First Amendment rights, which include the right not to express messages they do not want to express. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 219-20 (2015). That is particularly true regarding speech on controversial topics such as sexual orientation and gender identity. *See Bongo Prods., LLC v. Lawrence*, No. 3:21-cv-00490, 2022 WL 1557664, at *1, *16-17 (M.D. Tenn. May 17, 2022).

221.     The Memoranda would force Plaintiffs to post posters, rewrite policies, enforce policies, and otherwise engage in actions that express messages Plaintiffs do not agree with.

222.     The Memoranda seem to force Plaintiffs and their employees to engage in biologically inaccurate speech and to forbid biologically accurate speech due to the USDA's essentially moral judgment on the meaning of "sex." *See Epperson v. Arkansas*, 393 U.S. 97, 106 (1968).

223.     Title IX and the Food and Nutrition Act did not clearly impose such a curtailing of Plaintiffs' First Amendment rights, and the Memoranda place significant federal funding in jeopardy if Plaintiffs' do not express these newly required messages.

224.     Because the USDA's Memoranda violate the First Amendment and impose unconstitutional conditions on federal funding, they are unlawful and should be "set aside." 5 U.S.C. § 706(2).

## COUNT XII
## USDA Final Rule Is
## Agency Action That Violates the Spending Clause and First Amendment
## 5 U.S.C. § 706, U.S. Const. art. I, § 8, U.S. Const. amend. I

225.     The allegations in all preceding Paragraphs are reincorporated herein.

226.     The USDA's Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the First Amendment to the U.S. Constitution, conditions the receipt of federal funds on recipients violating the First Amendment rights of others, and conditions existing funding on new and unexpected restrictions on recipients' First Amendment rights.

227.     The Sixth Circuit has held that requiring a state university professor to use a transgender student's preferred pronouns violates the professor's First Amendment rights. *See Meriwether*, 992 F.3d at 511-12.

228.     The Final Rule also conflicts with the First Amendment's protection of religious liberty.

229.     The Final Rule infringes on Plaintiffs' sovereign authority to enact and enforce laws that protect the First Amendment rights of their citizens.

230.     To the extent the Final Rule requires Plaintiffs to adopt policies or engage in conduct that would infringe on First Amendment rights, the Final Rule imposes unconstitutional conditions on Plaintiffs' receipt of federal funds. *See, e.g., Dole*, 483 U.S. at 210 (explaining that

42

the spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional").

231.    Plaintiffs also have First Amendment rights, which include the right not to express messages they do not want to express. *See Walker*, 576 U.S. at 219-20.  That is particularly true regarding speech on controversial topics such as sexual orientation and gender identity.  *See Bongo Prods*, 2022 WL 1557664, at *1, *16-17.

232.    The Final Rule would force Plaintiffs to post posters, rewrite policies, enforce policies, and otherwise engage in actions that express messages Plaintiffs do not agree with.

233.    The Final Rule seems to force Plaintiffs and their employees to engage in biologically inaccurate speech and to forbid biologically accurate speech due to the USDA's essentially moral judgment on the meaning of "sex." *See Epperson*, 393 U.S. at 106.

234.    Title IX and the Food and Nutrition Act did not clearly impose such a curtailing of Plaintiffs' First Amendment rights, and the Final Rule places significant federal funding in jeopardy if Plaintiffs do not express these newly required messages.

235.    Because the USDA's Final Rule violates the First Amendment and imposes unconstitutional conditions on federal funding, it is unlawful and should be "set aside."  5 U.S.C. § 706(2).

## COUNT XIII
## USDA Memoranda Are
## Agency Action That Violates the Tenth Amendment and the Anticommandeering Doctrine
## 5 U.S.C. § 706, U.S. Const. amend. X

236.    The allegations in all preceding Paragraphs are reincorporated herein.

237.    The USDA's Memoranda are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction,

43

authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because they violate the Tenth Amendment to the U.S. Constitution, *see* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (explaining that Congress must make "clear and manifest" its purpose to supersede powers historically reserved to the States).

