UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

THE STATE OF TENNESSEE, *et al.*

               Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,  *et al.*

               Defendants.

Case No. 3:22-cv-00257

District Judge Travis R. McDonough
Magistrate Judge Debra C. Poplin

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................4

I.  USDA'S FOOD AND NUTRITION SERVICE AND ITS ADMINISTRATION
    OF SNAP AND SNAP-ED ..........................................................................................4

II.  USDA UPDATES ITS STANDARD SNAP FSA LANGUAGE BASED ON
     *BOSTOCK* IN ITS FINAL RULE ..............................................................................5

III.  USDA'S ENFORCEMENT OF VIOLATIONS OF A SNAP FSA AND SEX
      DISCRIMINATION UNDER TITLE IX AND THE FNA.........................................7

      A.  Enforcement of Violations of a SNAP FSA ....................................................7

      B.  Civil Rights Enforcement - The May 5 Memo and Related Documents ......8

PROCEDURAL HISTORY ..................................................................................................10

STANDARD OF REVIEW ...................................................................................................11

ARGUMENT ........................................................................................................................12

I.  THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS...........12

    A.  Plaintiffs Lack Standing Because Their Injuries Are Either Not Ripe, Not
        Traceable, Or Not Redressable ........................................................................12

        1.  *Plaintiffs Have Not Plausibly Alleged Harm to Their Sovereignty, or that Such
            Harm is Ripe, Traceable, or Redressable By Vacating the May 5 Memo and
            Final Rule*..............................................................................................14

        2.  *Plaintiffs Fail to Plausibly Allege a Loss of Federal Funds and Compliance
            Costs Or that Such Injury Is Sufficiently Imminent or Ripe* .........................16

        3.  *Plaintiffs Do not Plausibly Allege that Any Harm Due to Enforcement by
            Department of Education Is Ripe, Traceable, or Redressable* .........................19

    B.  The Court Lacks Jurisdiction Because Plaintiffs Have an Adequate
        Alternative Remedy Under Title IX, and that Remedy is Exclusive.............19

II.  PLAINTIFFS' CLAIMS ARE UNLIKELY TO SUCCEED ON THEIR MERITS...........22

    A.  The May 5 Memo Was Not a Final Agency Action Subject to Judicial Review
        Under the APA ..................................................................................................22

i

B.     Plaintiffs' Notice-and-Comment Claim Is Unlikely to Succeed Because the May 5 Memo Is Not Subject to that Requirement and the Final Rule Was Properly Issued After Notice-and-Comment.................................................25

C.     Plaintiffs' Contrary-to-Law Claim Is Unlikely to Succeed...............................27

D.     Plaintiffs' Arbitrary-and-Capricious Claim Is Unlikely to Succeed ..............30

E.     Plaintiffs' Assorted Constitutional Claims Are Unlikely to Succeed.............31

     1.     *Spending Clause* ...............................................................................31

     2.     *Tenth Amendment and Anticommandeering doctrine*.....................33

     3.     *Separation of Powers and Non-Delegation Doctrine* .....................33

     4.     *First Amendment* ..............................................................................34

III.     THE OTHER EQUITABLE FACTORS FAVOR DEFENDANTS....................................36

A.     Plaintiffs Have Not Demonstrated an Irreparable Harm from the Denial of Injunctive Relief..............................................................................................36

B.     The Public Interest and Balance of the Equities Favor Defendants ............37

C.     Any Injunctive Relief Should Be Limited .......................................................38

CONCLUSION..............................................................................................................................39

# TABLE OF AUTHORITIES

**CASES**

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013) ................................................................................................................12

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ................................................................................................38

*Ass'n of Cultural Exch. Organizations, Inc. v. Blinken,*
543 F. Supp. 3d 570 (W.D. Tenn. 2021) .............................................................................15

*Bangura v. Hansen,*
434 F.3d 487 (6th Cir. 2016) ...............................................................................................20

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.,*
208 F. Supp. 3d 850 (S.D. Ohio 2016) ..................................................................21, 22, 26

*Bennett v. Spear,*
520 U.S. 154 (1997) .............................................................................................................22

*Blair v. Nationwide Ins. Co. of Am.,*
No. 121CV00059, 2021 WL 1795163 (E.D. Tenn. May 5, 2021) .......................................12

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020)....................................................................................................*passim*

*Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. United States Dep't of Health & Human Servs.,*
---F. Supp. 3d ---, No. 20-11297, 2021 WL 3667760 (D. Mass. Aug. 18, 2021) ..............28

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) .............................................................................................................20

*City of L.A. v. Lyons,*
461 U.S. 95 (1983) ...............................................................................................................36

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................................................................................12, 13

*Columbia Broadcasting System, Inc. v. Democratic National Committee,*
412 U.S. 94 (1973) ...............................................................................................................36

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,*
452 F.3d 798 (D.C. Cir. 2006) .............................................................................................23

*D.T. v. Sumner Cnty. Schs.,*
942 F.3d 324 (6th Cir. 2019) ...............................................................................................11

*Daunt v. Benson,*
  956 F.3d 396 (6th Cir. 2020) .......................................................................... 11, 37

*Dodds v. U.S. Dep't of Education,*
  845 F.3d 217 (6th Cir. 2015) .......................................................................... 32, 38

*Doe v. Miami Univ.,*
  882 F.3d 579 (6th Cir. 2018) ................................................................................34

*Doe v. Univ. of Scranton,*
  No. 3:19-cv-01486, 2020 WL 5993766, n.61 (M.D. Pa. Oct. 9, 2020) ...............28

*Elgin v. Dep't of Treasury,*
  567 U.S. 1 (2012) .................................................................................................21

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .............................................................................................30

*First Nat'l Bank of Lexington v. Sanders,*
  946 F.2d 1185 (6th Cir. 1991) .............................................................................24

*Fowler v. Benson,*
  924 F.3d 247 (6th Cir. 2019) ...............................................................................11

*Friendship Materials, Inc. v. Mich. Brick, Inc.,*
  679 F.2d 100 (6th Cir. 1982) ...............................................................................11

*F.T.C. v. Standard Oil Co. of Cal.,*
  449 U.S. 232 (1980) .............................................................................................24

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.,*
  822 F.3d 709 (4th Cir. 2016) ...............................................................................26

*Garlock, Inc. v. United Seal, Inc.,*
  404 F.2d 256 (6th Cir. 1968) ...............................................................................36

*Gaye v. Lynch,*
  788 F.3d 519 (6th Cir. 2015) ...............................................................................23

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020) ............................................................... 27, 28, 29, 39

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.,*
  959 F.3d 178 (5th Cir.), *cert. denied,* 141 S. Ct. 901 (2020) ............................32

*Gundy v. United States,*
  139 S. Ct. 2116 (2019)..........................................................................................34

iv

*Illinois Rep. Party v. Prtizker,*
    973 F.3d 760 (7th Cir. 2020) ..................................................................................39

*Jama v. Dep't of Homeland Security,*
    760 F.3d 490 (6th Cir. 2014) ..................................................................................23

*Kennedy v. Bremerton School District,*
    142 S. Ct. 2407 (2022) ..........................................................................................36

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022) ..................................................................................35

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ................................................................................22, 23, 25

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ..............................................................................................23

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ..............................................................................................38

*Mann Construction, Inc. v. United States,*
    27 F.4th 1138 (6th Cir. 2022) ..........................................................................23, 24

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ..............................................................................................35

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ..............................................................................................11

*McNeilly v. Land,*
    684 F.3d 611 (6th Cir. 2012) ..................................................................................37

*Memphis A. Philip Randolph Inst. v. Hargett,*
    978 F.3d 378 (6th Cir. 2020) ............................................................................36, 37

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ............................................................................28, 34

*Michigan v. Thomas,*
    805 F.2d 176 (6th Cir. 1986) ..........................................................................22, 23, 25

*NAACP v. Meese,*
    615 F. Supp. 200 (D.D.C. 1985) ............................................................................20

*National Rifle Ass'n of Am. v. Magaw,*
    132 F.3d 272 (6th Cir. 1997) ..................................................................................12

*Nat'l Fed'n of Indep. Businesses v. Sebelius,*
    567 U.S. 519 (2012) ................................................................................................ 32

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ..................................................................................... 13, 14, 15

*Nelson v. Christian Bros. Univ.,*
    226 F. App'x 448 (6th Cir. 2007) ......................................................................... 28

*New Mexico v. McAleenan,*
    450 F. Supp. 3d 1130 (D.N.M. 2020) ............................................................. 35, 36

*New York v. United States,*
    505 U.S. 144 (1992) ................................................................................................ 33

*Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n,*
    457 F.3d 941 (9th Cir.2006) ................................................................................. 19

*Ohio v. Yellen,*
    No. 1:21-cv-181, 2021 WL 1903908 (S.D. Ohio May 12, 2021) ........................ 36

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't,*
    305 F.3d 566 (6th Cir. 2002) ............................................................................... 11

*Pelcha v. MW Bancorp., Inc.,*
    988 F.3d 318 (6th Cir. 2021) ............................................................................... 28

*Peltier v. Charter Day Sch., Inc.,*
    8 F.4th 251 (4th Cir. 2021) ................................................................................. 27

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) .................................................................................................. 31

*Perez v. Mortg. Bankers Assoc.,*
    575 U.S. 92 (2015) ................................................................................................ 23

*Planned Parenthood of Wisc., Inc. v. Azar,*
    316 F. Supp. 3d 291 (D.D.C. 2018), *vacated as moot,* 942 F.3d 512 (D.C. Cir. 2019) ........................ 24

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.,*
    769 F.3d 447 (6th Cir. 2014) ............................................................................... 12

*Princeton Univ. v. Schmid,*
    455 U.S. 100 (1982) .............................................................................................. 13

*Pros. & Patients for Customized Care v. Shalala,*
    56 F.3d 592 (5th Cir. 1995) ................................................................................. 24

vi

*Reno v. Catholic Social Servs., Inc.,*
    509 U.S. 43 (1993) ........................................................................................................23

*Rhea Lana, Inc. v. Dep't of Labor,*
    824 F.3d 1023 (D.C. Cir. 2016) ............................................................................ 23, 24

*Roberts v. Colo. State Bd. of Agric.,*
    998 F.2d 824 (10th Cir. 1993) ........................................................................................38

*Rogers v. Windmill Pointe Vill. Club Ass'n,*
    967 F.2d 525 (11th Cir. 1992) ........................................................................................38

*Sabri v. United States,*
    541 U.S. 600 (2004) ........................................................................................................31

*Sackett v. EPA,*
    566 U.S. 120 (2012) ................................................................................................ 20, 21

*Sch. Dist. of City of Saginaw v. Dep't of Health, Ed., & Welfare,*
    431 F. Supp. 147 (E.D. Mich. 1977) ............................................................................21

*Sch. of the Ozarks, Inc. v. Biden,*
    41 F.4th 992 (8th Cir. 2022) .................................................................................. 15, 18

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs,*
    251 F.3d 814 (9th Cir. 2001) ........................................................................................38

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ........................................................................................... 12, 13

