**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

THE STATE OF TENNESSEE, *et al.*,

           Plaintiffs,


v.


UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

           Defendants.

Case No. 3:22-cv-00257
District Judge Travis R. McDonough,
Magistrate Judge Debra C. Poplin

**REPLY IN SUPPORT OF THE STATES'**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION.................................................................................................................. 1

ARGUMENT......................................................................................................................... 2

I.     This Court Has Jurisdiction to Adjudicate the States' Claims............................... 2

     A.     The States have standing to challenge the USDA's rules. ...................................2

     B.     The States' claims are ripe for judicial review.......................................................5

     C.     The States lack an adequate alternative remedy. ...................................................5

II.     USDA Failed to Follow Proper Rulemaking Procedures......................................... 8

III.     USDA's Actions were Arbitrary and Capricious.................................................... 11

IV.     USDA's Rules are Contrary to Title IX and the Food and Nutrition Act. ............... 12

     A.     The Final Rule and Memoranda are Contrary to Title IX. .............................12

     B.     The Final Rule and Memoranda are Contrary to the Food and Nutrition Act.
          15

V.     The Final Rule and Memoranda Violate the U.S. Constitution. ................................ 16

VI.     The Equities Favor a Preliminary Injunction. ......................................................... 21

     A.     The States are already suffering irreparable harm. ...........................................21

     B.     The public interest favors an injunction...............................................................21

     C.     Injunctive relief should apply to all Plaintiff States. ........................................22

CONCLUSION ................................................................................................................... 23

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ............................................................................................ 21

*Advocs. for Highway & Auto Safety v. FMCSA,*
41 F.4th 586 (D.C. Cir. 2022) ................................................................................. 12

*Am. Clinical Lab'y Ass'n v. Becerra,*
40 F.4th 616 (D.C. Cir. 2022) ................................................................................... 4

*Appalachian Power Co. v. EPA,*
208 F.3d 1015 (D.C. Cir. 2000) ......................................................................... 10, 11

*Bennett v. Spear,*
520 U.S. 154 (1997) ................................................................................................... 9

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ...................................................................................... passim

*Broadgate Inc. v. U.S. Citizenship & Immigr. Servs.,*
730 F. Supp. 2d 240 (D.D.C. 2010) .......................................................................... 9

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ................................................................................... 21

*Chamber of Com. v. Edmondson,*
594 F.3d 742 (10th Cir. 2010) ................................................................................. 21

*Chesapeake Climate Action Network v. EPA,*
952 F.3d 310 (D.C. Cir. 2020) .................................................................................. 8

*Deja Vu of Nashville, Inc. v. Metro. Gov't,*
274 F.3d 377 (6th Cir. 2001) ................................................................................... 21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ............................................................................................ 11

*Dist. of Columbia v. USDA,*
496 F. Supp. 3d 213 (D.D.C. 2020) .................................................................. 7, 8, 9

ii

*Dist. of Columbia v. USDA*,
  444 F. Supp. 3d. 1 (D.D.C.) ............................................................................. 21

*Dodds v. U.S. Dep't. of Educ.*
  845 F.3d 217 (6th Cir. 2016) ........................................................................... 21

*Doe v. U.S. Customs & Border Protection*,
  No. 20-672, 2021 WL 980888 (D.C. Cir. Mar. 16, 2021) ........................................ 9

*Doe v. Univ. of Scranton*,
  No. 3:19-CV-01486, 2020 WL 5993766 (M.D. Pa. Oct. 9, 2020) ........................... 15

*Elk Run Coal Co. v. Dep't of Lab.*,
  804 F. Supp. 2d 8 (D.D.C. 2011) ....................................................................... 7

*Epperson v. Arkansas*,
  393 U.S. 97 (1968) ......................................................................................... 19

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) .................................................................................... 12

*Franciscan Alliance, Inc. v. Becerra*,
  No. 21-11174, 2022 WL 3700044 (5th Cir. Aug. 26, 2022) .................................. 15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ......................................................................................... 7

*Garcetti v. Ceballos*,
  547 U.S. 4108 (2006 ....................................................................................... 20

*Gen. Elec. Co. v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002) ........................................................................... 5

*Gilliam v. USDA*,
  486 F. Supp. 3d 856 (E.D. Pa. 2020) .................................................................. 7

*Gitlow v. New York*,
  268 U.S. 652 (1925 ........................................................................................ 19

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ........................................................................... 12

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric.*,
  959 F.3d 178 (5th Cir. 2020) ........................................................................... 21

iii

*Hall v. USDA,*
467 F. Supp. 3d 838 (N.D. Cal. 2020) ................................................... 7

*Iowa Utilities Bd. v. FCC,*
109 F.3d 418 (8th Cir. 1996) ................................................................. 21

*Jafarzadeh v. Duke,*
270 F. Supp. 3d 296 (D.D.C. 2017) ......................................................... 7

*Kennedy v. Bremerton Sch. Dist.,*
142 S. Ct. 24073 (2022 ......................................................................... 20

*Kentucky v. Biden,*
23 F.4th 585 (6th Cir. 2022) ................................................................. 19

*Kentucky v. Yellen,*
563 F. Supp. 3d 647 (E.D. Ky. 2021) ..................................................... 18

*Leyse v. Clear Channel,*
*Broad.*, 545 F. App'x 444 (6th Cir. 2013) ............................................... 8

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ............................................................................... 2

*McNary v. Haitian Refugee Ctr., Inc.,*
498 U.S. 479 (1991) ............................................................................... 6

*Meriwether v. Hartop*
992 F.3d 492 (6th Cir. 2021) ......................................................... passim

*Nat. Res. Def. Council v. EPA,*
279 F.3d 1180 (9th Cir. 2002) ............................................................... 11

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ............................................................................. 17

*Nat'l Min. Ass'n v. Dep't of Labor,*
292 F.3d 849 (D.C. Cir. 2002) ............................................................. 6, 7

*Nat'l Min. Ass'n v. McCarthy,*
758 F.3d 243 (D.C. Cir. 2014) ............................................................... 10

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
145 F.3d 1399 (D.C. Cir. 1998) ............................................................. 22

iv

*Nelson v. Christian Bros. Univ.*,
   226 F. App'x 448 (6th Cir. 2007) ................................................................. 14

*New York v. United States*,
   505 U.S. 144 (1992)....................................................................................... 20

*Nken v. Holder*,
   556 U.S. 418 (2009)....................................................................................... 21

*Pederson v. LSU*,
   213 F.3d 858 (5th Cir. 2000) ........................................................................ 17

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ........................................................... 14, 15, 16

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981).......................................................................................... 17

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979)...................................................................................... 14

*Sackett v. EPA*,
   566 U.S. 120 (2012)........................................................................................ 7

*Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*,
   584 F.3d 253 (6th Cir. 2009) ...................................................................... 2, 4

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) ....................................................................... 2

*South Dakota v. Dole*,
   483 U.S. 203 (1987)...................................................................................... 19

*State Nat'l Bank of Big Spring v. Lew*,
   795 F.3d 48 (D.C. Cir. 2015)....................................................................... 2, 4

*Steele v. Bulova Watch Co.*,
   344 U.S. 280 (1952)...................................................................................... 23

*Tenn. Hosp. Ass'n v. Azar*,
   908 F.3d 1029 (6th Cir. 2018) ............................................................ 9, 10, 11