238.    The Tenth Amendment and structure of the Constitution also deprive Congress of "the "the power to issue direct orders to the governments of the States," *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018), and forbid the federal government from commandeering state officers "into administering federal law," *Printz v. United States*, 521 U.S. 898, 928 (1997).

239.    The Memoranda commandeer Plaintiffs and their employees into enforcing federal policy by threatening Plaintiff States' SNAP funding and funding for entities subject to Title IX.  If the Memoranda are left in effect, Plaintiff States have no real choice but to allow their employees to be commandeered and used to enforce the Department's policy.

240.    Because the Department's Memoranda violate the Tenth Amendment, they are unlawful and should be "set aside."  5 U.S.C. § 706(2).

**COUNT XIV**
**USDA Final Rule Is**
**Agency Action That Violates the Tenth Amendment and the Anticommandeering Doctrine**
**5 U.S.C. § 706, U.S. Const. amend. X**

241.    The allegations in all preceding Paragraphs are reincorporated herein.

242.    The USDA's Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the Tenth Amendment to the U.S. Constitution, *see* U.S. Const. amend. X ("The powers not delegated to the United States

by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."); *Rice*, 331 U.S. at 230 (explaining that Congress must make "clear and manifest" its purpose to supersede powers historically reserved to the States).

243. The Tenth Amendment and structure of the Constitution also deprive Congress of "the "the power to issue direct orders to the governments of the States," *Murphy*, 138 S. Ct. at 1476, and forbid the federal government from commandeering State officers "into administering federal law," *Printz*, 521 U.S. at 928.

244. The Final Rule commandeers Plaintiffs and their employees into enforcing federal policy by threatening Plaintiff States' SNAP funding and funding for entities subject to Title IX. If the Final Rule is left in effect, Plaintiff States have no real choice but to allow their employees to be commandeered and used to enforce the Department's policy.

245. Because the Department's Final Rule violates the Tenth Amendment and the Anticommandeering Doctrine, it is unlawful and should be "set aside." 5 U.S.C. § 706(2).

## COUNT XV
### USDA Memoranda Are
### Agency Action That Violates the Separation of Powers and the Non-Delegation Doctrine
### 5 U.S.C. § 706, U.S. Const. art. I, § 1

246. The allegations in all preceding Paragraphs are reincorporated herein.

247. The USDA's Memoranda are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because they are so removed from any reasonable reading of Title IX and the Food and Nutrition Act that they amount to an unconstitutional exercise of legislative power, *see* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in . . . Congress.").

248.     Under U.S. Supreme Court precedent, "a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).  Congress must offer "specific restrictions" that "meaningfully constrain[]" the agency's exercise of authority.  *Touby v. United States*, 500 U.S. 160, 166-67 (1991).

249.     Moreover, Congress must "speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quotation omitted); *see West Virginia v. EPA*, 142 S. Ct. 2587, 2607-10 (2022).  Both the "separation of powers principles and a practical understanding of legislative intent" require that a federal agency "must point to clear congressional authorization for the authority it claims." *Id.* at 2609 (quotation omitted).

250.     Congress did not clearly delegate to the Department the authority to resolve this major question or to rewrite Title IX or the Food and Nutrition Act as the Memoranda have attempted to do here, *see id.* at 2609-10, and any such delegation would be unconstitutional.

251.     Because the Memoranda exceed the Department's authority and violate separation-of-powers principles and the non-delegation doctrine, they are unlawful and should be "set aside."  5 U.S.C. § 706(2).

### COUNT XVI
### USDA Final Rule Is
### Agency Action That Violates the Separation of Powers and the Non-Delegation Doctrine
### 5 U.S.C. § 706, U.S. Const. art. I, § 1

252.     The allegations in all preceding Paragraphs are reincorporated herein.

253.     The USDA's Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction,

46

authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it is so removed from any reasonable reading of Title IX and the Food and Nutrition Act that it amounts to an unconstitutional exercise of legislative power, *see* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in . . . Congress.").