*Taylor v. Cohen,*
    405 F.2d 277 (4th Cir. 1968) ........................................................................................21

*Tenn. Hosp. Ass'n v. Azar,*
    908 F.3d 1029 (6th Cir. 2018) ......................................................................................22

*Tennessee v. U.S. Dep't of Educ.,*
    No. 3:21-cv-308, 2022 WL 2791450 (E.D. Tenn. July 15, 2022) ..........................*passim*

*Tennessee v. U.S. Dep't of State,*
    329 F. Supp. 3d 597 (W.D. Tenn. 2018) ......................................................................31

*Texas v. United States,*
    201 F. Supp. 3d 810 (N.D. Tex. 2016) .........................................................................26

*Texas v. United States,*
    523 U.S. 296 (1998) ........................................................................................................13

Case 3:22-cv-00257-TRM-DCP   Document 54   Filed 09/09/22   Page 8 of 51   PageID #: 328

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ........................................................................................3, 21, 22, 37

*Travis v. Pennyrile Rural Elec. Co-op.*,
   399 F.2d 726 (6th Cir. 1968) ....................................................................................37

*Trudeau v. Fed. Trade Comm'n*,
   456 F.3d 178 (D.C.Cir.2006) ....................................................................................23

*United States v. AMC Entm't, Inc.*,
   549 F.3d 760 (9th Cir. 2008) ....................................................................................39

*University of Tex. Southwestern Medical Center v. Nassar*,
   570 U.S. 338 (2013) ..................................................................................................28

*Walker v. Azar*,
   480 F. Supp. 3d 417 (E.D.N.Y. 2020) .....................................................................28

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ..................................................................................................36

*Warshak v. United States*,
   532 F.3d 521 (6th Cir. 2008) .............................................................................. 13, 15

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022)...............................................................................................33

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   No. 16-CV-943-PP, 2016 WL 5239829 (E.D. Wis. Sept. 22, 2016) ........................26

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ..................................................................................39

*Whitman-Walker Clinic, Inc. v. HHS*,
   485 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................... 28, 30

*Wolfe v. Fayetteville, Ark. Sch. Dist.*,
   648 F.3d 860 (8th Cir. 2011) ....................................................................................27

Case 3:22-cv-00257-TRM-DCP   Document 54   Filed 09/09/22   Page 9 of 51   PageID #: 329

## STATUTES

5 U.S.C. § 553(b) .......................................................................................................23

5 U.S.C. § 553(b)(3) ..................................................................................................26

5 U.S.C. § 704 .....................................................................................................20, 22

7 U.S.C. § 2011 ...........................................................................................................4

7 U.S.C. § 2012(k) .......................................................................................................4

7 U.S.C. § 2013 ...........................................................................................................4

7 U.S.C. § 2014(a) .......................................................................................................4

7 U.S.C. § 2014(b) ....................................................................................................4, 8

7 U.S.C. § 2020(c)(1) .........................................................................................1, 9, 29

7 U.S.C. § 2020(g) .....................................................................................................18

7 U.S.C. § 2023 .................................................................................................8, 21, 22

20 U.S.C. § 1618(a) .....................................................................................................9

20 U.S.C. § 1681 .......................................................................................................26

20 U.S.C. § 1681(a) ...............................................................................................1, 27

20 U.S.C. § 1681(a)(3) ..............................................................................................35

20 U.S.C. § 1682 .......................................................................................................21

20 U.S.C. § 1683 .......................................................................................................21

42 U.S.C. § 2000e .....................................................................................................28

42 U.S.C. § 2000e-2 ....................................................................................................9

42 U.S.C. § 2000e-2(a) ...........................................................................................1, 9

## REGULATIONS

7 C.F.R. Part 273 .....................................................................................................4, 8

7 C.F.R. § 15a.205(a) ................................................................................................36

7 C.F.R. § 15.8 ................................................................................................... 9, 18

7 C.F.R. § 272(a)(2) .................................................................................................. 5

7 C.F.R. § 272(b)(1) .................................................................................................. 5

7 C.F.R. § 272.2(b)(1) ............................................................................................... 6

7 C.F.R. § 272.2(b)(2) .......................................................................................... 6, 17

7 C.F.R. § 272.2(e)(1) ............................................................................................... 6

7 C.F.R. § 276.4 .................................................................................................... 7, 8

7 C.F.R. § 276.4(e) .................................................................................................... 7

7 C.F.R. § 276.7 ........................................................................................................ 7

7 C.F.R. § 276.7(j) ..................................................................................................... 8

34 C.F.R. § 100.7(d) ................................................................................................ 19

81 Fed. Reg. 81,015-01 (Nov. 17, 2016) .............................................................. 5, 26

82 Fed. Reg. 46655 (October 6, 2017) .................................................................... 36

86 Fed. Reg. 7,023 (Jan. 20, 2022) ........................................................................... 9

87 Fed. Reg. 35,855 (2022) .................................................................................. 2, 6

The United States Department of Agriculture ("USDA") is not "trying to take the States' lunch money." Pls.' Mem. in Support of Mot. for Prelim. Inj. at 1, ECF No. 3 ("Br."). Nor is USDA imposing new requirements on "elementary school classrooms and bathrooms." *Id.* USDA has merely issued interpretive documents, related to food and nutrition assistance programs, that remind stakeholders of the meaning of sex discrimination under Title IX of the Education Amendments of 1972 ("Title IX") and the Food and Nutrition Act of 2008 ("FNA" or the "Act"). Both laws prohibit sex discrimination, including on the basis of sexual orientation or gender identity. They use slightly different words to do so: Title IX prohibits such discrimination "on the basis of sex," 20 U.S.C. § 1681(a), and the FNA prohibits discrimination "by reason of . . . sex," 7 U.S.C. § 2020(c)(1). Both formulations are substantively indistinguishable from the language of Title VII of the Civil Rights Act of 1964, which prohibits discrimination "because of" an individual's sex, 42 U.S.C. § 2000e-2(a). In *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020), the Supreme Court found that Title VII unambiguously precludes employers from firing someone "simply for being [gay] or transgender." *Id.* at 1737. The Supreme Court's reasoning also governs the nearly identical text in Title IX and the FNA.

On May 5 and June 14, 2022, USDA issued documents interpreting the requirements of Title IX and the FNA for state agencies and operators of programs or activities that receive federal financial assistance from the USDA's Food and Nutrition Services ("FNS"), which administers the Supplemental Nutrition Assistance Program ("SNAP") and a related grant program, SNAP-Education ("SNAP-Ed"). Specifically, on May 5, 2022, USDA issued a document explaining to Regional and State Directors of FNS Programs that "the certification of applicant households for SNAP shall be conducted without discrimination on the basis of gender identity and sexual orientation." *See* Compl., Ex. A at 3, ECF No. 1-1 ("May 5 Memo."). The May 5 Memo advised state agencies and program operators to ensure that complaints "alleging discrimination on the basis of gender identity and sexual

orientation are processed and evaluated as complaints of discrimination on the basis of sex." *Id.* On June 14, 2022, USDA published a rule updating language used in the legal agreements between USDA and state SNAP administrators to reflect, as pertinent here, the civil rights requirements of Title IX and the FNA, as interpreted by the agency. 87 Fed. Reg. 35,855 (2022) ("Final Rule").

Despite Plaintiffs' explicit assurances that they do not "deny benefits based on a household member's sexual orientation or gender identity," Compl. ¶ 12, ECF No.1; *see also id.* ¶ 40, and Br. at 1, 17, Plaintiffs claim that the Final Rule and May 5 Memo will irreparably harm them by forcing them to choose "between their sovereignty," and "education and lunch money for children." Br. at 24. Plaintiffs argue that the documents are procedurally defective, arbitrary and capricious, and contrary to law, but they are unlikely to succeed on those claims and cannot meet the other preliminary injunction factors.

At the outset, Plaintiffs cannot show that the Court has jurisdiction over their claims. First, Plaintiffs lack standing. They do not plausibly allege any pending or foreseeable enforcement action by USDA, and they fail to plausibly allege the sort of harms that would afford them standing to bring a claim for pre-enforcement review. Indeed, the harms Plaintiffs allege to their sovereignty and funding streams from USDA are either not ripe, not traceable to USDA action, or not redressable by this Court. Plaintiffs fail to plausibly allege that their state laws conflict with the challenged documents, and no such injury would be traceable to USDA or redressable by the relief Plaintiffs expressly seek, because Title IX and the FNA, not the Final Rule or May 5 Memo, are the source of the prohibitions on sex discrimination. Further, Plaintiffs are not in imminent danger of losing SNAP or SNAP-Ed funds; fourteen of the Plaintiff-States have already entered into new SNAP agreements with the updated non-discrimination language, no State alleges that it will refuse to enter into such an agreement, and only one has even proposed alternative language. Also, no State refused to abide by SNAP-Ed's requirements, nor has any State been denied SNAP-Ed funds. Finally, Plaintiffs' concern

that the May 5 Memo or Final Rule will trigger enforcement action by the U.S. Department of Education is speculative.

The Court also lacks jurisdiction because Plaintiffs could bring these claims as defenses in any enforcement action, and because both Title IX and the FNA provide a comprehensive enforcement scheme that precludes district court jurisdiction over pre-enforcement challenges to USDA's interpretation of those statutes under the doctrine set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215-16 (1994).

Even if Plaintiffs could surmount these threshold obstacles, they are not likely to succeed on the merits of their claims. The May 5 Memo does not constitute final agency action reviewable under the Administrative Procedures Act ("APA"); it is an interpretive rule not subject to the APA's notice and comment requirements. The Final Rule was promulgated consistent with the APA's notice and comment requirements. Neither the Final Rule nor the May 5 Memo are arbitrary and capricious or contrary to law; Defendants' interpretations hew closely to the reasoning of the Supreme Court's decision in *Bostock*, and Plaintiffs' attempts to distinguish the texts of Title VII, Title IX, and the FNA are unavailing. In addition, the challenged documents do not violate the Spending Clause, the First Amendment, the Tenth Amendment, the anticommandeering doctrine, the separation of powers principle/major questions doctrine, or the nondelegation doctrine.

Finally, the balance of the equities and public interest militate against a preliminary injunction. The primary intent of the May 5 Memo and the Final Rule is to protect individuals eligible for USDA-funded programs like SNAP and SNAP-Ed from being denied access to those programs because of their gender identity and sexual orientation. The States disavow engaging in such discrimination in the administration of those programs. The equities and public interest weigh heavily in favor of the government's ability to protect vulnerable populations pursuant to its statutory authority under civil rights laws. For these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

## I. USDA'S FOOD AND NUTRITION SERVICE AND ITS ADMINISTRATION OF SNAP AND SNAP-ED

USDA's FNS administers the nutrition assistance programs of USDA. Decl. of Angela Kline ¶ 4 ("Kline Decl."), attached hereto as Ex. A. FNS's mission is to provide children and needy families better access to food and a more healthful diet through its food assistance programs and comprehensive nutrition education efforts. *Id.* The largest nutrition assistance program FNS administers is SNAP, *id.* ¶ 5, whose mission is "to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." 7 U.S.C. § 2011. SNAP benefits increase the food purchasing power of eligible households by supplementing the funds those households have to spend on food. Kline Decl. ¶ 5 (citing 7 U.S.C. § 2013).