*Tennessee v. U.S. Dep't of Educ.*,
   No. 3:21-CV-308, 2022 WL 2791450 (E.D. Tenn. July 15, 2022) ................... passim

v

*Tennessee v. U.S. Dep't of State,*
    329 F.Supp.3d 597 (W.D. Tenn. 2018) ................................................................. 17

*Tennessee v.U.S. Dep't of State,*
    931 F.3d 499 (6th Cir. 2019) .............................................................................. 18

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ...................................................................................... 5, 6

*Trans-Pac. Freight Conf. of Japan/Korea v. Fed. Maritime Comm'n,*
    650 F.2d 1235 (D.C. Cir. 1980) ............................................................................ 7

*U.S. Army Corps of Engineers v. Hawkes Co.,*
    578 U.S. 590 (2016) ........................................................................................ 7

*United States v. AMC Ent., Inc.,*
    549 F.3d 760 (9th Cir. 2008) ............................................................................. 23

*United States v. Fla. E. Coast Ry. Co.,*
    410 U.S. 224 (1973) ........................................................................................ 6

*United States v. Glaser,*
    14 F.3d 1213 (7th Cir. 1994) ............................................................................. 23

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 2000 (2015 ...................................................................................... 19

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ......................................................................... 2, 3, 4, 20

*Zukerman v. USPS,*
    961 F.3d 431 (D.C. Cir. 2020) ............................................................................. 5

**Statutes**

5 U.S.C. § 551 ....................................................................................................... 6

5 U.S.C. § 553(b)(3) ................................................................................................ 8

5 U.S.C. § 706 .................................................................................................. 11, 22

5 U.S.C. § 706(2) ................................................................................................. 3, 8

5 U.S.C. § 706(2)(A) ............................................................................................... 11

7 U.S.C. § 2014(b) ................................................................................................. 16

7 U.S.C. § 2020(c)(1) .......................................................................................... 1, 15

7 U.S.C. § 2020(c)(2) ............................................................................................ 15

7 U.S.C. § 2020(g) ................................................................................................. 6

7 U.S.C. § 2023(a)(13) ........................................................................................... 6

20 U.S.C. § 1681(a) .......................................................................................... 13, 14

20 U.S.C. § 1686 .................................................................................................. 13

42 U.S.C. § 2000e-2(a)(1) ..................................................................................... 14

U.S. Const. amend. I ............................................................................................. 19

### Other Authorities

U.S. Const. amend. I ............................................................................................. 19

7 C.F.R. § 272.2(b)(2) ............................................................................................. 4

## INTRODUCTION

USDA's response only confirms the need for an injunction pending resolution of this case. Acting on the U.S. Department of Education's erroneous rewriting of Title IX, which this Court has already enjoined, *see Tennessee v. U.S. Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *21, *24 (E.D. Tenn. July 15, 2022), USDA dictated that Federal-State SNAP Agreements and other documents and publications *all* list "gender identity" and "sexual orientation" as discrimination-protected characteristics. *See* Doc. 1-5, Final Rule, 87 Fed. Reg. 35,855, 35,857 (June 14, 2022); Doc. 1-1, Memorandum at 2; Doc. 1-4, Supplemental Memorandum at 1-2. And the agency has *not* limited its new policy to "the certification of applicant households" for SNAP benefits. 7 U.S.C. § 2020(c)(1). Instead, it has required the States and their SNAP-administering agencies to implement this policy on the "institution[al]" level, reaching matters well beyond USDA's proper purview. USDA, Food & Nutrition Serv. Nondiscrimination Statement (May 5, 2022), https://bit.ly/3nZTc6W ("Nondiscrimination Statement"); *see* Doc. 1-3, Memorandum Q&A at 2-3 (requiring this new Nondiscrimination Statement).

Pressed to defend its actions in court, Defendants insist that USDA was "merely . . . remind[ing] stakeholders of the meaning of sex discrimination." Doc. 54, Opp. 1. In the agency's view, the States have simply "imagin[ed]" the broader sweep of its edicts, and there is thus no need for a lawsuit. Opp. 30. If USDA's litigating position matched its policies, the States might agree. But the actual terms of USDA's Final Rule and Memoranda require far more than a commitment to "not deny [SNAP] benefits based on a household member's sexual orientation or gender identity." Doc. 1, Compl. ¶ 12. So long as those documents are in force, the States have standing to challenge them, ripe claims for relief, and a pressing need for an injunction pending further litigation.

1

## ARGUMENT

**I.      This Court Has Jurisdiction to Adjudicate the States' Claims.**

USDA cannot evade review by challenging this Court's jurisdiction.  The Final Rule and Memoranda regulate the States directly as administrators of the SNAP and SNAP-Ed programs.  As a result of that direct regulation, the States have standing to challenge USDA's new policy directives, and their claims ripened the day those directives issued.  Because the claims broadly attack USDA's rules and rulemaking process—not some imminent or ongoing administrative adjudication—they fall outside the channeling provisions USDA raises as an obstacle to review.

### A.      The States have standing to challenge the USDA's rules.

USDA's standing arguments strain credulity.  The States' standing is "self-evident" in this case, *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002), because the States are "regulated . . . entit[ies]" challenging "illegal . . . rule[s] under which [they are] regulated," *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)).  Indeed, the States "are 'the object[s] of' [USDA's] requirement" that all SNAP administrators adopt new policies for processing discrimination complaints, *West Virginia v. EPA*, 142 S. Ct. 2587, 2606 (2022) (quoting *Lujan*, 504 U.S. at 561-62); *see* Memorandum at 4, "objects" of USDA's requirement that all Federal-State Agreements and program posters list "gender identity and sexual orientation" as protected characteristics, *see* Doc. 1-2, Cover Letter at 1; and, most importantly, "objects" of USDA's requirement that all SNAP administrators refrain from gender identity and sexual orientation discrimination on the "institution[al]" level—not just in the administration of SNAP.  Nondiscrimination Statement. Each of those requirements carries a "cost" associated with "compliance," *Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 262 (6th Cir. 2009), and a burden on State autonomy,

2

*see* Doc. 3, Br. 8. There can thus "be 'little question' that the rule[s] . . . injure the States," *West Virginia*, 142 S. Ct. at 2606, and this Court can redress those injuries by "set[ting] aside" the rules, 5 U.S.C. § 706(2).

USDA nonetheless insists that the States have sued over nothing more than "an abstract disagreement" because the States "affirm that they do not engage in discrimination in the administration of SNAP on the basis of gender identity or sexual orientation." Opp. 14 (citing Compl. ¶¶ 12, 40; Br. 1, 17). To be clear, the States do not "*deny* [*SNAP*] *benefit*s based on a household member's sexual orientation or gender identity." Compl. ¶ 12 (emphasis added); *see* Br. 1. And if that were the only practice touched by USDA's rules, the States would drop this lawsuit. But that is not what the Memoranda and Final Rule say. Instead, those documents require the States to espouse and adopt broader nondiscrimination policies that purportedly stretch beyond SNAP certification of applicant households, and even beyond SNAP administration more generally, to *all* conduct of any SNAP-administering "institution." *See* Nondiscrimination Statement. That expansive sweep does, in fact, give rise to the injuries underlying this suit.