254.     Under U.S. Supreme Court precedent, "a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Gundy*, 139 S. Ct. at 2123.  Congress must offer "specific restrictions" that "meaningfully constrain[]" the agency's exercise of authority.  *Touby*, 500 U.S. at 166-67.

255.     Moreover, Congress must "speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (quotation omitted); *see West Virginia*, 142 S. Ct. at 2607-10.  Both the "separation of powers principles and a practical understanding of legislative intent" require that a federal agency "must point to clear congressional authorization for the authority it claims." *Id.* at 2609 (quotation omitted).

256.     Congress did not clearly delegate to the Department the authority to resolve this major question or to rewrite Title IX or the Food and Nutrition Act as the Final Rule has attempted to do here, *see id.* at 2609-10, and any such delegation would be unconstitutional.

257.     Because the Final Rule exceeds the Department's authority and violates separation-of-powers principles and the non-delegation doctrine, it is unlawful and should be "set aside."  5 U.S.C. § 706(2).

## COUNT XVII
## USDA Memoranda and Final Rule
## Declaratory Judgment
## 5 U.S.C. § 706, 28 U.S.C. § 2201

258.    The allegations in all preceding Paragraphs are reincorporated herein.

259.    The USDA's Memoranda are unlawful because they are legislative rules that did not undergo notice and comment.

260.    The USDA's Memoranda are unlawful because they are arbitrary and capricious.

261.    The USDA's Memoranda are contrary to law because they violate Title IX, the Food and Nutrition Act, and the Constitution.

262.    The Memoranda exceed the USDA's statutory authorization.

263.    Plaintiffs are entitled to a declaration that the USDA's Memoranda are invalid and cannot be enforced against Plaintiffs.

264.    The USDA's Final Rule is unlawful because the Department failed to provide adequate notice and a fair opportunity for comment as required by the APA.

265.    The USDA's Final Rule is unlawful because it is arbitrary and capricious.

266.    The USDA's Final Rule is contrary to law because it violates Title IX, the Food and Nutrition Act, and the Constitution.

267.    The Final Rule exceeds the USDA's statutory authorization.

268.    Accordingly, Plaintiffs are entitled to a declaration that the USDA's Final Rule is invalid and cannot be enforced against Plaintiffs.

## REQUEST FOR RELIEF AND DEMAND FOR JUDGMENT

A.      A declaratory judgment holding unlawful the Department's Memoranda and Final Rule.

B.      A declaratory judgment holding that Plaintiffs are not bound by the Department's Memoranda and Final Rule.

C.      A declaratory judgment affirming that the Department may neither penalize nor withdraw federal funding from Plaintiffs and Title IX and Food and Nutrition Act recipients located in the Plaintiff States that continue to separate students by biological sex in appropriate circumstances.

D.      A declaratory judgment that the Department may neither penalize nor withdraw federal funding from Plaintiffs and Title IX and Food and Nutrition Act recipients located in Plaintiff States that maintain showers, locker rooms, bathrooms, residential facilities, and other living facilities separated by biological sex or regulate each individual's access to those facilities based on the individual's biological sex.

E.      A declaratory judgment that the Department may neither penalize nor withdraw federal funding from Plaintiffs and Title IX and Food and Nutrition Act recipients located in Plaintiff States that do not require employees or students to use a transgender individual's preferred pronouns.

F.      A declaratory judgment that the Department may neither penalize nor withdraw federal funding from Plaintiffs and Title IX and Food and Nutrition Act recipients located in Plaintiff States that maintain athletic teams separated by biological sex or from assigning an individual to a team based on the individual's biological sex.