Congress limited participation in the SNAP program to "those households whose incomes and other financial resources . . . are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet." 7 U.S.C. § 2014(a). Congress required the Secretary of Agriculture to establish "uniform national standards of eligibility." *Id.* § 2014(b). The Secretary issued regulations establishing eligibility standards based on household income and assets, *see* 7 C.F.R. Part 273 (standards); none included sex-based considerations, and "no State agency [may] impose any other standards of eligibility as a condition for participating in the program," 7 U.S.C. § 2014(b), including standards of eligibility related to sexual orientation or gender identity.

The SNAP program provides low-income households with federal funds to purchase food from authorized retailers (*e.g.*, grocery stores). Kline Decl. ¶¶ 5, 7. Schools do not meet the FNA's statutory definition of "retail food store[s]," and do not participate in SNAP as authorized retailers. *Id.* ¶ 7. Nor do meals provided in school cafeterias constitute eligible food for purposes of SNAP. *Id.* (citing 7 U.S.C. § 2012(k)). FNS also administers SNAP-Ed, a much smaller program which provides nutrition education in a wide variety of settings and for diverse audiences. *See id.* ¶ 9. Unlike the main

4

SNAP program, SNAP-Ed is a grant program and does not distribute funds or other direct benefits. *Id.* ¶ 9. Although schools may be implementing agencies or sites for the SNAP-Ed program, FNS's focus in relation to the program is limited strictly to its nutrition and education purposes and to ensuring that eligible individuals have access to the program. *Id.* Neither SNAP nor SNAP-Ed concern or otherwise relate to policy concerning the regulation of bathrooms, locker rooms, athletics, dress codes, or other areas identified in Plaintiffs' Complaint. *Id.* ¶¶ 8-9.

Although USDA funds and oversees SNAP, it is administered through USDA's partnership with state agencies. *Id.* ¶ 6. To participate in SNAP, state agencies must submit a State Plan of Operation, which includes the Federal/State Agreement ("FSA"), the Budget Projection Statement, and the Program Activity Statement. *Id.* ¶ 10. The FSA is the legal agreement through which states agree to administer SNAP in accordance with the FNA, the Act's associated regulations, and the FNS-approved State Plan of Operation. *Id.* ¶ 11 (citing 7 C.F.R. § 272(a)(2)).[1] The FSA contains standard nondiscrimination language set forth by regulation, *see* 7 C.F.R. § 272(b)(1), but a State may "propose alternative language to any or all the provisions." *Id.* § 272(b)(2); *see also* Kline Decl. ¶ 14. Any proposed alternative language must be approved by both parties before execution. *Id.*

## II. USDA UPDATES ITS STANDARD SNAP FSA LANGUAGE BASED ON *BOSTOCK* IN ITS FINAL RULE

From time to time, USDA has updated the standard SNAP FSA language. USDA began that process in late 2016 by publishing a proposed rule in the Federal Register. *See* 81 Fed. Reg. 81,015-01 (Nov. 17, 2016) ("Proposed Rule"). Among other topics, the Proposed Rule addressed the standard SNAP FSA non-discrimination language. *Id.* USDA proposed modifying the standard language to "incorporate references to additional civil rights legislation," *id.* at 81,015, including references to Title

---

[1] State agencies wishing to participate in SNAP-Ed must include a Nutrition Education Plan to FNS by August 15 if they wish to participate in SNAP-Ed in the next federal fiscal year. Kline Decl. ¶ 10.

IX, the Age Discrimination in Employment Act, and certain parts of the Americans with Disabilities Act, among others. This change was intended only to "codify protections already required by Federal law, regulations and existing policy." *Id.*

Following the comment period, USDA published its Final Rule on June 14, 2022. 87 Fed. Reg. 35,855. Under the Final Rule, the updated SNAP FSA non-discrimination language includes a reference to additional civil rights legislation, including an assurance that a state receiving SNAP funds would comply with Title IX. 87 Fed. Reg. at 35,855, 35,857. Moreover, although past FSA non-discrimination assurances had long prohibited states from discriminating against SNAP beneficiaries on the basis of sex, the new language explicitly included "gender identity and sexual orientation" as forms of sex discrimination. *Id.* at 35,857. USDA stated that the updated non-discrimination language was intended to "codify protections already required by Federal law and existing policy." *Id.* at 35,855. Further, states retained the option, "[i]f [they did] . . . not wish to sign the FSA with the language as written in 7 C.F.R. § 272.2(b)(1)," to "'propose alternative language to any or all the provisions.'" Kline Decl. ¶ 14 (quoting 7 C.F.R. § 272.2(b)(2)). USDA and the state must agree in writing on any alternative language. 87 Fed. Reg. at 35,857.

The Final Rule became effective as of August 15, 2022, and provided, consistent with 7 C.F.R. § 272.2(e)(1), that each participating state must sign and submit a new SNAP FSA to FNS within 120 days after the publication of the regulations in final form. Kline Decl. ¶ 13. This means that states must submit their new signed FSA to FNS by December 15, 2022. *Id.* Once signed, the SNAP FSA is valid until terminated. *Id.* In the interim, the state's currently effective FSAs remain in place, meaning it can continue to participate in SNAP until the deadline for the new FSA. *Id.*

As of September 8, 2022, fourteen Plaintiff-States (Alaska, Arizona, Arkansas, Georgia, Kansas, Louisiana, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, and West Virginia) have finalized their new SNAP FSA, adopting the exact language promulgated in the Final

Rule. *Id.* ¶ 15 & Exs. 2-15. Of the remaining eight other Plaintiff-States, three (Alabama, Indiana, and Virginia) have indicated that they expect to submit their SNAP FSAs by December 13, 2022, and one (Mississippi) has proposed alternative language for FNS to consider. *Id.* The other four states (Kentucky, Missouri, South Dakota, and Texas) have not indicated what they plan to do. *Id.* State agencies wishing to participate in SNAP-Ed were required to submit their State Plans of Operation by August 15. Kline Decl. ¶ 10 & Ex. 1. All the Plaintiffs-States did so, and all have been allocated SNAP-Ed funds for Federal Fiscal Year 2023. *Id.*

### III. USDA'S ENFORCEMENT OF VIOLATIONS OF SNAP FSAs AND NON-DISCRIMINATION PROVISIONS OF TITLE IX AND THE FNA

#### A. Enforcement of Violations of SNAP FSAs

In the hypothetical event that a state agency was to violate one of the assurances in its SNAP FSA, there are numerous steps that would need to occur before a suspension and/or disallowance action could be taken under the FNA. *See* 7 U.S.C. §§ 2020(g), 2023; 7 C.F.R. §§ 276.4, 276.7; Kline Decl. ¶ 17. The state agency would receive written advance notice of a potential action that provides a time period in which to remedy the deficiency in a state's administration of SNAP. Kline Decl. ¶ 17 (citing 7 C.F.R. § 276.4(d)(1)). Failure to remedy the deficiency within the prescribed timeframe would result in a formal warning about a possible suspension and/or disallowance action. *Id.* (citing 7 C.F.R. § 276.4(d)(2)). The state agency would then have thirty days to submit either (a) evidence that it had actually complied with the FSA or (b) a corrective action plan laying out how and when the agency could bring itself into compliance. *Id.* (citing 7 C.F.R. § 276.4(d)(2)). A state agency's SNAP funds may be suspended or disallowed only if it fails to respond to the formal complaint, submits insufficient evidence of compliance or an unsatisfactory corrective action plan, or violates an agreed-upon corrective action. *Id.* (citing 7 C.F.R. § 276.4(e). A disallowance of SNAP funds may be appealed to

the SNAP Appeals Board, and the Board's decision is subject to judicial review. *Id.* ¶ 18 (citing 7 C.F.R. § 276.7).

The Final Rule did not change anything with regard to the manner in which FNS can enforce a prohibition against sex discrimination in SNAP or SNAP-Ed. States were prohibited from considering a person's gender identity or sexual orientation for purposes of SNAP and SNAP-Ed eligibility and participation even before the Final Rule was adopted. *See* 7 C.F.R. Part 273; 7 U.S.C. § 2014(b). Thus, regardless of the Final Rule, FNS can pursue the suspension and/or disallowance of Federal funds pursuant to 7 U.S.C. §§ 2020, 2023, 7 C.F.R. § 276.4(b), (c) as to discriminatory conduct based on a person's gender identity or sexual orientation. Kline Decl. ¶ 16.

### B. Civil Rights Enforcement - The May 5 Memo and Related Documents

In addition to its SNAP-specific nondiscrimination enforcement mechanisms under the FNA, USDA also may pursue remedies for violations of specific civil rights laws in programs or activities receiving USDA funds. *See* 20 U.S.C. §§ 1682-1683; 42 U.S.C. § 2000d-1; *see also* Decl. of Roberto Contreras ¶¶ 12-29 ("Contreras Decl."), attached hereto as Ex. B. When USDA receives a complaint of a violation of civil rights laws in a program or activity receiving USDA funds and determines that it has jurisdiction, it notifies the complainant that USDA has accepted the complaint. Contreras Decl. ¶¶ 16-20. At that point, USDA "attempts to resolve the complaint at the lowest possible level through alternative dispute resolution." *Id.* ¶ 22.

In the event those attempts are unsuccessful, USDA will assign an investigator, who will compile sworn statements and documents relating to the issues in the complaint. *Id.* Based on the investigation, USDA decides whether the recipient of federal funds has failed to comply with its civil rights obligations. *Id.* If the recipient is found to be out of compliance, USDA will seek voluntary compliance. *Id.* ¶ 24-25. If the recipient fails to comply voluntarily, the complaint may then be referred to OASCR for consideration of further enforcement pursuant to 7 C.F.R. § 15.8. *Id.* ¶ 25.

8

Only after completion of these steps might USDA refer the matter to the Department of Justice to pursue judicial action for unlawful discrimination in USDA-administered programs and activities. *See* Contreras Decl. ¶¶ 25-28 (citing 7 C.F.R. § 15.8).

On January 20, 2021, President Biden issued an executive order that instructed federal agencies to evaluate statutes and regulations prohibiting sex discrimination in light of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Executive Order 13988, "Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation," 86 Fed. Reg. 7,023 (Jan. 20, 2021). In *Bostock*, the Supreme Court held that Title VII's prohibition on discrimination "because of sex" included discrimination based on sexual orientation and gender identity because "[gay] and transgender status are inextricably bound up with sex." 140 S. Ct. at 1737, 1741-42.