Try as it might, USDA cannot sever those injuries from its own conduct. Although the agency now claims the rules have no "independent legal significance," Opp. 16, the record belies that assertion, *see, e.g.*, Final Rule, 87 Fed. Reg. at 35,855 ("The protections included in *this rule* will prevent discrimination . . . ." (emphasis added)). The Final Rule and Memoranda command state actions not dictated by Congress. Indeed, USDA conducted notice-and-comment rulemaking—albeit improperly—precisely because its new Federal-State Agreement imposes specific language *not* contained in the Food and Nutrition Act or prior Federal-State Agreements. *See, e.g.*, Final Rule, 87 Fed. Reg. at 35,855 (claiming that "[c]odifying civil rights protections" through "update[d]" language "is vital to the success of SNAP"). And despite what the agency

3

now implies, *see* Opp. 17 (citing 7 C.F.R. § 272.2(b)(2)), that language is *not* negotiable: When Nebraska submitted its updated Federal-State Agreement without the new "including gender identity and sexual orientation" clause, USDA required Nebraska to resubmit its Federal-State Agreement with that objectionable clause. Ex. A, Botelho Decl. ¶¶ 5-6. Nebraska only did so under protest and submitted a letter to that effect. Ex. A, Botelho Decl. ¶¶ 7-10. Other States, such as Montana and Tennessee, have also signed updated Federal-State Agreements with riders explaining that they do *not* accept USDA's unlawful attempt to impose the "gender identity and sexual orientation" language on them. Ex. B, Hermanson Decl. ¶ 6; Ex. C, Thaxton Decl. ¶ 4.

The fact that some States may assent to new language in their Federal-State Agreements is no impediment to this Court's jurisdiction, either. The States have acknowledged that, without a preliminary injunction, they may be forced to yield to USDA's pressure and "change how they operate SNAP," Br. 5 (citing Doc. 3-2, Crum Decl. ¶¶ 7-10), but that ongoing burden on state autonomy is itself a harm undergirding this lawsuit. Indeed, the States' standing *does not* turn on any "refus[al] to sign the new" Agreements or any commitment to disregard the Memoranda. Opp. 17. On the contrary, the States can derive standing from the costs and burdens of *complying* with the Final Rule and Memoranda as "regulated . . . entit[ies]." *State Nat'l Bank of Big Spring*, 795 F.3d at 53; *see Sch. Dist. of Pontiac*, 584 F.3d at 262; *cf. West Virginia*, 142 S. Ct. at 2606 ("There can be 'little question' that the rule[s] . . . injure the States."). Such costs and burdens were imminent "at the time [the States] filed [their] complaint," *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 622 (D.C. Cir. 2022), because they agency was already demanding that States update their complaint-processing procedures, *see* Memorandum at 1-3, publish the new Nondiscrimination Statement, *see* Supplemental Memorandum at 1, and adopt USDA's view of Title IX discrimination on the "institution[al] level," Nondiscrimination Statement. The costs and

4

burdens associated with those directives will perpetuate the underlying controversy unless USDA permanently abandons its new rules and "eradicate[s] the[ir] effects," *Zukerman v. USPS*, 961 F.3d 431, 443 (D.C. Cir. 2020). USDA's failure to do so confirms the States' standing to sue.

**B.      The States' claims are ripe for judicial review.**

USDA next suggests the States' claims are not ripe for review. *See* Opp. 18. That, too, is wrong. These claims ripened as soon as USDA published its Final Rule and Memoranda containing the mandates at issue. *See, e.g.*, *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380-81 (D.C. Cir. 2002) (holding a challenge to an EPA "guidance document" ripe because the document contained final, legislative rules). To argue otherwise, USDA must reconceive this lawsuit as a preemptive collateral attack on some future administrative order "suspending, terminating, or refus[ing]" SNAP funding to one or more of the States. Opp. 18. That is not accurate. Contrary to USDA's belief, this is a challenge to the new mandates themselves, not some "application of the agency's position to particular facts." *Gen. Elec.*, 290 F.3d at 381. "In this situation, nothing would be gained from delaying review." *Id.* Defendants' ripeness argument fails.

**C.      The States lack an adequate alternative remedy.**

As should be clear by now, Defendants' attempt to channel this lawsuit through an administrative adjudication necessarily fails as well. Relying primarily on *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), Defendants argue that the States should raise their grievances "in defense of" some yet-uninitiated "enforcement action," Opp. 19. According to the agency, "Congress intended Title IX and the FNA to create exclusive avenues for challenging enforcement actions brough by the federal government under those laws," Opp. 19-20, so the States cannot invoke the APA's more-general review provisions to challenge the Final Rule and Memoranda. Again, the agency's obfuscation buckles under scrutiny.

5

*Thunder Basin* is irrelevant. In that case, a mine operator sought to short-circuit an administrative adjudication by securing an injunction against the Secretary of Labor in federal district court. *See* 510 U.S. at 204–05. The Supreme Court checked that maneuver, reasoning that the Mine Act vested the Federal Mine Safety and Health Review Commission with "exclusive jurisdiction over challenges to agency enforcement proceedings" and subjected the Commission's decisions to review in "the [federal] courts of appeals." *Id.* at 208. According to the Supreme Court, "[n]othing in the language [or] structure of the [Mine] Act or its legislative history" could be read "to allow mine operators to evade the statutory-review process by enjoining the Secretary from commencing enforcement proceedings." *Id.* at 216. The lawsuit was thus premature.

Yet, unlike the plaintiff in *Thunder Basin*, the States in this case have brought a "broad-scale attack on the" USDA's new "*regulations*," *Nat'l Min. Ass'n v. Dep't of Labor*, 292 F.3d 849, 856 (D.C. Cir. 2002) (emphasis added), not an anticipatory challenge to "enforcement proceedings," Opp. 21. Administrative law "typically treat[s] . . . regulations" that follow rulemaking "differently from" orders that follow "adjudication[s]." *Nat'l Min. Ass'n*, 292 F.3d at 857 (citing *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224 (1973)); *see also* 5 U.S.C. § 551 (distinguishing "rule[s]" of general applicability from "order[s]" applied to a specific party). And only a dispute over the latter could fall within the relevant claim-channeling provisions, which apply to any "final determination," 7 U.S.C. § 2023(a)(13), finding that a State has "fail[ed] . . . without good cause to comply with" its SNAP-implementing obligations, *id.* § 2020(g); *cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (reading the phrase "determination" to refer only to an individual adjudication—not a determination made in a regulation).

6

No such order has issued in this case, and Plaintiff States are not attempting to preempt one. Instead, "[i]n the case at bar," USDA has promulgated regulations "prospective in operation and general in scope," and the States have challenged "all of [those] regulations together as well as the entire rulemaking process." *Nat'l Min. Ass'n*, 292 F.3d at 858 (quoting *Trans-Pac. Freight Conf. of Japan/Korea v. Fed. Maritime Comm'n*, 650 F.2d 1235, 1244-45 (D.C. Cir. 1980)). Under these circumstances, the States' claims are wholly collateral to statutory review processes set out in Title IX and the FNA, and *that* finding clearly supports the conclusion that Congress did not intend to relegate these types of claims to the USDA. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010); *cf. Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 308 (D.D.C. 2017) (permitting review of "the allegedly unlawful processes and practices" an agency applied to *all* adjudications); *Elk Run Coal Co. v. Dep't of Lab.*, 804 F. Supp. 2d 8, 19 (D.D.C. 2011) (permitting review of "broad facial and systemic challenges" to agency action). Federal district courts have repeatedly exercised jurisdiction over this type of claim. *See, e.g.*, *Dist. of Columbia v. USDA*, 496 F. Supp. 3d 213 (D.D.C. 2020); *Gilliam v. USDA*, 486 F. Supp. 3d 856 (E.D. Pa. 2020); *Hall v. USDA*, 467 F. Supp. 3d 838 (N.D. Cal. 2020). This Court should do the same.