G.      A declaratory judgment holding that the Department lacked authority to issue the Memoranda and Final Rule.

49

H.      A judgment setting aside the Memoranda and Final Rule.

I.      A preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Memoranda and Final Rule.

J.      All other relief to which Plaintiffs are entitled.


Dated: <u>July 26, 2022</u>

Respectfully Submitted,


<u>/s/ Brandon J. Smith (BPR # 037272)</u>
HERBERT H. SLATERY III
  *Attorney General and Reporter of Tennessee*
ANDRÉE S. BLUMSTEIN
  *Solicitor General*
CLARK L. HILDABRAND
BRANDON J. SMITH
  *Assistant Solicitors General*
J. MATTHEW RICE*
  *Special Assistant to the Solicitor General*
TRAVIS J. ROYER
  *Office of the Solicitor General Honors Fellow*
Office of the Tennessee Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
(615) 532-4081
Brandon.Smith@ag.tn.gov
  ***Counsel for State of Tennessee***

/s/ Melinda Holmes
THEODORE E. ROKITA
  *Attorney General of Indiana*
THOMAS M. FISHER*
  *Solicitor General*
MELINDA HOLMES*
  *Deputy Attorney General*
Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington St.
Indianapolis, IN 46204
(317) 232-6255
Melinda.Holmes@atg.in.gov
  ***Counsel for State of Indiana***

/s/ Edmond G. LaCour Jr.
STEVE MARSHALL
  *Attorney General of Alabama*
EDMUND G. LACOUR JR.*
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov
  **Counsel for State of Alabama**


/s/ Charles E. Brasington
TREG R. TAYLOR
  *Attorney General of Alaska*
CHARLES E. BRASINGTON*
JUSTIN NELSON*
  *Assistant Attorneys General*
State of Alaska
P.O. Box 110300
Juneau, AK 99811
(907) 465-3600
Charles.Brasington@alaska.gov
  **Counsel for State of Alaska**


/s/ Kate B. Sawyer
MARK BRNOVICH
  *Attorney General of Arizona*
KATE B. SAWYER*
  *Assistant Solicitor General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Kate.Sawyer@azag.gov
  **Counsel for State of Arizona**

/s/ Nicholas J. Bronni
LESLIE RUTLEDGE
  *Attorney General of Arkansas*
NICHOLAS J. BRONNI*
  *Solicitor General*
Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-6307
nicholas.bronni@arkansasag.gov
  **Counsel for State of Arkansas**


/s/ Stephen J. Petrany
CHRISTOPHER M. CARR
  *Attorney General of Georgia*
STEPHEN J. PETRANY*
  *Solicitor General*
DREW WALDBESER*
  *Deputy Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square, S.W.
Atlanta, GA 30334
(404) 458-3378
dwaldbeser@law.ga.gov
  **Counsel for State of Georgia**


/s/ Kurtis K. Wiard
DEREK SCHMIDT
  *Attorney General of Kansas*
KURTIS K. WIARD*
  *Assistant Solicitor General*
Office of the Kansas Attorney General
120 S.W. 10th Ave.
Topeka, KS 66612
(785) 296-2215
kurtis.wiard@ag.ks.gov
  **Counsel for State of Kansas**

/s/ Marc Manley
DANIEL CAMERON
 *Attorney General of Kentucky*
MARC MANLEY*
 *Assistant Attorney General*
Office of the Kentucky Attorney General
700 Capital Ave., Suite 118
Frankfort, KY 40601
(502) 696-5300
Marc.Manley@ky.gov
**Counsel for Commonwealth of Kentucky**

/s/ Elizabeth B. Murrill
JEFF LANDRY
 *Attorney General of Louisiana*
ELIZABETH B. MURRILL*
 *Solicitor General*
J. SCOTT ST. JOHN*
 *Deputy Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6766
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov
**Counsel for State of Louisiana**

/s/ Justin L. Matheny
LYNN FITCH
 *Attorney General of Mississippi*
JUSTIN L. MATHENY*
 *Deputy Solicitor General*
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov
**Counsel for State of Mississippi**