In response to the Executive Order, USDA conducted an independent legal analysis that re-examined the non-discrimination provisions of the statutes and regulations governing USDA-funded programs and activities. On May 5, 2022, USDA issued a memorandum to the state and regional directors of FNS programs laying out USDA's interpretation of the non-discrimination provisions of Title IX and the FNA based on its understanding of *Bostock*. *See* May 5 Memo.[2] USDA stated that it concurred with the Departments of Justice and Education in concluding that Title VII's prohibition of discrimination "because of sex," 42 U.S.C. § 2000e-2(a), and Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1618(a), were sufficiently similar that *Bostock*'s interpretation should apply to Title IX. *See* May 5 Memo at 2-3. USDA likewise found the FNA's non-discrimination provision—which prohibits discrimination "by reason of ... sex," 7 U.S.C. § 2020(c)(1)—was similar enough to Title VII's language that it was governed by *Bostock* too. The May 5 Memo therefore advised "[s]tate agencies and program operators . . . [to] expeditiously review their program discrimination

---

[2] The May 5 Memo was transmitted with a cover letter. Defendants refer to the Memo and its cover letter collectively as the "May 5 Memo."

complaint procedures and make any changes necessary to ensure complaints alleging discrimination on the basis of gender identity and sexual orientation are processed and evaluated as complaints of discrimination on the basis of sex." May 5 Memo at 3.

Though the May 5 Memo set out USDA's understanding of the non-discrimination provisions of Title IX and the FNA, USDA made clear that the Memo "does not determine the outcome in any particular case, which will depend on the specific facts and circumstances of that case." *Id.* Nor did the Memo address other "legal requirements, including, . . . Title IX's religious exemption, the Religious Freedom Restoration Act . . . and any other applicable exemptions." *Id.*

On the same day as the May 5 Memo, USDA issued two additional documents. One document answers anticipated questions about the Memo, *see* Compl., Ex. C, ECF No. 1-3 ("Q&A Memo"), including questions about the updating and placement of "*And Justice for All*" posters. The Q&A Memo discusses poster production and implementation timing, which had not yet been finalized, as well as potential timing for enforcement of noncompliance. *Id.* at 2-3. The second document advises state agencies on how to begin the process of updating the non-discrimination statements in their public-facing materials to reflect the May 5 Memo. Compl., Ex. D, ECF No. 1-4 ("May 5 Memo Supplement"). Neither the Q&A Memo nor the May 5 Memo Supplement purports to have any independent legal effect. *See generally id.,* Ex. C & Ex. D.[3]

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on July 26, 2022, alleging that the USDA, in issuing the May 5 Memo and the Final Rule, violated the APA and assorted provisions of the Constitution. *See generally* Compl. Plaintiffs filed their motion for preliminary injunction the same day, requesting preliminary injunctive relief and seeking expedited consideration of the Motion. Mot. for Prelim. Inj. at 3, ECF

---

[3] For ease of reference, Defendants will refer primarily to the Final Rule and the May 5 Memo unless the other documents have some additional relevance.

No. 2 ("Motion"). In explaining their purported need for expedition, Plaintiffs cited to the SNAP-Ed-related August 15, 2022, deadline for incorporating the updated USDA non-discrimination statement. *Id.* The Court *sua sponte* denied Plaintiffs' request for expedited briefing on two grounds. First, the Court explained that it would be improper to consider the Motion before Defendants had been served and had a fair opportunity to respond. Order at 3-4, ECF No. 33. Second, the Court found that no good cause existed for expedition because "Plaintiffs States repeatedly and clearly state that they 'do not deny benefits based on a household member's sexual orientation or gender identity' for purposes of administering SNAP benefits." *Id.* at 4. Further, the Court noted that Plaintiffs' briefing "does not explain how incorporating the Rule's language, regarding only SNAP benefits, would impact their state laws regarding sports participation, restroom use, religious freedom, or free speech." *Id.*

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (citations omitted). The party moving for a preliminary injunction has the burden of proof, *see Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002), and that burden must be met "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (cleaned up). Even then, the final decision of whether a preliminary injunction should issue is within the court's discretion. *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982).

In determining whether to issue a preliminary injunction, courts consider four factors: "(1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). Where the federal government is the defendant, the last two factors merge. *Daunt v. Benson*, 956 F.3d 396, 422 (6th Cir. 2020). And while

11

the factors may be balanced, "the existence of an irreparable injury is mandatory." *D.T.*, 942 F.3d at 326–27 (citation omitted). Indeed, parties "requesting a preliminary injunction must demonstrate that irreparable harm is not merely possible, but likely." *Blair v. Nationwide Ins. Co. of Am.*, No. 121CV00059, 2021 WL 1795163, at *3 (E.D. Tenn. May 5, 2021) (citation omitted).

## ARGUMENT

## I. THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

### A. Plaintiffs Lack Standing Because Their Injuries Are Either Not Ripe, Not Traceable, Or Not Redressable

A foundational principle of Article III is that "an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (internal quotation marks omitted). "In an attempt to give meaning to Article III's 'case or controversy' requirement, the courts have developed a series of principles termed 'justiciability doctrines.' The Article III doctrine that requires a litigant to have 'standing' to invoke the jurisdiction of a federal court is perhaps the most important." *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). A related justiciability doctrine is that of ripeness, which "prevents courts from hearing premature or abstract disagreements." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 451 (6th Cir. 2014).

To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Where a plaintiff seeks prospective relief, as Plaintiffs do here, the "threatened injury must be certainly impending to constitute injury in fact"; "[a]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). The prospect of enforcing a purportedly unlawful statutory or regulatory regime against a plaintiff must be "sufficiently imminent" to create a concrete injury. *Platt*, 769 F.3d at 451 (6th Cir. 2014) (citation omitted). A "theory of standing [that]

12

relies on a highly attenuated chain of possibilities, does not satisfy" this requirement. *Clapper*, 568 U.S. at 410. "The plaintiff . . . bears the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547.

Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and "also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation omitted). As the Sixth Circuit has recognized, "[a]nswering difficult legal questions before they arise and before the courts know how they will arise is not the way we typically handle constitutional litigation." *Warshak v. United States*, 532 F.3d 521, 526 (6th Cir. 2008). The ripeness test comprises two elements: (1) the fitness of the matter for adjudication, and (2) the hardship to the plaintiffs in withholding relief. *Id.* at 525.

A claim is not fit for review unless it involves a concrete dispute, *Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982). In other words, "a general interest in a judicial ruling on the merits does not by itself confer jurisdiction on the federal courts." *Warshak*, 532 F.3d at 532. In a pre-enforcement challenge to a statutory scheme, where a court has "no idea whether or when" the statute will be enforced against the plaintiff and "no idea what" the particular factual circumstances of any ultimate dispute will be, a claim is not ripe. *Id.* at 526 (citation omitted). Accordingly, a party's claim "is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

Standing and ripeness may be analyzed together where the analyses overlap as they do here. *Platt*, 769 F.3d at 451. Plaintiffs cannot satisfy their burden to demonstrate either.

Plaintiffs argue that they will be imminently harmed for the following three reasons: *First*, they allege that USDA's actions interfere with their sovereign authority to enforce and administer their

13

laws, Compl. ¶ 138, because they will be forced to agree to prevent discrimination under the terms established in the Final Rule to enter into any SNAP agreement, *id.* ¶ 123, and will be required to incorporate USDA's non-discrimination statement and policies in order to use federal funds, *id.* ¶ 125, all of which "at least arguably conflict" with some of the States' laws, *see id.* ¶¶ 130-31. *Second*, Plaintiffs allege that the enforcement of the policies set forth in the May 5 Memo or their refusal to accept the Final Rule's terms "could cause Plaintiff States to lose significant federal funds from the USDA," *id.* ¶ 132, and would "impose immediate administrative and compliance costs and burdens on Plaintiffs," *id.* ¶ 139. *Third*, they fear that "USDA's actions could trigger Title IX enforcement action by the Department of Education, which enforces Title IX." *Id.* ¶ 133.

None of these alleged harms establishes that Plaintiffs' purported injuries are ripe, traceable, or redressable.

### 1. *Plaintiffs Have Not Plausibly Alleged Harm to Their Sovereignty, or that Such Harm is Ripe, Traceable, or Redressable By Vacating the May 5 Memo and Final Rule*

Plaintiffs principally claim that their sovereignty will be infringed by the May 5 Memo and Final Rule. But they cannot show that there is a live controversy ripe for adjudication, that their alleged injury is traceable to those documents as opposed to Title IX and the FNA, or that the Court could redress their injuries by setting aside those documents. In their Complaint, Plaintiffs allege only that the Final Rule and May 5 Memo "at least arguably conflict" with only some of their state laws. *See* Compl. ¶¶ 130-31 (identifying state laws for only thirteen of the twenty-two Plaintiff States). But, as the Court has already noted, the "Plaintiff States' briefing . . . does not explain how incorporating the Rule's language, regarding only SNAP benefits, would impact their states laws regarding sports participation, restroom use, religious freedom, or free speech." Order at 4, ECF No. 33. Indeed, Plaintiffs affirm that they do not engage in discrimination in the administration of SNAP on the basis of gender identity or sexual orientation, *see* Compl. ¶¶ 12, 40; Br. at 1,17, and do not allege that their state laws require them to do so. Plaintiffs have identified no more than an abstract disagreement

with the agencies' interpretation of the law. That is not sufficient to establish standing. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807–08; *Warshak*, 532 F.3d at 526; *See Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022) (holding that plaintiffs did not have standing to challenge an agency memorandum that did not require the agency to "reach [a] specific enforcement decision"). And because Plaintiffs would have a full opportunity to present their claims in a future enforcement proceeding against them, they face no hardship from the withholding of judicial review now.

Defendants acknowledge that another court addressing a similar challenge brought by many of these same Plaintiffs against the Department of Education concluded that the States had alleged a sufficiently ripe injury to their sovereignty. *Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-308, 2022 WL 2791450, at *24 (E.D. Tenn. July 15, 2022) ("*Tennessee*"). Defendants respectfully disagree with that decision, which is not binding on this Court. *Ass'n of Cultural Exch. Orgs., Inc. v. Blinken*, 543 F. Supp. 3d 570, 575 n.2 (W.D. Tenn. 2021). Further, that court concluded that the States had adequately alleged that "their sovereign power to enforce their own legal code is hampered by the issuance of [the Department of Education's] guidance and they face substantial pressure to change their state laws as a result." *Tennessee,* 2022 WL 2791450, at *12. The same cannot be said here, as this Court has already noted. Order at 4, ECF No. 33. The *Tennessee* court also ruled that the States "have shown a credible threat of enforcement," and that at least the State of Tennessee faces "considerable financial penalties for violating Title VII's prohibition on sex discrimination." *Tennessee,* 2022 WL 2791450, at *12. Here, Plaintiffs have not alleged a credible threat of enforcement or considerable financial penalties for sex discrimination, including discrimination on the basis of sexual orientation and gender identity, given that the States have disavowed any intention of engaging in such conduct.