Moreover, even if this case were construed as a "pre-enforcement" challenge to some administrative punishment, it would not matter. "[A] long line of precedent allow[s]" such challenges, and rightfully so. *Tennessee*, 2022 WL 2791450, at *9. Indeed, "[a]s the Supreme Court recognized in both [*Sackett v. EPA*, 566 U.S. 120 (2012)] and [*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016)], helplessly awaiting the initiation of enforcement proceedings . . . and risking potential liability in the interim is not an adequate remedy under the APA." *Tennessee*, 2022 WL 2791450, at *18. The Court has jurisdiction to decide the merits of this case.

7

## II. USDA Failed to Follow Proper Rulemaking Procedures.

Upon reaching the merits, the Court should curb USDA's flouting of the APA's mandatory rulemaking procedures. The Final Rule announced non-discrimination requirements conspicuously missing from the agency's rulemaking proposal, and the Memoranda imposed legislative rules without providing any notice at all. Those defects alone require this Court to set aside USDA's rules. *See* 5 U.S.C. § 706(2).

**Final Rule.** USDA enacted its Final Rule without providing fair notice or the opportunity for public comment. *See* Br. 9-10; 5 U.S.C. § 553(b)(3). The agency does not deny that its rulemaking proposal "lack[ed] of any mention" of gender identity or sexual orientation. *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 320 (D.C. Cir. 2020). Nor does it dispute that those requirements "eliminate, rather than retain, the status quo" by imposing new obligations on the States. *Dist. of Columbia v. USDA*, 496 F. Supp. 3d at 231 (cleaned up). Instead, it briskly maintains that the Final Rule's expansion was "entirely foreseeable" because (1) the proposal referenced discrimination "on the grounds of sex," and (2) parties in pending litigation had argued that such language extends beyond biological sex. Opp. 26-27. That is no defense.

To begin with, Defendants offer no authority for their novel conception of notice. That should come as no surprise. Adopting USDA's approach would require the public to scour federal dockets to divine an agency's thinking, all but eliminating the agency's obligation to provide "fair notice" itself. *Leyse v. Clear Channel Broad.*, 545 F. App'x 444, 454 (6th Cir. 2013).

This case amply illustrates what would result from that arrangement. USDA's initial proposal elicited only five comments, not one of which addressed sexual orientation or gender identity. *See* Supplemental Nutrition Assistance Program: Civil Rights Update to the Federal-

8

State Agreement, Regulations.gov (Nov. 16, 2016).[1]  By contrast, a recent notice that expressly proposed expanding Title IX to discrimination based on gender identity and sexual orientation received over 240,000 comments—many of which directly address those issues.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Regulations.gov (Sept. 14, 2022).[2]  This disparity shows that USDA "failed to give the public any inkling" that these groups would be included in the Final Rule.  *See Dist. of Columbia v. USDA*, 496 F. Supp. 3d at 231.

On this record, USDA cannot credibly deny its attempt to sneak in new anti-discrimination requirements through a long-dormant rulemaking proposal—removing the public from the process entirely.  This Court should not allow that blatant disregard of mandatory administrative procedure.

**Memoranda.**  With respect to the Memoranda, USDA failed to even attempt a public comment process.  The agency claims it did not have to comport with the APA's notice-and-comment requirements because the Memoranda qualify as "interpretive document[s] that do[] not constitute final agency action."  Opp. 22; *see* Opp. 22-24.  That argument mixes the final-agency-action inquiry with the interpretive-or-legislative-rule determination.  Regardless, the Memoranda satisfy both inquiries by imposing binding obligations on regulated parties.  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (agency action is final if it imposes "obligations"); *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (rule is legislative if "create[s] new . . . duties").  Indeed, "[l]egislative . . . rules are, by definition, final agency action."  *Doe v. U.S. Customs & Border Protection*, No. 20-672, 2021 WL 980888, at *9 (D.C. Cir. Mar. 16, 2021) (quoting *Broadgate*

---

[1] https://www.regulations.gov/document/FNS-2016-0078-0001/comment.
[2] https://www.regulations.gov/document/ED-2021-OCR-0166-0001.

9

*Inc. v. U.S. Citizenship & Immigr. Servs.*, 730 F. Supp. 2d 240, 243 (D.D.C. 2010)), and the Memoranda contain legislative rules.

Contrary to USDA's contentions, the Memoranda do far more than "simply state[] what the administrative agency thinks the statute means." Opp. 22 (quoting *Azar*, 908 F.3d at 1042). In addition to creating "new law," *Tennessee*, 2022 WL 2791450, at *21, the Memoranda impose concrete obligations and other "changes" that "impact [State] operations." Cover Letter at 1. For example, State agencies "must" publish USDA's new Nondiscrimination Statement on their websites "within 90 days" and must update "[d]ocuments, pamphlets, brochures, etc., . . . when current supply on hand is exhausted or by September 30, 2023." Supplemental Memorandum at 1. The Memoranda also list "steps [that] must be taken by State Agencies and program operators" to effectuate USDA's new policies: they must "update their . . . complaint processing procedures," Memorandum Q&A at 2, and ensure that "[a]ll new printing" contains the new Nondiscrimination Statement, Supplemental Memorandum at 1. In short, these obligations constitute far more than a non-binding interpretation that States are "free to ignore." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). The Memoranda "read[] like a ukase": they "command[]," they "require[]," they "order[]," and they "dictate[]." *Id.* (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000)). In fact, Defendants themselves suggest that USDA "could . . . bring an enforcement action" for violation of these new obligations, which soundly confirms the legislative nature of the rules. Opp. 24; *see Appalachian Power*, 208 F.3d at 1021 (stating that a rule qualifies as legislative if an agency can "base[] enforcement actions on the policies or interpretations formulated in the document")

Lastly, the fact that the rules may "flow from" a statutory regime does not make them interpretive. Opp. 25. USDA must ground *all* its actions in some grant of "statutory . . . authority,"

10

5 U.S.C. § 706, so in that sense, all its rules do "flow from" a statute, Opp. 25. But in this case, USDA was not "merely inform[ing] the public of [its] interpretation" of a statute when it required States' websites to contain a new Nondiscrimination Statement within 90 days. *Id.* at 24. Rather, it was "giv[ing] the States their 'marching orders' and . . . expect[ing] the[m] to fall in line." *Appalachian Power*, 208 F.3d at 1023. Such "mandatory language" imposed concrete obligations subject to judicial review. *Env't Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005).

Because USDA "attempt[ed] to issue . . . legislative rule[s] without abiding by the APA's procedural requirements," the States will likely succeed on the merits of their procedural challenge. *Azar*, 908 F.3d at 1042.