/s/ D. John Sauer
ERIC S. SCHMITT
 *Attorney General of Missouri*
D. JOHN SAUER*
 *Solicitor General*
Office of the Missouri Attorney General
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
John.Sauer@ago.mo.gov
**Counsel for the State of Missouri**

/s/ Christian B. Corrigan
AUSTIN KNUDSEN
 *Attorney General of Montana*
DAVIS M.S. DEWHIRST*
 *Solicitor General*
CHRISTIAN B. CORRIGAN*
 *Deputy Solicitor General*
Office of the Montana Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620
(406) 444-2707
Christian.Corrigan@mt.gov
**Counsel for State of Montana**

/s/ James A. Campbell
DOUGLAS J. PETERSON
 *Attorney General of Nebraska*
JAMES A. CAMPBELL*
 *Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
Jim.Campbell@nebraska.gov
**Counsel for State of Nebraska**

/s/ Sylvia May Mailman
DAVE YOST
  *Attorney General of Ohio*
SYLVIA MAY MAILMAN*
  *Assistant Solicitor General*
Office of the Ohio Attorney General
615 W. Superior Ave., 11th Floor
Cleveland, OH 44113
(614) 282-3594
May.Mailman@OhioAGO.gov
  **Counsel for State of Ohio**

/s/ Paul Swedlund
JASON R. RAVNSBORG
  *Attorney General of South Dakota*
Office of the South Dakota Attorney General
PAUL SWEDLUND*
  *Assistant Attorney General*
1302 East Highway 14, Suite 1
Pierre, SD 57501
(605) 773-3215
Jason.Ravnsborg@state.sd.us
  **Counsel for State of South Dakota**

/s/ Bryan Cleveland
JOHN M. O'CONNOR
  *Attorney General of Oklahoma*
BRYAN CLEVELAND*
  *Deputy Solicitor General*
Oklahoma Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105-4894
(405) 521-3921
Bryan.Cleveland@oag.ok.gov
  **Counsel for the State of Oklahoma**

/s/ Aaron Rietz
KEN PAXTON
  *Attorney General of Texas*
AARON RIETZ*
  *Deputy Attorney General*
Office of the Attorney General of Texas
P.O Box 12548
Austin, TX 78711-2548
(512) 936-1989
Aaron.Rietz@oag.texas.gov
  **Counsel for State of Texas**

/s/ J. Emory Smith Jr.
ALAN WILSON
  *Attorney General of South Carolina*
J. EMORY SMITH, JR.*
  *Deputy Solicitor General*
Office of the South Carolina Attorney General
P.O. Box 11549
Columbia, SC 29211
(803) 734-3680
esmith@scag.gov
  **Counsel for State of South Carolina**

/s/ Melissa A. Holyoak
SEAN D. REYES
  *Attorney General of Utah*
MELISSA A. HOLYOAK*
  *Solicitor General*
Office of the Utah Attorney General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
(801) 366-0260
melissaholyoak@agutah.gov
  **Counsel for State of Utah**

53

<u>/s/ Andrew N. Ferguson</u>
JASON S. MIYARES
  *Attorney General of Virginia*
ANDREW N. FERGUSON*
  *Solicitor General*
LUCAS W.E. CROSLOW*
  *Deputy Solicitor General*
Office of the Attorney General of Virginia
Richmond, VA 23219
(814) 786-7704
AFerguson@oag.state.va.us
LCroslow@oag.state.va.us
  ***Counsel for the Commonwealth of Virginia***

<u>/s/ Lindsay S. See</u>
PATRICK MORRISEY
  *Attorney General of West Virginia*
LINDSAY S. SEE*
  *Solicitor General*
Office of the West Virginia Attorney General
State Capitol Bldg. 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
  ***Counsel for the State of West Virginia***

**\*Application for Pro Hac Admission Forthcoming**