Furthermore, even if Plaintiffs had identified a concrete, ripe conflict with their laws, any sovereign injury they might suffer would be traceable only to the FNA and Title IX, not to the Final Rule and May 5 Memo. The Final Rule and May 5 Memo's explanation that discrimination on the

15

basis of sexual orientation and gender identity is prohibited does not have independent legal significance. It is Title IX and the FNA that prohibit such discrimination on the basis of sex, and they would prohibit it even if the Final Rule and May 5 Memo had never been issued. Indeed, consistent with its interpretations of Title IX and the FNA, USDA's internal regulation, DR 4330-002, requires USDA employees to ensure programs and activities receiving federal financial assistance from USDA are in compliance with applicable civil rights laws, and identifies discrimination on the basis of sexual orientation and gender identity as prohibited conduct. *See* Contreras Decl. ¶ 12. Accordingly, even in the absence of the Final Rule and May 5 Memo, USDA would still be able to enforce the prohibitions on sexual orientation and gender identity discrimination in Title IX and the FNA.

For similar reasons, an injunction invalidating the Final Rule and May 5 Memo and prohibiting Defendants from "enforcing" them would not redress Plaintiffs' alleged sovereign injury. Those documents are neither the source of any harm nor the source of USDA's enforcement authority. Plaintiffs ask the Court in part to "hold[] unlawful the Department's Memoranda and Final Rule," Compl. at 49 (Prayer for Relief ¶ A), and to issue "preliminary and permanent injunction[s] prohibiting Defendants . . . from enforcing the Memoranda and Final Rule," *id.* at 50 (Prayer for Relief ¶ I). But such an injunction would not redress any injury, because USDA does not "enforce" the Final Rule or May 5 Memo; USDA enforces Title IX and the FNA. Courts may not "enjoin" an agency's view of the law. *See Whole Women's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) ("[A] federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But . . . no court may . . . purport to enjoin challenged 'laws themselves.'").

2. *Plaintiffs Fail to Plausibly Allege a Loss of Federal Funds and Compliance Costs Or that Such Injury Is Sufficiently Imminent or Ripe*

Plaintiffs also allege that they are in imminent danger of a loss of significant federal funds if they fail to comply with the May 5 Memo and the Final Rule, but they have not shown that any action that might lead to such an injury is sufficiently imminent for standing and ripeness purposes. Plaintiffs

16

allege that they "face an immediate threat that the USDA will enforce the Final Rule against Plaintiffs," Compl. ¶ 126, because they face "an immediate requirement ('120 days after the publication of the regulations in final form') to accept the Final Rule's terms in SNAP Federal-State Agreements." *Id.* ¶ 124.[4]  They also allege that they faced "an imminent deadline" of August 15, 2022, for the SNAP-Ed program to "incorporate the new USDA non-discrimination statement and policies to various projects." *Id.* ¶ 125.[5]  Plaintiffs claim that they are at risk of losing "significant federal funds" if they fail to meet these deadlines. *Id.* ¶ 134.

But Plaintiffs again fail to plausibly allege an imminent injury.  Not one Plaintiff-State alleges that it will refuse to sign the new SNAP FSAs if those agreements contain the Final Rule's updated standard non-discrimination language.  In fact, fourteen of the Plaintiffs, including the only two who submitted declarations in support of their Motion—Tennessee and Alaska—have already entered into new SNAP FSAs containing the updated non-discrimination language; three have indicated that they expect to do so by December 13, 2022; and only one, Mississippi, has offered alternative language as permitted by the Final Rule for states concerned about the language in the SNAP FSA, *see* Kline Decl. ¶¶ 14-15 (citing 7 C.F.R. § 272.2(b)(2)).  Mississippi, however, does not allege that any of its state laws conflict with the Final Rule or May 5 Memo, *see* Compl. ¶ 131.  Accordingly, none of the Plaintiffs plausibly allege in their Complaint or adduce evidence in their Motion that they are in imminent danger

---

[4] The Final Rule became effective on August 15, 2022; States must submit their new signed FSA by December 15, 2022.  Kline Decl. ¶ 13.

[5] Plaintiffs allege in their Complaint that the imminence of the enforcement threat posed by these deadlines is established by the Q&A Memo, which Plaintiffs claim "state[s] that 'there will not be a grace period'" for changing discrimination complaint procedures." Compl. ¶ 127. But Plaintiffs fail to even mention the "grace period" issue in their Motion.  Further, the full sentence in the Q&A Memo states "there will not be a grace period for *accepting and processing discrimination complaints* based on sexual orientation and gender identity in FNS programs." Q&A Memo at 3 (emphasis added).  Plaintiffs do not allege that they will refuse to accept and process complaints, so they fail to allege any reason why USDA would threaten an enforcement action.

17

of losing significant federal funds. *See Sch. of the Ozarks, Inc.*, 41 F.4th at 998 (concluding that it was speculative that HUD would file a charge of discrimination against the plaintiff and that the plaintiff's claimed injury was based on a "highly attenuated chain of possibilities") (citation omitted).

Moreover, neither the Final Rule nor the May 5 Memo suggests that States will lose their funding immediately in the event of noncompliance. FNS's suspension and disallowance process provides multiple opportunities for the offending state agency to come into compliance. *See* Kline Decl. ¶ 17. Indeed, only after a state agency fails to respond satisfactorily to an Advance Notification, Formal Warning, or corrective action proposal does FNS consider suspending or disallowing funds, *id.*, and the extent of such suspension or disallowance is subject to the Secretary's discretion. *Id.*; *see also* 7 U.S.C. § 2020(g). Further, such a disallowance is appealable to the State SNAP Appeals Board, and ultimately subject to judicial review. *See* Kline Decl. ¶ 18.

FNS's Civil Rights Division ("CRD") likewise has an elaborate enforcement process that aims to resolve a complaint at the lowest possible level. Contreras Decl. ¶¶ 22, 25. If the process does not resolve the complaint, CRD proceeds through an investigative stage, produces a report, and then issues a Final Agency Decision, which is appealable to OASCR. *Id.* ¶ 23. If OASCR affirms the Final Agency Decision, USDA may seek compliance through the procedures set forth at 7 C.F.R. § 15.8 or through other authorized means, including reference to the Department of Justice. *See* Contreras Decl. ¶¶ 26-28 (citing 7 C.F.R. § 15.8). According to CRD's declarant, FNS has never sought to suspend, terminate, or refuse to grant or to continue financial assistance to a State under 7 C.F.R. § 15.8. Contreras Decl. ¶ 30.

In light of these highly reticulated enforcement processes, through which Plaintiffs can present their claims, and the absence of any historical precedent of USDA suspending, terminating, or refusing financial assistance pursuant to those processes, Plaintiffs are unable to show that their alleged fiscal injuries are ripe.

18

3. *Plaintiffs Do not Plausibly Allege that Any Harm Due to Enforcement by Department of Education Is Ripe, Traceable, or Redressable*

Finally, Plaintiffs' alleged fear that the Final Rule and May 5 Memo "could trigger Title IX enforcement action by the Department of Education, which enforces Title IX," Compl. ¶ 133, is not only unripe, but also untraceable to USDA, and could not be redressed by an order of this Court. First, Plaintiffs fail to identify any imminent enforcement action by the Department of Education, never mind a causal connection between such an enforcement action and USDA's Final Rule and the May 5 Memo. Indeed, the Department of Education is currently enjoined from implementing its analogous interpretive documents as to nearly every Plaintiff State. *See Tennessee*, 2022 WL 2791450, at *24. But even if this were not the case, Plaintiffs fail to allege or identify any actual, impending enforcement action from violations of Title IX, or imminent loss of federal funding. Moreover, the Department of Education similarly attempts to resolve matters by informal means where possible, 20 U.S.C. § 1682; 34 C.F.R. § 100.7(d), allowing Plaintiffs the opportunity to remedy any issues before any loss of federal funds would occur. Finally, the federal government is entitled to enforce violations of Title IX regardless of the existence of the USDA's Final Rule and May 5 Memo, so Plaintiffs' fears of enforcement are neither traceable to nor redressable by the invalidation of USDA's challenged documents. *Cf. Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941 (9th Cir. 2006) (holding that even if plaintiff was harmed by one agency's regulation, the existence of another agency's unchallenged regulation made the injury unredressable).

**B. The Court Lacks Jurisdiction Because Plaintiffs Have an Adequate Alternative Remedy Under Title IX and the FNA, and that Remedy is Exclusive**

This Court also lacks jurisdiction over Plaintiffs' claims for two additional reasons: First, the APA's alternative remedy provision precludes them from bringing this action because they can raise their arguments in defense of any future Title IX or FNA enforcement action. Second, Congress

19

intended Title IX and the FNA to create exclusive avenues for challenging enforcement actions brought by the federal government under those laws.

The APA conditions judicial review on the requirement that there be no other adequate avenue of judicial review. *See* 5 U.S.C. § 704 (permitting judicial review of "final agency action for which there is no other adequate remedy in a court"). To determine whether the APA precludes review of an action where there is an adequate alternative remedy, "the essential inquiry is whether another statutory scheme of judicial review exists so as to preclude review under the more general provisions of the APA." *Bangura v. Hansen*, 434 F.3d 487, 501 (6th Cir. 2006). Where "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action" a court lacks subject matter jurisdiction over APA claims. *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Here, for example, if the United States filed suit against one of the Plaintiffs for having violated Title IX or the FNA, that State would "[a]lmost by definition [] have an adequate remedy in a court, that is, the remedy of opposing the . . . motion in . . . court." *N.A.A.C.P. v. Meese*, 615 F. Supp. 200, 2013 (D.D.C. 1985). Such an opposition brief would afford a judicial forum that would "obviat[e] the need for resort to the APA." *Id.*

Defendants recognize that the *Tennessee* court rejected a similar argument, but its analysis is flawed and inapt here. The *Tennessee* court concluded that a pre-enforcement challenge is permitted where the alternative would require a respondent to accrue liability while waiting for the government bring an enforcement action. *Tennessee*, 2022 WL 2791450, at *17 (citing *Sackett v. EPA*, 566 U.S. 127 (2012)). The *Tennessee* court relied on the Supreme Court's decision in *Sackett*, noting that in "*Sackett*, legal consequences flowed from the Government's compliance order, as it exposed the landowners to increased financial penalties in subsequent civil enforcement proceedings." *Id.* The *Tennesssee* court acknowledged that the plaintiff-states before it did "not face consequences as concrete as those in *Sackett*," but nevertheless concluded that the Department of Education's "guidance documents do

20

impose an immediate hardship on Plaintiffs," including the "risk of incurring significant financial penalties." *Id.* Here, USDA's enforcement regime makes clear that Plaintiffs will not lose funding prior to an enforcement action, which would only occur after informal means of resolution are attempted, so the *Tennessee* court's conclusion is not warranted here. *See, e.g.*, Kline Decl. ¶¶ 17-18; Contreras Decl. ¶ 26.