## III.   USDA's Actions were Arbitrary and Capricious.

Even if the Final Rule and Memoranda had sprung from appropriate procedures, they would still be "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A); *see* Br. 12. For one, as a matter of law, an agency decision made "without adequate notice and comment is arbitrary or an abuse of discretion"—a point USDA does not dispute. *See Nat. Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002). Moreover, USDA effectively admits that it failed to consider the reliance interests associated with banning sex-separated facilities, claiming only that the Final Rule and Memoranda do not "mention" that issue. Opp. 30. Whether mentioned directly or not, the new rules do implicate facilities and other sex-based policies by banning gender identity discrimination on the "institution[al]" level. Nondiscrimination Statement. USDA was thus required to consider reliance interests independently, rather than relying on the Department of Education's equally vacuous analysis. Indeed, the fact that a rule arguably comports with precedent, which these do not, does not immunize an agency from having to consider reliance interests. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020).

11

USDA's failure to "'reasonably consider[]'" that "relevant issue[]" renders its rules arbitrary and capricious. *Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 595 (D.C. Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).

## IV.    USDA's Rules are Contrary to Title IX and the Food and Nutrition Act.

Even if USDA's rules had been well-reasoned and properly promulgated, the States would still succeed on the merits because the rules violate governing law.

### A.    The Final Rule and Memoranda are Contrary to Title IX.

This Court has already ruled that "nowhere in *Bostock*, Title IX, or its implementing regulations" is there an obligation for Title IX "regulated entities not to discriminate based on sexual orientation or gender identity." *Tennessee*, 2022 WL 2791450, at *21. Defendants have no way to distinguish that ruling or the Sixth Circuit's post-*Bostock* precedent. Instead, Defendants repeat the same Title IX arguments that were unsuccessful in *Tennessee* and encourages this Court to follow out-of-circuit decisions rather than the text of Title IX.

Defendants' assertion that there is an "absence of any substantial linguistic or structural distinction between the non-discrimination mandates in Title VII [and] Title IX," Opp. 28, requires them to ignore the text of Title IX. Most notably, despite claiming the States "have conjured up a fear of their own imagining" about the Final Rule and Memoranda prohibiting sex-separated bathrooms, Opp. 30, they rely on a divided Fourth Circuit opinion holding that schools violate Title IX if they do not allow transgender students to use the bathrooms of the opposite biological sex, *id.* at 29 (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. 2878 (with Justices Thomas and Alito noting that they would have granted the petition for writ of certiorari)).

12

That approach to Title IX essentially erases 20 U.S.C. § 1686 from the statute. In enacting Title IX, Congress specified that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act[] from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686; *see Tennessee*, 2022 WL 2791450, at \*21 (ruling that "Title IX does allow for sex-separation in" such circumstances). The Sixth Circuit identified this very statutory provision in *Meriwether v. Hartop* as one of several "important . . . differ[ences]" between Title IX and Title VII. 992 F.3d 492, 510 n.4 (6th Cir. 2021). USDA's construction of Title IX, in contrast, apparently prohibits institutions from maintaining separate bathrooms, locker rooms, and shower facilities for the different sexes when an individual's gender identity does not align with (biological) sex. Institutions cannot have truly separate living facilities for the different sexes if they must make exceptions for every transgender individual.

The Final Rule and Memoranda are, at their foundation, an attempt to convert Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), into a prohibition of all forms of sexual orientation or gender identity discrimination. If Congress had wanted the latter prohibition, it would not have used the word "sex." That word has a binary biological definition— a point Defendants do not dispute, Opp. 29—and it does not mean sexual orientation or gender identity. Instead, Defendants argue that Congress's choice of words in Title IX "is irrelevant," Opp. 29, because of *Bostock v. Clayton County*'s ruling that firing "someone simply for being homosexual or transgender" is discrimination "because of such individual's sex" under Title VII, 140 S. Ct. 1731, 1753 (2020). That this *one type* of sexual orientation or gender identity discrimination is also discrimination because of sex under Title VII does not mean that either Title VII or Title IX prohibits *all forms* of sexual orientation or gender identity discrimination. *See Tennessee*, 2022 WL 2791450, at \*21-22. For example, while "[a]n individual's homosexuality

13

or transgender status *is not relevant* to employment decisions" about hiring and firing, *Bostock*, 140 S. Ct. at 1741 (emphasis added), sex *is relevant* to decisions about locker rooms, showers, and other contexts where biological differences between the two sexes matter.

Even if this Court were to retreat from its recent interpretation in *Tennessee* of Title VII discrimination "because of . . . sex," 42 U.S.C. § 2000e-2(a)(1), Title IX uses distinct "on the basis of sex" language that makes clear biological sex must be the sole reason for the discrimination, 20 U.S.C. § 1681(a). *See* Br. 16-17. Defendants ignore that textual distinction except to say that *Bostock* seemed to "use[] the terms interchangeably." Opp. 27. But Defendants also ignore Plaintiff States' reminder that "'the language of an opinion is not always to be parsed as though' it were 'the language of a statute.'" Br. 17 (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). The dispositive question is what *Congress* intended, and Congress chose to use different language in the two statutes.

Before *Bostock* expanded the understanding of Title VII to include firing employees simply for being homosexual or transgender, it made more sense generally to "look[] to Title VII . . . as an analog for the legal standards in both Title IX discrimination and retaliation claims." Opp. 28 (quoting *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007)). Nevertheless, the Sixth Circuit has repeatedly said after *Bostock* that "that principles announced in the Title VII context" do not "automatically apply in the Title IX context." *Meriwether*, 992 F.3d at 510 n.4. Obeying the Supreme Court's instruction not to extend its reasoning beyond the particular Title VII issue in *Bostock*, the Sixth Circuit has held that "the rule in *Bostock* extends no further than Title VII and does not stretch to the" Age Discrimination in Employment Act ("ADEA"). *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). That the ADEA uses similar "because of" language and protects individuals from discrimination made no difference in the Sixth Circuit's

14

analysis. *Id.* Nor should the reasoning of *Bostock* extend to Title IX, which does not even use the "because of" language of Title VII.

Because USDA's rewriting of Title IX conflicts with how this Court and the Sixth Circuit have approached Title IX after *Bostock*, the agency points the Court to *Grimm* and district court opinions from outside the Sixth Circuit. *See* Opp. 27-28. Those scattered opinions are no reason to sideline *Tennessee*, *Meriwether*, and *Pelcha*. Most of the district court cases Defendants rely upon, *see* Opp. 28, involved the Affordable Care Act and conflict with the Fifth Circuit's recent affirmance of a permanent injunction against the U.S. Department of Health and Human Services, *see Franciscan Alliance, Inc. v. Becerra*, No. 21-11174, 2022 WL 3700044, at *2 & n.11, *8 (5th Cir. Aug. 26, 2022) (affirming the permanent injunction in part because the Eastern District of New York and the District of D.C. had attempted to undo the vacatur of a gender-identity rule). All that Defendants have left from other district courts is a footnote from *Doe v. University of Scranton*, No. 3:19-CV-01486, 2020 WL 5993766, at *5 n.61 (M.D. Pa. Oct. 9, 2020). That footnote is inconsistent with precedent from this Court and the Sixth Circuit, and that district court still ultimately *granted* the motion to dismiss the Title IX claims because the university did not control the off-campus housing where the incidents in that case occurred. *Id.* at *9.