Second, Congress did not intend for pre-enforcement judicial review of any USDA action seeking to remedy violations of Title IX or the FNA because it mandated extensive administrative enforcement proceedings culminating in the opportunity for judicial review. *See* 20 U.S.C. § 1682-1683 (Title IX); 7 U.S.C. §§ 2020(g), 2023 (FNA). Where it is "fairly discernable" that an elaborate statutory review scheme was intended to create an exclusive remedy, parallel jurisdiction outside that scheme is precluded. *See Thunder Basin*, 510 U.S. at 207, 216 (citation omitted); *see also Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012). As in *Thunder Basin*, this Court does not have jurisdiction to consider Plaintiffs' challenge to the USDA's interpretation of Title IX or the FNA before the United States has initiated any enforcement proceedings. Plaintiffs style their Complaint as challenging the statutory interpretation announced in Defendants' documents, but the same was true in *Thunder Basin*. 510 U.S. at 205 (describing plaintiff's pre-enforcement "challenge [to] the [agency's] interpretation of" a statute). Courts have long refused to allow funding recipients to circumvent the civil rights laws' administrative enforcement processes in this manner. *See, e.g.*, *Taylor v. Cohen*, 405 F.2d 277 (4th Cir. 1968) (en banc); *Sch. Dist. of City of Saginaw v. U.S. Dep't of Health, Educ., & Welfare*, 431 F. Supp. 147 (E.D. Mich. 1977). Indeed, in *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 859-64 (S.D. Ohio 2016) ("*Highland*"), another district court in the Sixth Circuit concluded that it lacked jurisdiction over a school district's challenge to an agency's guidance documents discussing Title IX's application to discrimination against transgender students because there was an adequate remedy through Title IX's administrative process.

21

The *Tennessee* court rejected this argument as well, but failed to distinguish or even reference *Highland*, choosing instead to cite out-of-circuit or outdated cases. *Tennessee*, 2022 WL 2791450 at *19. Further, the *Tennessee* court mistakenly agreed with Plaintiffs, *see id.*, that their challenge to the agency's rules distinguished their claims from those barred in *Thunder Basin*, despite the fact, as noted above, that the same argument was rejected in *Thunder Basin* itself. Last, the *Tennessee* court did not have the FNA before it. In light of the extensive administrative review scheme Congress established in that statute, *see* 7 U.S.C. §§ 2020(g), 2023, it is more than "fairly discernable" that Congress intended to preclude pre-enforcement challenges in federal court. *Thunder Basin*, 510 U.S. at 216; *Highland*, 208 F. Supp. 3d at 861.

## II. PLAINTIFFS' CLAIMS ARE UNLIKELY TO SUCCEED ON THEIR MERITS

### A. The May 5 Memo Was Not a Final Agency Action Subject to Judicial Review Under the APA

Plaintiffs challenge the Final Rule and May 5 Memo as being contrary to law, arbitrary and capricious, and issued without the requisite procedure (*i.e.*, notice-and-comment rulemaking). Br. at 9-10, 12. However, Plaintiffs' claims regarding the May 5 Memo and its associated documents are unlikely to succeed because they are challenging an interpretive document that does not constitute final agency action over which courts can exercise judicial review. *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993). The APA permits judicial review only of "final agency action," 5 U.S.C. § 704, which is agency action that is (1) "the consummation of the agency's decisionmaking process" and that (2) also determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). The May 5 Memo does not determine anyone's "rights or obligations"; instead, it is an interpretative document that does not "'create new law, rights or duties, . . . [but rather] 'simply state[s] what the administrative agency thinks the statute means" and "only reminds affected parties of existing duties.'" *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (quoting *Michigan v. Thomas,* 805 F.2d

176, 182-83 (6th Cir. 1986)).)[6]

Absent a statute to the contrary, the issuance of an agency policy is not ordinarily a final action that can be directly challenged under the APA. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57-61 (1993). Instead, judicial review must wait until "concrete effects" from the policy are felt. *Nat'l Wildlife Fed'n*, 497 U.S. at 891; *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006). By contrast, agency action that constitutes a "substantive rule" may be reviewed if it has an immediate legal or practical coercive effect. *Nat'l Wildlife Fed'n*, 497 U.S. at 891; *Reno*, 509 U.S. at 57.

Substantive rules stand in contrast to interpretative rules or general statements of policy. 5 U.S.C. § 553(b). An agency policy is a substantive (or "legislative") rule only if it "impose[s] new rights or duties and change[s] the legal status of regulated parties." *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022). In contrast, "the critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015), 575 U.S. at 97 (citation omitted); *see also Mann Constr.*, 27 F.4th at 1143 (quoting same from *Perez*); *Tenn. Hosp. Ass'n*, 908 F.3d at 1042 (same). Similarly, a general statement of policy "'advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" *Lincoln*, 508 U.S. at 197.

Because the May 5 Memo merely announces USDA's interpretation of Title IX and the FNA, it lacks the requisite legal effect to be a final agency action. *See Mann Constr.*, 27 F.4th at 1143; *Tenn. Hosp. Ass'n*, 908 F.3d at 1042. It is not a substantive rule because it "create[s] no new legal obligations

---

[6] The Sixth Circuit appears to have variously treated the absence of a final agency action as a jurisdictional matter, *see also Gaye v. Lynch*, 788 F.3d 519, 528 (6th Cir. 2015), and a merits issue, *see Jama v. Dep't of Homeland Security*, 760 F.3d 490, 494 & n.4 (6th Cir. 2014). Treating it as a merits question appears to be the more customary approach. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 184 (D.C.Cir.2006) ("[T]he APA's final agency action requirement is not jurisdictional"). But the proper result is the same under either approach.

beyond those the [statute] already imposed," *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016); *Mann Constr.*, 27 F.4th at 1143. The May 5 Memo "simply states what the administrative agency thinks the statute[s] mean[]." *First Nat'l Bank of Lexington v. Sanders*, 946 F.2d 1185, 1188 (6th Cir. 1991).

Plaintiffs' two arguments that the May 5 Memo and its associated documents set forth a substantive rule are without merit. First, Plaintiffs argue that "legal consequences undoubtedly flow from the" documents because Plaintiffs "collectively risk the loss of over $28 billion [in SNAP funds] if they do not comply with USDA's directives to adopt new policies, binding contractual language, and enforcement procedures contained within" those documents. Br. at 7-8. However, the May 5 Memo and its associated documents merely inform the public of the Department's interpretation of the sex discrimination laws governing USDA-funded programs and activities. Only an action to enforce compliance with that interpretation under particular facts and circumstances could determine a party's rights or obligations regarding the laws. *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 246 (1980). USDA would have to take numerous steps aimed at achieving compliance before it could even bring an enforcement action. The unquantifiable and speculative "risk" that these steps will occur is not a legal consequence sufficient to make something final agency action.

Rather, "[a]s long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm" and will not amount to a substantive rule. *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 594–97 (5th Cir. 1995) (citation omitted). Policies that are "not outcome determinative" cannot have force of law and therefore cannot be substantive rules. *Planned Parenthood of Wis., Inc. v. Azar*, 316 F. Supp. 3d 291, 307-08 (D.D.C. 2018), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019). Here, the May 5 Memo provides that its "interpretation . . . does not determine the outcome in any particular case, which will depend on the specific facts and circumstances of that case" as well as "legal requirements, including, where

24

applicable, Title IX's religious exemption, the Religious Freedom Restoration Act . . . and any other applicable exemptions." May 5 Memo at 3. Merely "advis[ing] the public prospectively of the manner in which the agency proposes to exercise a discretionary power" does not create a substantive rule. *Lincoln*, 508 U.S. at 197 (citation omitted).

Second, Plaintiffs argue that the May 5 Memo and its associated documents collectively set forth a substantive rule because they "impos[e] on regulated entities a new obligation not to discriminate on the basis of sexual orientation or gender identity—an obligation that appears nowhere in the Title IX or the Food and Nutrition Act" and "implement a number of duties and other "changes" that "impact [State] operations." Br. at 11 (citation omitted) (second alteration in original). These arguments are meritless because, as has been reiterated, (a) the obligations flow from Title IX and the FNA, not the documents reflecting USDA's interpretations of those statutes, and (b) Plaintiffs could only suffer practical or legal consequences from USDA's interpretations at the conclusion of an enforcement proceeding.

Defendants note that the *Tennessee* court found that the Department of Education's similar interpretive documents constituted a substantive rule. Respectfully, the court's decision was in error as it wrongly concluded that reading Title IX in accordance with *Bostock*'s reading of Title VII went "beyond putting the public on notice of pre-existing legal obligations and reminding affected parties of their existing duties." *Tennessee*, 2022 WL 2791450, at \* 21. Even if the *Tennessee* court were correct, the FNA—which was not at issue in that case—would still supply the basis for the pre-existing legal obligations elucidated by the Final Rule.

**B. Plaintiffs' Notice-and-Comment Claim Is Unlikely to Succeed Because the May 5 Memo Is Not Subject to that Requirement and the Final Rule Was Properly Issued After Notice-and-Comment**

As laid out above, the May 5 Memo is an interpretive rule that does not require notice-and-comment rulemaking. *See Michigan*, 805 F.2d at 183 ("[An] interpretative rule . . . does not require

25

notice and comment procedures prior to its adoption."). Plaintiffs therefore have no likelihood of success on their claims that it was required to go through that rulemaking process. *See* Br. at 9-10.

Plaintiffs' notice-and-comment challenge to the Final Rule is unlikely to succeed because that policy document went through notice-and-comment rulemaking. Plaintiffs argue that the notice-and-comment process was defective as to the updated discrimination statement in the Final Rule because that statement is purportedly not a logical outgrowth of the Proposed Rule on which the public commented. Br. at 9-10. This argument is unlikely to succeed because USDA's Proposed Rule gave "a description of the subjects and issues involved" in the rule, as required by 5 U.S.C. § 553(b)(3). The Proposed Rule made clear that it was intended to "update[] FSA language [to] emphasize existing non-discrimination protections for SNAP households to the effect that no person in the United States shall, on the grounds of sex" or other protected traits be the "subject of discrimination under SNAP." 81 Fed. Reg. at 81,016-17. To do this, the anticipated rule "would incorporate references to additional civil rights legislation[, including Title IX,] into the standard FSA language," which already included a prohibition on sex discrimination. *Id.* at 81,015, 81,017.

At the time, significant litigation was already pending regarding the meaning of Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681, especially in relation to discrimination on the basis of gender identity in schools. *See G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-CV-943-PP, 2016 WL 5239829 (E.D. Wis. Sept. 22, 2016); *Highland*, 208 F. Supp. 3d at 859-64; *Texas v. United States*, 201 F. Supp. 3d 810, 826–27 (N.D. Tex. 2016). The public was on notice that USDA was contemplating making the non-discrimination statement in the FSA explicitly incorporate Title IX's non-discrimination provision and providing more detail about the "existing non-discrimination protections for SNAP households." 81 Fed. Reg. at 81,016. That USDA might incorporate judicial

decisions regarding the meaning of Title IX's non-discrimination language related to gender identity and sexual orientation was entirely foreseeable.