**B. The Final Rule and Memoranda are Contrary to the Food and Nutrition Act.**

Defendants next assert that the portions of the Final Rule and Memoranda implementing the Food and Nutrition Act do not "bear on issues related to 'maintaining sex separated bathrooms and locker rooms, offering sex-separated athletic teams, or using biologically accurate pronouns.'" Opp. 30 (quoting Br. 19). To be sure, that statute only prohibits discrimination "by reason of . . . sex" "[i]n the certification of applicant households for" SNAP benefits. 7 U.S.C. § 2020(c)(1); *see also id.* § 2020(c)(2) (prohibiting discrimination on the basis of *age*, *disability*, and *race* in

15

SNAP "administration"). And the States have not tried to "impose any other standards of eligibility as a condition for participating in the program." *Id.* § 2014(b).

But to the extent the agency is relying on the Food and Nutrition Act to prohibit gender identity and sexual orientation discrimination throughout all SNAP-administering "institution[s]," Nondiscrimination Statement, it is undisputedly violating the law. Moreover, USDA offers no reasoning for why "sex" in the Food and Nutrition Act would not refer to the same biological binary as it does in Title IX and *not* refer to sexual orientation or gender identity. Br. 15-16. Of course *Tennessee*, *Meriwether*, and *Pelcha* did not specifically address the Food and Nutrition Act. But the Sixth Circuit's holding that "the rule in *Bostock* extends no further than Title VII" is just as applicable. *Pelcha*, 988 F.3d at 324.

## V.   The Final Rule and Memoranda Violate the U.S. Constitution.

USDA's new assertions of authority are also contrary to law because they violate the U.S. Constitution in myriad ways. Despite Defendants' repeated attempts to wave away these constitutional defects by invoking *Bostock*, Opp. 31-34, "the rule in *Bostock* extends no further than Title VII" and does not "stretch to" Title IX or the Food and Nutrition Act, *Pelcha*, 988 F.3d at 324; *see Bostock*, 140 S. Ct. at 1737; *Tennessee*, 2022 WL 2791450, at *21. The only constitutional provision that the Supreme Court even referenced was the First Amendment, but "how these doctrines protecting religious liberty interact with Title VII are questions for future cases too." *Bostock*, 140 S. Ct. at 1754. There is no justification for pretending that *Bostock* has already "confirmed" that USDA's rewriting of Title IX and the Food and Nutrition Act presents no constitutional problem. Opp. 31.

**Spending Clause.** USDA's rules violate the Spending Clause for at least two reasons. First, Title IX and the Food and Nutrition Act—at the time of their enactment and initial acceptance

16

by Plaintiff States—did not "unambiguously" prohibit discrimination based on gender identity and sexual orientation. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The Sixth Circuit's divided, pre-*Bostock* motions panel decision in *Dodds v. U.S. Department of Education* said nothing about the meaning of Title IX. 845 F.3d 217 (6th Cir. 2016) (per curiam). *Dodds* did not definitively address whether the school district had violated Title IX; it only declined to stay an injunction. *Id.* at 221-22. And, as now-Chief Judge Sutton pointed out in his dissent, the Supreme Court reached exactly the opposite conclusion when it granted a similar stay request. *Id.* at 222 (Sutton, J., dissenting).

Second, the Final Rule and Memoranda leverage billions of dollars in SNAP and SNAP-Ed funding to coerce States into adopting USDA's newly preferred policies. Defendants do not deny that the Final Rule and Memoranda are designed to coerce States, Opp. 32-33, nor could they. USDA's new rules have already put "a gun to the head" of each State, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (opinion of Roberts, C.J.), and succeeded in getting States such as Alaska to comply, Br. 20 (citing Crum Decl., ¶¶ 8-10). And yet, the agency maintains that the rules are not "*improperly*" or "*unlawful[ly]*" coercive. Opp. 32-33 (emphases added).

To justify that claim, Defendants try two maneuvers. They start by citing two cases where courts rejected Spending Clause arguments. Opp. 32. In *Gruver v. Louisiana Board of Supervisors for LSU Agricultural & Mechanical College*, the Fifth Circuit reaffirmed a twenty-year-old decision holding that Louisiana waived "immunity against suits alleging sex discrimination," not sexual orientation or gender identity discrimination, by accepting Title IX funding. 959 F.3d 178, 180 (5th Cir. 2020) (citing *Pederson v. LSU*, 213 F.3d 858, 876 (5th Cir. 2000)). There was no new funding condition. And *Tennessee v. U.S. Department of State* involved a situation where the district court ruled the State already had an independent obligation due to constitutional

17

requirements and a preexisting statute based on Congress's enumerated powers. 329 F. Supp. 3d 597, 623-25 (W.D. Tenn. 2018), *aff'd on alternative grounds sub nom. State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499 (6th Cir. 2019). Defendants do not make those same arguments here.

Instead, without any case to turn to, Defendants retreat to the proposition that USDA's rules *cannot* be unconstitutionally coercive because "simply applying the existing provisions of Title IX and the FNA to [USDA's] longstanding nutrition programs . . . based on an interpretation of those statutes that has been recognized as valid under analogous circumstances in *Bostock*" is not really a new funding condition. Opp. 32-33. That roundabout explanation for why the Memoranda and Final Rule supposedly do nothing mistakenly conflates the Spending Clause's prohibition of federal coercion with its unambiguous-statement-of-conditions rule. Even if a statute's funding conditions are obvious from the get-go, they can still be coercive. *See Kentucky v. Yellen*, 563 F. Supp. 3d 647, 658 (E.D. Ky. 2021) (ruling the American Rescue Plan Act unconstitutionally coercive regardless of whether the funding provisions were unambiguous), *appeal pending*, No. 21-6108 (6th Cir.). And if Title IX and the Food and Nutrition Act really meant what Defendants now say the laws mean, then those statutes would no doubt be coercive under the Spending Clause.

**First Amendment.** Defendants insist that "neither the Final Rule nor the May 5 Memo says anything" about the use of biologically accurate pronouns. Opp. 34. But requiring the States to prohibit gender identity discrimination at least arguably does so. The EEOC already tried to force that understanding of Title VII on the States until this Court enjoined the purported guidance. *Tennessee*, 2022 WL 2791450, at *3, *24. The Sixth Circuit held in *Meriwether* that an Ohio university attempting to enforce a supposed prohibition in Title IX against gender identity

18

discrimination "violated [a professor's] free-speech rights" by punishing the professor for declining to use a student's "preferred pronouns." 992 F.3d at 512. And the exemption for "educational institutions that are controlled by religious organizations," Opp. 35, will provide no protection for state employees or public-school students.

Even worse, Defendants completely ignore Plaintiff States' concern that "Congress's spending power 'may not be used to induce the States to engage in activities that would themselves be unconstitutional.'" Br. 21 (quoting *South Dakota v. Dole*, 483 U.S. 203, 210 (1987)). By requiring the States to engage in conduct that would violate the First Amendment rights of their students and employees, the Final Rule and Memoranda impose unconstitutional conditions on the receipt of federal funds. USDA *cannot* "require that teaching and learning must be tailored to the principles or prohibitions of" a "dogma." *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968). But forcing States and their employees to propagate the USDA's views about sex and gender does just that. The States "seek to assert their own 'sovereign' and 'quasi-sovereign' interests against the federal government," and their First Amendment claim is part of that effort. *Kentucky v. Biden*, 23 F.4th 585, 597-99 (6th Cir. 2022).