### C. Plaintiffs' Contrary-to-Law Claim Is Unlikely to Succeed

Plaintiffs' Complaint and preliminary injunction motion center on their contention that USDA's interpretation of the phrases "on the basis of sex" in Title IX, 20 U.S.C. § 1681(a), and "by reason of . . . sex" in the FNA, 7 U.SC. § 2020(c)(1), are unlawful. *See* Compl. ¶¶ 178-97; Br. at 12-19. But that can hardly be the case in light of *Bostock*. Courts have recognized that "Title IX's language closely resembles Title VII's." *Peltier v. Charter Day Sch., Inc.*, 8 F.4th 251, 273 (4th Cir. 2021) (explaining that although *Bostock* involved Title VII rather than Title IX, its reasoning "is consistent with the broadly applicable text of Title IX"), *aff'd in part and vacated in part*, 37 F.4th 104(4th Cir. 2022); *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011) (holding that the "Supreme Court's interpretation of Title VII properly informs our examination of Title IX"). The resemblance is particularly notable with respect to the language at issue in *Bostock*. Just as Title VII prohibits discrimination "because of" sex, Title IX prohibits discrimination against that individual "on the basis of sex." *See, e.g.*, *Bostock*, 140 S. Ct. at 1753 (holding "that employers are prohibited from firing employees *on the basis* of [sexual orientation] or transgender status") (emphasis added). Plaintiffs argue that there is significance to the linguistic differences in Title VII's "because of," Title IX's "on the basis of," and FNA's "by reason of." *See* Br. at 16-17. However, in *Bostock*, the Supreme Court used the terms interchangeably. *See* 140 S. Ct. at 1740-41 (stating both that an employer may not intentionally treat "a person worse *because of* sex," and that "it is impossible to discriminate against a person" for reasons related to their gender identity or sexual preference "without discriminating *based on* sex") (emphasis added).

Indeed, because of the similar phrasing, courts have consistently recognized that *Bostock*'s reasoning extends to Title IX, and Plaintiffs have identified no case to the contrary. *See, e.g.*, *Grimm v.*

*Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020); *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*, 557 F. Supp. 3d 224, 244 (D. Mass. 2021) (holding that "[t]hough *Bostock* was a Title VII case, the Supreme Court's reasoning applies equally outside of Title VII."); *Doe v. Univ. of Scranton*, No. 3:19-cv-01486, 2020 WL 5993766, at *5 n.61 (M.D. Pa. Oct. 9, 2020) (finding "persuasive" the argument that *Bostock* extends to Title IX); *see also Walker v. Azar*, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 64 (D.D.C. 2020).

Plaintiffs highlight dicta from the Sixth Circuit's decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), that "Title VII differs from Title IX in important respects," *id.* at 510 n.4, *see* Br. at 13, but the Sixth Circuit did not identify the specific language at issue here as being the differentiating factor between Title VII and Title IX. Indeed, the Sixth Circuit has recognized that "[g]enerally, courts have looked to Title VII, 42 U.S.C. § 2000e, as an analog for the legal standards in both Title IX discrimination and retaliation claims." *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007) (citations omitted).

Further, *Meriwether* did not address the FNA, and it cannot be said that the FNA's "by reason . . . of sex" is meaningfully different from the language in Title VII or Title IX. In fact, in *Bostock*, the Supreme Court explained in clear terms that "as this Court has previously explained, 'the ordinary meaning of 'because of' is '*by reason of*' or 'on account of.'" 140 S. Ct. at 1739 (emphasis added) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013)). Plaintiffs also briefly reference *Pelcha v. MW Bancorp., Inc.*, 988 F.3d 318 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 461 (2021); *see* Br. at 13, as relevant to this issue, but that case concerned neither Title IX nor the FNA.

The absence of any substantial linguistic or structural distinction between the non-discrimination mandates in Title VII, Title IX or the FNA renders Plaintiffs' claims unlikely to succeed. Nevertheless, Plaintiffs argue that *Bostock*'s reasoning was unlawfully applied by USDA to Title IX because "Title IX—unlike Title VII—also expressly authorizes separation based on sex in

28

certain circumstances," for example, by allowing "certain single-sex educational institutions and organizations," and allowing entities to maintain separate living facilities for different sexes. Br. at 13 (citing 20 U.S.C. §§ 1681(a)(1)-(9) & 1686). The Fourth Circuit rejected a similar argument in *Grimm,* where it held that the violation of Title IX is not in maintaining sex-separated facilities; it is in excluding transgender students from the sex-separated facility or program matching their gender identities. 972 F.3d at 618.

Plaintiffs fail in particular to explain how the text of the FNA can be distinguished from Title VII. They argue that "the term 'sex' ha[s] the same binary biological meaning" in the FNA as in Title IX. Br. at 15. But that point is irrelevant. In *Bostock*, the Supreme Court assumed, for the sake of argument, "that 'sex' signified . . . biological distinctions between male and female." 140 S. Ct. at 1739. But that was "just a starting point. The question isn't just what 'sex' meant, but what the [statute] says about it." *Id.* The Supreme Court explained that the statute prohibited discrimination against individuals "based on sex." *Id.* at 1741. The Supreme Court placed great significance on the fact that Title VII's anti-discrimination provision was focused on individuals—it meant that the law was focused on preventing employers from treating an "individual worse than others who are similarly situated," *id.* at 1740, and was not written so as to focus "on differential treatment between the two sexes as groups." *Id.* at 1741. With that focus in mind, the Court concluded that "it is impossible to discriminate against a person for being [gay] or transgender without discriminating against that individual based on sex." *Id.*

Likewise, the FNA's anti-discrimination language "focuses on protecting individuals from discrimination." May 5 Memo. at 2. The Act "focuses on individual households . . . as opposed to program applicants as a whole," *id.* at 2-3 (citing 7 U.S.C. § 2020(c)(1)). As USDA explained, "the focus on individual households and the prohibition of discrimination 'by reason of' sex under the [FNA] is sufficiently similar to Title VII such that the *Bostock* analysis applies to the [FNA]." *Id.* at 3.

Plaintiffs have not identified any textual provision in the FNA that suggests otherwise. Instead, they argue that "[e]ven if the Title VII reasoning of *Bostock* applied to [the FNA], [that law] would merely prohibit denying certification [for SNAP beneficiaries] because a household member is homosexual or transgender—a practice the States do not engage in"; it would "not prohibit States from maintaining sex-separated bathrooms or engaging in other non-certification practices that USDA . . . ha[s] apparently targeted." Br. at 17-18. But neither the May 5 Memo nor the Final Rule bear on issues related to "maintaining sex separated bathrooms and locker rooms, offering sex-separated athletic teams, or using biologically accurate pronouns," Br. at 19, and neither does the FNA. Kline Decl. ¶¶ 8-9. Plaintiffs have conjured up a fear of their own imagining, ignoring the reality of what the May 5 Memo and Final Rule do and do not do.

### D. Plaintiffs' Arbitrary-and-Capricious Claim Is Unlikely to Succeed

Plaintiffs' arbitrary-and-capricious argument is likewise unfounded. Br. at 12. To the extent it is not duplicative of its notice-and-comment and contrary-to-law claims, addressed above, it rests on the premise that "USDA intends to use the Final Rule or Memoranda as a mechanism to enforce its bathroom policy." Br. at 12. But there is no mention of any such school-related policy in the Final Rule or the May 5 Memo. *See* Kline Decl. ¶¶ 8-9.

The Final Rule and May 5 Memo clearly explain USDA's rationale for interpreting Title IX and the FNA to include prohibitions on discrimination against individuals on the basis of their sexual orientation or gender identity. *See* May 5 Memo at 1-3; 87 Fed. Reg. at 35,855-56. USDA's reasoning follows that of the Court in *Bostock*, and accounting for and employing the Supreme Court's rationale cannot be arbitrary and capricious. *Cf. Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1 (D.D.C. 2020) (finding Title IX rule arbitrary and capricious where agency failed to consider *Bostock*'s reasoning); *see generally FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (an agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one," but only

that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better.").

### E.  Plaintiffs' Assorted Constitutional Claims Are Unlikely to Succeed

Plaintiffs also set forth a smorgasbord of constitutional arguments under the Spending Clause, the Tenth Amendment, the First Amendment, and various doctrines such as the Anti-Commandeering Doctrine, the Non-Delegation Doctrine, and the Major Questions Doctrine.  All fail because USDA's Final Rule and May 5 Memo are based on a straightforward interpretation of Title IX and the FNA as confirmed by the Supreme Court in *Bostock*.

#### 1.  *Spending Clause*

The Supreme Court has long acknowledged—and the Constitution expressly provides—that "Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare" and "to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare." *Sabri v. United States*, 541 U.S. 600, 605 (2004).  Congress's power to impose conditions on the acceptance of federal funds applies regardless of whether Congress legislates "in an area historically of state concern." *Id.* at 608 n.*.

Plaintiffs contend that they lacked constitutionally adequate notice of the Final Rule and May 5 Memo, because neither of the statutes interpreted therein "unambiguously prohibit discrimination based on sexual orientation or transgender status."  Br. at 19 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  This claim is meritless.  As the Supreme Court made clear in *Bostock* after reviewing analogous language in Title VII, the "express terms of [the] . . . statute give us [the] . . . answer," 140 S. Ct. at 1737, which is that "it is impossible to discriminate against a person for being [gay] or transgender without discriminating against that individual based on sex."  140 S. Ct. at 1741. The Court noted that "Title VII's broad language," *id.* at 1747, encompassed other forms of discrimination, including "sexual harassment" and "motherhood discrimination," *id.* (internal

31

quotation marks omitted), and generally "all forms of discrimination because of sex, however they may manifest themselves or whatever labels might attach to them." *Id.* It has been two years since the *Bostock* decision was issued, and six years since the Sixth Circuit's decision in *Dodds v. Department of Education*, 845 F.3d 217, 221-22 (6th Cir. 2015) (per curiam), which found that Title IX prohibits discrimination based on sex stereotyping and gender nonconformity. Plaintiffs cannot say that they lacked notice that USDA, which already conditions its SNAP and SNAP-Ed funding on compliance with Title IX and the FNA, would inform states that compliance would need to be consistent with the agency's interpretation of those statutes in light of *Bostock*.

Plaintiffs further argue that the Final Rule and May 5 Memo violate the Spending Clause in that they are improperly coercive under *Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519, 584 (2012) ("*NFIB*"). In that case, the Supreme Court held that Congress could not make the entirety of a State's traditional Medicaid funding contingent on participation in a new program to provide health coverage for all low-income adults. But here, the Secretary is not "enlisting the States in a new . . . . care program." *Id. See Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 184 (5th Cir.), *cert. denied*, 141 S. Ct. 901 (2020) ("The problem in *NFIB* was that Congress had conditioned all of a state's Medicaid funding on accepting significant obligations that created a new program entirely different than the original one the state had opted in to."); *see also Tennessee v. U.S. Dep't of State*, 329 F. Supp. 3d 597, 629 (W.D. Tenn. 2018), *aff'd sub nom. State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499 (6th Cir. 2019), *cert. denied*, 141 S. Ct. 549 (2020) ("The State must also show that Congress has created a new condition that is different from the original program Congress is purporting to modify and is using that program's funding as leverage to force the states to accept the new condition."). Here, the Secretary is simply applying the existing provisions of Title IX and the FNA to its longstanding nutrition programs, including SNAP and SNAP-Ed, based on an interpretation of those statutes that has been recognized as valid under analogous circumstances in

32

*Bostock*. This does not constitute unlawful coercion under *NFIB*. Thus, Plaintiffs' Spending Clause claim is not likely to succeed.