The First Amendment protects States from USDA turning them into federal mouthpieces. The First Amendment begins by declaring that "*Congress* shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech." U.S. Const. amend. I (emphasis added). That language is object-neutral; the First Amendment protects *all* from the federal government abridging their freedom of speech. Although the Supreme Court eventually incorporated the First Amendment into the Fourteenth Amendment to protect citizens against States, *see Gitlow v. New York*, 268 U.S. 652 (1925), the States have First Amendment rights "just as" private citizens do, *Walker v. Tex. Div., Sons of Confederate*

19

*Veterans, Inc.*, 576 U.S. 200, 219-20 (2015). At a minimum, a state "government, just like a private employer, retains" the right to control its own speech. *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 342 (6th Cir. 2010) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). State employees cannot "speak on the" state "government's behalf and convey its intended messages" if the *federal* government has the untrammeled authority to dictate state employees' every pronouncement. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022).

**Tenth Amendment and Anticommandeering Doctrine.** Defendants have little to say about how USDA has violated the Tenth Amendment and Anticommandeering Doctrine. Opp. 33. They gesture at *New York v. United States*, 505 U.S. 144 (1992). But that case held that "the Constitution does not confer upon Congress the ability simply to compel the States" to "provide for the disposal of the radioactive waste generated within their borders" even though the State of New York, which brought the suit, had previously "complied with the Act's requirements." *Id.* at 149, 154, 188. State consent cannot justify federal commandeering.

**Separation of Powers and Non-Delegation Doctrine.** If the Final Rule and Memoranda pronounced an across-the-board prohibition of gender identity and sexual orientation discrimination under Title IX and the Food and Nutrition Act, then USDA lacked the authority to resolve such a major question of "great political significance," that "regulates a significant portion of the American economy," impacts "billions of dollars" of funding, and intrudes into an area that is "traditionally regulated by the States." *West Virginia*, 142 S. Ct. at 2621 (2022) (Gorsuch, J., concurring) (cleaned up).

*Bostock* is no justification for what USDA has done. Defendants cannot identify any intelligible principle in the text of Title IX or the Food and Nutrition Act justifying their redefinition of "sex" to include "gender identity and sexual orientation." Defendants thus rewrite

20

*Bostock* to include USDA's preferred language in brackets because that phrasing appears nowhere in the opinion. *See* Opp. 34 (turning "that employers are prohibited from firing employees on the basis of homosexuality or transgender status," *Bostock*, 140 S. Ct. at 1753, into "on the basis of sex [sex, including. . . sexual orientation] or transgender status" (alterations in Opp.)).

## VI. The Equities Favor a Preliminary Injunction.

### A. The States are already suffering irreparable harm.

Contrary to Defendants' characterization, the States are not facing the mere possibility of irreparable harms in the future; they are suffering *actual* irreparable harm *today*. The States are currently being subjected to regulations that conflict with their legal codes, burden their autonomy, and impose compliance costs that they can never recoup. *See, e.g.*, Br. 24. Such impositions on State sovereignty "inflict[] irreparable harm," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018), and the associated compliance costs routinely justify preliminary relief in challenges to federal agency action, *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020) (citing *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); *Chamber of Com. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010); and *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996)).

### B. The public interest favors an injunction.

When the injunction would run against the federal government, the potential harm to the opposing party and the public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009), and typically turn on a lawsuit's merit. Indeed, when a "plaintiff shows a substantial likelihood" that government action will be deemed unlawful, "no substantial harm to others can be said to inhere in its enjoinment*." Deja Vu of Nashville, Inc. v. Metro. Gov't*, 274 F.3d 377, 400 (6th Cir. 2001). If Plaintiff States are correct that the Final Rule and Memoranda are unlawful, then USDA's

21

enforcement of those rules would *undermine*, rather than further, the purposes of Title IX, the Food and Nutrition Act, and the APA.

Plaintiff States, to be sure, do not deny certification of SNAP benefits based on a household member's sexual orientation or gender identity. But Plaintiff States have various laws and policies that at least arguably conflict with what the Memoranda and Final Rule seek to accomplish because USDA did not cabin its gender identity and sexual orientation discrimination rules to SNAP certification decision-making. *See* Br. 24-25; *see also Tennessee*, 2022 WL 2791450, at \*7 & nn.8-9 (identifying laws of ten Plaintiff States as arguably conflicting with the Department of Education's similar attempt to redefine Title IX discrimination on the basis of sex). As in *Tennessee*, which involved the very Department of Education Interpretation that USDA adopted in its Memoranda, an arguable conflict exists, and that suffices.

The challenged rules also impose harms on Plaintiff States' citizens. Plaintiff States' arguably conflicting laws and policies protect student and employee safety and privacy, safeguard fair competition in sports, and defend religious liberties and freedom of speech. There is no harm in preserving the status quo for SNAP that existed for nearly two years after *Bostock*.

### C.      Injunctive relief should apply to all Plaintiff States.

The APA instructs this Court to "hold unlawful and set aside agency action" that is procedurally or substantively deficient. 5 U.S.C. § 706. Courts have long held this to mean that invalid "rules are vacated," not merely inapplicable to particular parties. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quotation marks omitted). While this case is pending, this Court should exercise an already limited version of that vacatur power to protect all Plaintiff States (and entities within their jurisdiction) from implementation of

22

the Final Rule and Memoranda. Otherwise, this Court is failing to provide them complete preliminary relief. *See Tennessee*, 2022 WL 2791450, at \*24 & n.18 (granting such relief).

As two federal agencies unsuccessfully requested in *Tennessee*, USDA wants the Court to deny relief to Plaintiff States "in the Fourth and Seventh Circuit where the courts of appeals have already concluded that Title IX prohibits discrimination based on sexual orientation or gender identity." Opp. 38. But this Court is not bound by decisions of other circuits. Instead, the Court must apply federal law according to its own binding precedent and reasoning, *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994), and must bring that application to bear on all parties properly before it, *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952). Indeed, the only case Defendants cite for their remarkable request is a divided Ninth Circuit opinion where *the federal government* itself sought a nationwide injunction. *United States v. AMC Ent., Inc.*, 549 F.3d 760 (9th Cir. 2008). Thus, those Fourth and Seventh Circuit decisions do not prevent this Court from awarding relief to parties that are properly before it.

Moreover, even if this Court deferred to the Fourth and Seventh Circuits in the interest of comity, it could not erase the procedural defects in the rules, or the constitutional issues those courts have not addressed. Thus, even if USDA were right about Title IX, the rules are still unlawful, and the States are still entitled to injunctive relief.

## CONCLUSION

Plaintiff States respectfully request that this Court preliminarily enjoin Defendants from implementing USDA's Final Rule and Memoranda against the Plaintiff States (and entities within those States' jurisdiction) while this action remains pending.