### 2. *Tenth Amendment and Anticommandeering Doctrine*

Because the USDA's Final Rule and May 5 Memo are permissible under the Spending Clause, they do not constitute an impermissible "commandeering" of state-run institutions. As the Supreme Court has explained, valid conditions on the receipt of federal funds do not constitute commandeering. *See New York v. United States*, 505 U.S. 144, 167, 173 (1992) (contrasting funding conditions with commandeering).

### 3. *Separation of Powers and Non-Delegation Doctrine*

Plaintiffs further argue that USDA's Final Rule and May 5 Memo violate the major questions doctrine and the non-delegation doctrine. Br. at 23-24. Neither position has any merit. This is not one of those rare, extraordinary cases that raises the major questions doctrine. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (explaining that such cases are ones "in which the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority" (citations omitted)). USDA is not exercising any vast new authority to implement policies that Congress could not have intended. Congress clearly intended to prohibit sex discrimination against individuals under both Title IX and the FNA. Even if the drafters "weren't thinking about many of the [statutes'] consequences, . . . the limits of the drafters' imagination supply no reason to ignore the law's demands." *Bostock*, 140 S. Ct. at 1737. The Supreme Court made clear in *Bostock* that "Title VII's prohibition of sex discrimination in employment is a major piece of federal civil rights litigation," written in "starkly broad terms," that encompasses conduct in which employers "fir[e] employees *on the basis of* [sexual orientation] or transgender status." *Id.* at 1753 (emphasis added). This was why the Supreme Court found that opponents of this reading of Title VII could not "hide behind

33

the no-elephants-in-mouseholes cannon," *id.*; the expanse of the prohibition "has been standing before us all along." *Id. See also West Virginia v. EPA*, 142 S. Ct. at 2622 (Gorsuch, J., concurring) (identifying the elephants-in-mouseholes canon as part of the major questions analysis).

The States' nondelegation doctrine challenge is equally deficient. A "nondelegation inquiry always begins (and often almost ends) with statutory interpretation. The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States,* 139 S. Ct. 2116, 2123 (2019). "[T]he answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* Here, as in *Bostock*, "the express terms of [the statutes] give us one answer," 140 S. Ct. at 1737, which is that administrators of USDA-funded programs may not discriminate against individuals "on the basis of [sex, including. . .sexual orientation] or transgender status." *Id.* at 1753. Nothing more is required under the nondelegation inquiry.

### 4. *First Amendment*

Plaintiffs' First Amendment arguments are unlikely to succeed because they are based on unsupported speculation. For example, Plaintiffs contend that "USDA appears to have imposed the Department of Education's position that the use of biologically accurate pronouns could constitute unlawful discrimination." Br. at 20. But neither the Final Rule nor the May 5 Memo says anything of the sort. Plaintiffs suggest that such a position would violate the free speech rights of teachers and professors, citing, for example, *Meriwether v. Hartop*, 992 F.3 492 (6th Cir. 2021). But *Meriwether* involved an individual's free speech rights, not a state's, and USDA has not addressed pronoun usage in the challenged documents. Nor does this case present the sort of fact-intensive dispute that was at issue in *Meriwether*. USDA has not received a complaint, has not conducted any specific investigation, and has not made any determination that an individual's use of incorrect pronouns constitutes discrimination. This further underscores why Plaintiffs' challenge is not ripe.

34

Next, Plaintiffs inaccurately contend that the Final Rule and May 5 Memo conflict with religious liberty guarantees under the First Amendment, the Religious Freedom Restoration Act, and federal antidiscrimination laws. Br. at 20-21. Plaintiffs note that those authorities provide "robust protections for religious employers and employees." Br. at 20. But whatever those protections maybe be, they do not belong to the States, and the States lacks standing to assert them on behalf of religious employers and employees. *See, e.g., Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("While the state, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government."); *Kentucky v. Biden*, 23 F.4th 585, 597 (6th Cir. 2022) (same); *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1208 (D.N.M. 2020) (noting general consensus "that the First Amendment works in one direction: it protects people and private entities, not governments").

Moreover, the States fail to acknowledge that Title IX and USDA's own regulations contain a religious exemption. Since its enactment, Title IX has exempted educational institutions that are controlled by religious organizations from complying with Title IX's prohibitions that conflict with its religious tenets. *See* 20 U.S.C. § 1681(a)(3). Since April 1979, USDA's Title IX regulations have made clear that they do "not apply to an educational institution which is controlled by a religious organization to the extent application of this part would not be consistent with the religious tenets of such organization." *See* 44 Fed. Reg. 21,610, 21,613 (Apr. 11, 1979). On October 6, 2017, USDA updated its Title IX regulations but the language of the religious exemption in the new regulation, 7 C.F.R. § 15a.205, provides the same exemption for religious organizations as the 1979 language ("This part does not apply to any operation of an educational institution or other entity that is controlled by a religious organization to the extent that application of this part would not be consistent with the religious tenets of such organization."). *See* 82 Fed. Reg. 46,655, 46,659 (Oct. 6, 2017); 7 C.F.R. § 15a.205(a). The States do not identify any specific religious employer or employee who will be

harmed by the Final Rule or May 5 Memo, nor could they in light of these exemptions.

Finally, the States argue that the USDA's actions violate their own First Amendment rights. Br. at 21. But, of course, States do not have First Amendment rights.[7] *See Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 139 (1973) (Stewart, J., concurring); *New Mexico v. McAleenan,* 450 F. Supp. 3d at 1208.

The First Amendment protects the rights of individuals against infringement by the government, not the rights of States against the federal government. That work is done by the Tenth Amendment, under which, as described above, the States' arguments also fail.

### III.   THE OTHER EQUITABLE FACTORS FAVOR DEFENDANTS

#### A. Plaintiffs Have Not Demonstrated an Irreparable Harm from the Denial of Injunctive Relief

Plaintiffs have failed to meet their burden to show that they will suffer irreparable harm in the absence of a preliminary injunction. Plaintiffs have "the burden of establishing a clear case of irreparable injury," *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968) (per curiam), and their burden to show irreparable harm is higher than what is required to establish standing. *See Ohio v. Yellen*, 539 F. Supp. 3d 802, 820-21 (S.D. Ohio 2021). To satisfy the "high standard" for establishing irreparable harm, Plaintiffs must show that their asserted injuries are "real," "substantial," and "immediate," not speculative or conjectural. *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983); *see also Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020). And, as relevant here, "[a]n injunction against [even] threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin." *Travis v. Pennyrile Rural Elec. Co-op.*, 399 F.2d 726, 729 (6th Cir. 1968); *Thunder Basin*, 510 U.S. at 217-18.

---

[7] Plaintiffs cite *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), and *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022). Br. at 21. Neither case is applicable here because they did not address the constitutional rights of states.

Here, Plaintiffs seek to preemptively enjoin USDA's interpretations of Title IX and the FNA in the absence of any particular enforcement action. Even if USDA were to bring an enforcement action under Title IX or the FNA against Plaintiffs consistent with the challenged interpretations—a possibility that seems highly speculative given that Plaintiffs disavow discrimination on the basis of sexual orientation and gender identity in relation to the USDA's programs—Plaintiffs would have "an adequate opportunity to fully present [their] defenses and objections" in any such enforcement proceeding. *Id. See supra* at 7-9 (describing procedures). Accordingly, Plaintiffs cannot show irreparable harm in the absence of the injunction they seek.

Plaintiffs allege that their sovereign interests would be infringed if the Defendants were permitted to enforce their interpretations of Title IX and the FNA. But, as discussed previously, Plaintiffs allege only that certain state laws may "arguably" conflict with Defendants' interpretations of Title IX and the FNA. Compl. ¶¶ 130-31; *see also* Br. at 8. Particularly where they identify no pending enforcement action against them, this is a far cry from the "certain and immediate" harm that would merit a preliminary injunction. *Memphis A. Philip Randolph Inst.*, 978 F.3d at 391.

### B. The Public Interest and Balance of the Equities Favor Defendants

An injunction is also improper because the balance of the equities and the public interest are in Defendants' favor. As a reminder, where the federal government is the defendant, these two factors merge. *Daunt*, 956 F.3d at 422. Plaintiffs cannot establish that their alleged injury to their sovereignty outweighs any harm that an injunction would cause the government and unrepresented third parties, or that granting the injunction would not be adverse to the public interest. *McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012).

This is particularly so in light of the substantial public interest in achieving Title IX's and the FNA's goals of eliminating sex discrimination. Indeed, the Plaintiffs themselves forswear such discrimination. Violations of federal civil rights statutes constitute irreparable harm as a matter of law.

37

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993); *Rogers v. Windmill Pointe Vill. Club Ass'n*, 967 F.2d 525, 528 (11th Cir. 1992). An injunction prohibiting USDA from making clear that Title IX and the FNA prohibit discrimination on the basis of sexual orientation or gender identity would have a severe impact on a vulnerable population. *Dodds*, 845 F.3d at 222 (holding that the public interest weighed heavily against a stay of an injunction where the injunction sought to protect a transgender student's constitutional and civil rights, "a purpose that is always in the public interest"). Given that Plaintiffs are not in imminent danger of losing funds from USDA and have not shown how their state laws are impacted by the Final Rule and May 5 Memo, they have not identified a sufficiently serious irreparable harm that would justify inflicting these injuries.

### C. Any Injunctive Relief Should Be Limited

If this Court were to enjoin any aspect of the challenged documents (and it should not), its injunction should apply only to Plaintiffs, excluding those in the Fourth and Seventh Circuits where the courts of appeals have already concluded that Title IX prohibits discrimination based on sexual orientation or gender identity. Injunctions must be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring) (criticizing injunctions that apply beyond the parties to the suit). This is particularly true in matters involving injunctive relief against the federal government. *Id.* ("[A] district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government."). Accordingly, nonplaintiff States should not be subject to injunctive relief here.

Furthermore, in the Fourth and Seventh Circuits that have held that Title IX precludes discrimination based on gender identity, it would be inappropriate for this Court to enjoin the federal government from enforcing that view of the law. *See, e.g., Grimm*, 972 F.3d at 618-19; *Whitaker by*

38

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir, 2017), *abrogation on other grounds as recognized by Ill. Rep. Party v. Prtizker*, 973 F.3d 760 (7th Cir. 2020); *see also United States v. AMC Ent., Inc.*, 549 F.3d 760, 773 (9th Cir. 2008) ("[p]rinciples of comity require that, once a sister circuit has spoken to an issue, that pronouncement is the law of that geographical area").  This would include Plaintiffs Indiana, South Carolina, Virginia, and West Virginia.

## CONCLUSION

For all these reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

Dated: September 9, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA WELLS
Assistant Branch Director, Federal Programs
Branch

*/s/ JONATHAN D. KOSSAK*
JONATHAN D. KOSSAK
Trial Attorney (DC Bar # 991478)
CODY T. KNAPP
Trial Attorney (NY Bar # 5715438)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel. (202) 305-0612
Email:  Jonathan.Kossak@usdoj.gov
            Cody.Knapp@usdoj.gov

*Counsel for Defendants*