23

Dated: September 23, 2022                    Respectfully Submitted,

/s/ Clark L. Hildabrand (BPR # 038199)       /s/ Melinda Holmes
JONATHAN SKRMETTI                            THEODORE E. ROKITA
  *Attorney General and Reporter of*           *Attorney General of Indiana*
*Tennessee*                                  THOMAS M. FISHER*
ANDRÉE S. BLUMSTEIN                            *Solicitor General*
  *Solicitor General*                        MELINDA HOLMES*
BRANDON J. SMITH                              *Deputy Attorney General*
  *Chief of Staff*                           Office of the Indiana Attorney General
CLARK L. HILDABRAND                          IGC-South, Fifth Floor
  *Assistant Solicitor General*              302 West Washington St.
J. MATTHEW RICE*                             Indianapolis, IN 46204
  *Special Assistant to the Solicitor General*   (317) 232-6255
TRAVIS J. ROYER*                             Melinda.Holmes@atg.in.gov
  *Office of the Solicitor General Honors*      ***Counsel for State of Indiana***
*Fellow*
Office of the Tennessee Attorney General
and Reporter
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
Clark.Hildabrand@ag.tn.gov
  ***Counsel for State of Tennessee***

/s/ Edmund G. LaCour Jr.                     /s/ Charles E. Brasington
STEVE MARSHALL                               TREG R. TAYLOR
  *Attorney General of Alabama*                *Attorney General of Alaska*
EDMUND G. LACOUR JR.*                        CHARLES E. BRASINGTON*
  *Solicitor General*                          *Assistant Attorney General*
Office of the Attorney General               State of Alaska
State of Alabama                             P.O. Box 110300
501 Washington Ave.                          Juneau, AK 99811
Montgomery, AL 36130                         (907) 465-3600
(334) 242-7300                               Charles.Brasington@alaska.gov
Edmund.LaCour@AlabamaAG.gov                    ***Counsel for State of Alaska***
  ***Counsel for State of Alabama***

24

/s/ Kate B. Sawyer
MARK BRNOVICH
  *Attorney General of Arizona*
KATE B. SAWYER*
  *Assistant Solicitor General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Kate.Sawyer@azag.gov
  **Counsel for State of Arizona**

/s/ Nicholas J. Bronni
LESLIE RUTLEDGE
  *Attorney General of Arkansas*
NICHOLAS J. BRONNI*
  *Solicitor General*
Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-6307
nicholas.bronni@arkansasag.gov
  **Counsel for State of Arkansas**

/s/ Drew Waldbeser
CHRISTOPHER M. CARR
  *Attorney General of Georgia*
DREW WALDBESER*
  *Deputy Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square, S.W.
Atlanta, GA 30334
(404) 458-3378
dwaldbeser@law.ga.gov
  **Counsel for State of Georgia**

/s/ Kurtis K. Wiard
DEREK SCHMIDT
  *Attorney General of Kansas*
KURTIS K. IARD*
  *Assistant Solicitor General*
Office of the Kansas Attorney General
120 S.W. 10t Ave.
Topeka, KS 66612
(785) 296-2215
kurtis.wiard@ag.ks.gov
  **Counsel for State of Kansas**

/s/ Marc Manley
DANIEL CAMERON
  *Attorney General of Kentucky*
MARC MANLEY*
  *Assistant Attorney General*
Office of the Kentucky Attorney General
700 Capital Ave., Suite 118
Frankfort, KY 40601
(502) 696-5300
Marc.Manley@ky.gov
  **Counsel for Commonwealth of Kentucky**

/s/ Elizabeth B. Murrill
JEFF LANDRY
  *Attorney General of Louisiana*
ELIZABETH B. MURRILL*
  *Solicitor General*
J. SCOTT ST. JOHN*
  *Deputy Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6766
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov
  **Counsel for State of Louisiana**

25

/s/ Justin L. Matheny
LYNN FITCH
  *Attorney General of Mississippi*
JUSTIN L. MATHENY*
  *Deputy Solicitor General*
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov
  **Counsel for State of Mississippi**


/s/ D. John Sauer
ERIC S. SCHMITT
  *Attorney General of Missouri*
D. JOHN SAUER*
  *Solicitor General*
Office of the Missouri Attorney General
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
John.Sauer@ago.mo.gov
  **Counsel for State of Missouri**


/s/ Christian B. Corrigan
AUSTIN KNUDSEN
  *Attorney General of Montana*
DAVIS M.S. DEWHIRST*
  *Solicitor General*
CHRISTIAN B. CORRIGAN*
  *Deputy Solicitor General*
Office of the Montana Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620
(406) 444-2707
Christian.Corrigan@mt.gov
  **Counsel for State of Montana**

/s/ James A. Campbell
DOUGLAS J. PETERSON
  *Attorney General of Nebraska*
JAMES A. CAMPBELL*
  *Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
Jim.Campbell@nebraska.gov
  **Counsel for State of Nebraska**


/s/ Benjamin Flowers
DAVE YOST
  *Attorney General of Ohio*
BENJAMIN FLOWERS*
  *Solicitor General*
Office of the Ohio Attorney General
30 East Broad Street, 17th Floor
Columbus, OH 43215
(614) 466-8980
Benjamin.Flowers@OhioAGO.gov
  **Counsel for State of Ohio**


/s/ Bryan Cleveland
JOHN M. O'CONNOR
  *Attorney General of Oklahoma*
BRYAN CLEVELAND*
  *Deputy Solicitor General*
Oklahoma Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105-4894
(405) 521-3921
Bryan.Cleveland@oag.ok.gov
  **Counsel for State of Oklahoma**

26

/s/ J. Emory Smith Jr.
ALAN WILSON
  *Attorney General of South Carolina*
J. EMORY SMITH, JR.*
  *Deputy Solicitor General*
Office of the South Carolina Attorney
General
P.O. Box 11549
Columbia, SC 29211
(803) 734-3680
esmith@scag.gov
  **Counsel for State of South Carolina**

/s/ Paul Swedlund
MARK VARGO
  *Attorney General of South Dakota*
Office of the South Dakota Attorney
General
PAUL SWEDLUND*
  *Assistant Attorney General*
1302 East Highway 14, Suite 1
Pierre, SD 57501
(605) 773-3215
Jason.Ravnsborg@state.sd.us
  **Counsel for State of South Dakota**

/s/ Aaron Rietz
KEN PAXTON
  *Attorney General of Texas*
AARON RIETZ*
  *Deputy Attorney General*
Office of the Attorney General of Texas
P.O Box 12548
Austin, TX 78711-2548
(512) 936-1989
Aaron.Rietz@oag.texas.gov
**Counsel for State of Texas**

/s/ Melissa A. Holyoak
SEAN D. REYES
  *Attorney General of Utah*
MELISSA A. HOLYOAK*
  *Solicitor General*
Office of the Utah Attorney General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
(801) 366-0260
melissaholyoak@agutah.gov
  **Counsel for State of Utah**

s/ Andrew N. Ferguson
JASON S. MIYARES
  *Attorney General of Virginia*
ANDREW N FERGUSON*
  *Solicitor General*
LUCAS W.E. CROSLOW*
  *Deputy Solicitor General*
Office of the Attorney General of Virginia
Richmond, VA 23219
(814) 786-7704
AFerguson@oag.state.va.us
LCroslow@oag.state.va.us
  **Counsel for Commonwealth of Virginia**

/s/ Lindsay S. See
PATRICK MORRISEY
  *Attorney General of West Virginia*
LINDSAY S. SEE*
  *Solicitor General*
Office of the West Virginia Attorney
General
State Capitol Bldg. 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
  **Counsel for State of West Virginia**

**\*Admitted Pro Hac Vice**

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 23, 2022, a true and exact copy of the foregoing Reply in Support of Plaintiffs' Motion for Preliminary Injunction was served on all counsel of record through the Court's Electronic Filing System.

/s/ Clark L. Hildabrand
CLARK L. HILDABRAND
*Assistant Solicitor General*
