**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | |
|---|---|
| STATE OF TENNESSEE, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 3:22-cv-257-TRM-DCP |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

   I.    THE ADMINISTRATION OF SNAP AND SNAP-ED ..............................................2

   II.   THE UPDATE OF STANDARD FSA LANGUAGE BASED ON *BOSTOCK* ....................4

   III.  USDA'S ENFORCEMENT OF NON-DISCRIMINATION REQUIREMENTS ..............5

      A.   Enforcement of SNAP FSAs and the FNA ...............................................5

      B.   Enforcement of Title IX and Other Civil Rights Laws ...............................6

   IV.  THE MAY 5 MEMO ON DISCRIMINATION-COMPLAINT PROCESSING .................7

PROCEDURAL HISTORY ....................................................................................................8

STANDARD OF REVIEW ....................................................................................................8

ARGUMENT .......................................................................................................................9

   I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS. ....................9

      A.   Plaintiffs Do Not Satisfy Article III's Requirement of Standing. .............9

      B.   Plaintiffs' Claims are Not Ripe. ............................................................12

      C.   Title IX and the FNA Provide Plaintiffs with Adequate and Exclusive Remedies ............14

   II.   PLAINTIFFS' CLAIMS LACK MERIT ..............................................................16

      A.   The May 5 Memo Is Not a Final Agency Action Subject to Judicial Review ................16

      B.   USDA Has Complied with Applicable Notice-and-Comment Requirements. .................17

      C.   Plaintiffs' Contrary-to-Law Claim Is Unlikely to Succeed .......................18

      D.   Plaintiffs' Arbitrary-and-Capricious Claim Fails. ...................................20

      E.   Plaintiffs' Assorted Constitutional Claims Fail.......................................20

          1.   *Spending Clause* .........................................................................21

          2.   *Tenth Amendment and Anticommandeering Doctrine* ....................22

          3.   *Separation of Powers and Non-Delegation Doctrine* .......................23

          4.   *First Amendment* .........................................................................24

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................................9

*Bangura v. Hansen,*
    434 F.3d 487 (6th Cir. 2006) ...................................................................................14

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.,*
    208 F. Supp. 3d 850 (S.D. Ohio 2016) ...................................................15, 16, 18

*Bennett v. Spear,*
    520 U.S. 154 (1997) ................................................................................................16

*Bostock v. Clayton Cnty.,*
    140 S. Ct. 1731 (2020) ....................................................................................*passim*

*Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS,*
    557 F. Supp. 3d 224 (D. Mass. 2021) .....................................................................19

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988 .................................................................................................14

*Sch. of the Ozarks, Inc. v. Biden,*
    41 F.4th 992 (8th Cir. 2022) ..............................................................................10, 11

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ..................................................................................................9

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.,*
    412 U.S. 94 (1973) ..................................................................................................25

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ..................................................................................................9

*Gundy v. United States,*
    139 S. Ct. 2116 (2019 .............................................................................................24

*Dodds v. Department of Education,*
    845 F.3d 217 (6th Cir. 2015) ..................................................................................22

*Doe v. Univ. of Scranton,*
    No. 3:19-cv-01486, 2020 WL 5993766 (M.D. Pa. Oct. 9, 2020) ..........................19

*Eidson v. Tenn. Dep't of Children's Servs.,*
    510 F.3d 631 (6th Cir. 2007) ....................................................................................9

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) .................................................................................................15

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...........................................................................................20

*First Nat'l Bank of Lexington v. Sanders,*
    946 F.2d 1185 (6th Cir. 1991) ...........................................................................17

*FTC v. Standard Oil Co. of Cal.,*
    449 U.S. 232 (1980) ...........................................................................................16

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.,*
    822 F.3d 709 (4th Cir. 2016) .............................................................................18

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) .............................................................................19

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.,*
    959 F.3d 178 (5th Cir.) ......................................................................................22

*Jones v. FBI,*
    No. 3:21-CV-225, 2021 WL 5239586 (E.D. Tenn. Nov. 10, 2021) ...................9

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022)...............................................................................25

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ...........................................................................................16

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .............................................................................................8

*Mann Constr. Inc. v. United States,*
    27 F.4th 1138 (6th Cir. 2022) ............................................................................17

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ...........................................................................................24

*Meriwether v. Hartop,*
    992 F.3 492 (6th Cir. 2021) ...............................................................................24

*Michigan v. Thomas,*
    805 F.2d 176 (6th Cir. 1986) .............................................................................17

*NAACP v. Meese,*
    615 F. Supp. 200 (D.D.C. 1985) ........................................................................15

*Nat'l Fed'n of Indep. Business v. Sebelius,*
    567 U.S. 519 (2012) ..................................................................................................22

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ..................................................................................................12

*New Mexico v. McAleenan,*
    450 F. Supp. 3d 1130 (D.N.M. 2020) .......................................................................25

*New York v. United States,*
    505 U.S. 144, 167 (1992) ...........................................................................................23

*Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n,*
    457 F.3d 941 (9th Cir. 2006) ......................................................................................12

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
    523 U.S. 726 (1998 .....................................................................................................14

*Peltier v. Charter Day Sch., Inc.,*
    8 F.4th 251 (4th Cir. 2021) .........................................................................................18

*Platt v. Bd. of Comm'rs,*
    769 F.3d 447 (6th Cir. 2014) ........................................................................................9

*Pros. & Patients for Customized Care v. Shalala,*
    56 F.3d 592 (5th Cir. 1995) ........................................................................................16

*Rhea Lana, Inc. v. Dep't of Lab.,*
    824 F.3d 1023 (D.C. Cir. 2016) ..................................................................................17

*Sabri v. United States,*
    541 U.S. 600 (2004) ..................................................................................................21

*Sch. Dist. of City of Saginaw v. U.S. Dep't of Health, Educ., & Welfare,*
    431 F. Supp. 147 (E.D. Mich. 1977) .........................................................................15

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) .................................................................................................9

*State by & through Tenn. Gen. Assembly v. U.S. Dep't of State,*
    931 F.3d 499 (6th Cir. 2019 ......................................................................................22

*Taylor v. Cohen,*
    405 F.2d 277 (4th Cir. 1968) ......................................................................................15

*Tenn. Hosp. Ass'n v. Azar,*
    908 F.3d 1029 (6th Cir. 2018) ....................................................................................17

*Tennessee v. U.S. Dep't of State,*
    329 F. Supp. 3d 597 (W.D. Tenn. 2018) ................................................................22

*Tennessee v. USDA,*
    No. 3:22-cv-257, 2022 WL 5336196 (E.D. Tenn. Aug. 10, 2022) ................................. 8, 10

*Texas v. United States,*
    201 F. Supp. 3d 810 (N.D. Tex. 2016).................................................................18

*Texas v. United States,*
    523 U.S. 296 (1998) .............................................................................13

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) .....................................................................2, 15, 16

*Walker v. Azar,*
    480 F. Supp. 3d 417 (E.D.N.Y. 2020) .................................................................19

*Warshak v. United States,*
    532 F.3d 521 (6th Cir. 2008) .................................................................. 12, 13

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022)...........................................................................23

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    No. 16-CV-943-PP, 2016 WL 5239829 (E.D. Wis. Sept. 22, 2016) ...................................18

*Whitman-Walker Clinic, Inc. v. HHS,*
    485 F. Supp. 3d 1 (D.D.C. 2020) .............................................................. 19, 20

*Whole Women's Health v. Jackson,*
    142 S. Ct. 522 (2021).............................................................................11

*Wolfe v. Fayetteville, Ark. Sch. Dist.,*
    648 F.3d 860 (8th Cir. 2011) ......................................................................18

**STATUTES**

5 U.S.C. § 553 ......................................................................................17

5 U.S.C. § 704 ................................................................................. 14, 16

7 U.S.C. § 2011 .....................................................................................2

7 U.S.C. § 2012 .....................................................................................3

7 U.S.C. § 2014 .................................................................................. 3, 6

v

7 U.S.C. § 2020 ...................................................................................................................*passim*

7 U.S.C. § 2023 .................................................................................................................................15

20 U.S.C. § 1618 ................................................................................................................................7

20 U.S.C. § 1681 .................................................................................................................17, 18, 25

20 U.S.C. § 1682 ...................................................................................................................6, 12, 15

20 U.S.C. § 1683 .......................................................................................................................6, 15

42 U.S.C. § 2000d-1 ..........................................................................................................................6

42 U.S.C. § 2000e-2 ..........................................................................................................................7

## OTHER AUTHORITIES

44 Fed. Reg. 21,610 (Apr. 11, 1979)...............................................................................................25

81 Fed. Reg. 81,015 (Nov. 17, 2016).................................................................................4, 17, 18

82 Fed. Reg. 46,655 (Oct. 6, 2017)..................................................................................................25

86 Fed. Reg. 7,023 (Jan. 20, 2021)....................................................................................................7

87 Fed. Reg. 35,855 ...........................................................................................................................4

## REGULATIONS

7 C.F.R. § 15.8 ...........................................................................................................................6, 14

7 C.F.R. § 15a.205 ............................................................................................................................25

7 C.F.R. § 272 ...........................................................................................................................4, 10

7 C.F.R. § 272.2 .................................................................................................................................4

7 C.F.R. Part 273 ........................................................................................................................3, 6

7 C.F.R. § 276.4 .........................................................................................................................5, 6

7 C.F.R. § 276.7 .........................................................................................................................5, 6

34 C.F.R. § 100.7 .............................................................................................................................12

# INTRODUCTION

This case involves two interpretive documents that the United States Department of Agriculture (USDA) has issued regarding its food and nutrition assistance programs: a May 5, 2022 memo concerning the processing of discrimination complaints filed in connection with USDA's Supplemental Nutrition Assistance Program (SNAP) (the "May 5 Memo"), and a June 14, 2022 final rule updating certain template nondiscrimination language proposed for use in legal agreements between USDA and state administrators of the SNAP program (the "Final Rule"). Those documents served to advise stakeholders of USDA's understanding that the sex-discrimination prohibitions in the Food and Nutrition Act of 2008, as amended (FNA) and Title IX of the Education Amendments of 1972 (Title IX) include prohibitions against discrimination on the basis of sexual orientation and gender identity. USDA's understanding is grounded in the reasoning of *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020), in which the Supreme Court found a similar prohibition on sex discrimination unambiguously precludes discrimination "simply for being [gay] or transgender." *Bostock*, 140 S. Ct. at 1737. Plaintiffs filed this suit just before the start of the current academic year, alleging that USDA's interpretive documents would disrupt planning for the school year, threaten state fiscs, and preempt state law. Plaintiffs' claims should be dismissed.

As a threshold matter, the Court lacks jurisdiction over Plaintiffs' claims. Memorializing the already-extant requirements of the FNA and Title IX in advisory materials imposed no harms on Plaintiffs, who maintain that they do not "deny benefits based on a household member's sexual orientation or gender identity," Compl. ¶ 12, ECF No.1, and who would remain subject to the prohibitions on sex discrimination contained in Title IX and the FNA even in the absence of the interpretive documents that Plaintiffs challenge. Additionally, though Plaintiffs seek pre-enforcement review of USDA's interpretative documents, they do not plausibly allege any pending or foreseeable enforcement action by USDA. Moreover, Plaintiffs fail to plausibly allege the sort of harms that would

1

afford them standing to bring a claim for pre-enforcement review. And Plaintiffs' allegations of harm to their sovereignty and funding streams from USDA are not concrete, traceable to USDA, or redressable by this Court. For similar reasons, Plaintiffs' claims are not ripe. Finally, the Court also lacks jurisdiction because Plaintiffs could bring these claims as defenses in any enforcement action, and because both Title IX and the FNA provide comprehensive enforcement schemes that preclude district court jurisdiction over pre-enforcement challenges to the application of those statutes under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).

Even if this Court had jurisdiction, Plaintiffs' claims should be dismissed for lack of merit. The May 5 Memo concerning the processing of discrimination complaints filed in connection with USDA's SNAP program is an interpretive rule and does not constitute final agency action reviewable under the Administrative Procedure Act ("APA"). The June 14 Final Rule was promulgated consistent with the APA. Neither document is arbitrary, capricious or contrary to law, as they hew closely to the reasoning of the Supreme Court's decision in *Bostock* in aligning USDA's interpretation of virtually identical language across Title VII, *see* 42 U.S.C. §2000e *et seq.*, Title IX, and the FNA. And neither document runs afoul of the various constitutional provisions and principles that Plaintiffs invoke.

For these reasons, which supplement all those already stated in Defendants' brief in opposition to Plaintiffs' Motion for Preliminary Injunction, the Court should dismiss Plaintiffs' complaint.

## BACKGROUND

## I.    THE ADMINISTRATION OF SNAP AND SNAP-ED

USDA's Food and Nutrition Service (FNS) administers the nutrition assistance programs of USDA. Decl. of Angela Kline ¶ 4 ("Kline Decl."), ECF No. 54-1. The largest nutrition assistance program FNS administers is SNAP, *id.* ¶ 5, which "safeguard[s] the health and well-being of the Nation's population by raising the levels of nutrition among low-income households," 7 U.S.C. § 2011. Congress limited participation in SNAP to "those households whose incomes and other financial

2

resources . . . are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet," *id.* § 2014(a), and required the Secretary of Agriculture to establish "uniform national standards of eligibility," *id.* § 2014(b). The Secretary issued regulations establishing eligibility standards based on household income and assets, *see* 7 C.F.R. Part 273 (standards); none includes sex-based considerations, and "no State agency [may] impose any other standards of eligibility as a condition for participating in the program," 7 U.S.C. § 2014(b). Accordingly, States are prohibited from considering a person's gender identity or sexual orientation for purposes of SNAP and SNAP-Ed eligibility and participation. *See* 7 C.F.R. Part 273; 7 U.S.C. § 2014(b).

The SNAP program provides federal funds to purchase food from authorized retailers (*e.g.*, grocery stores). Kline Decl. ¶¶ 5, 7. Schools do not participate in SNAP as authorized retailers, and school meals are not eligible food for purposes of SNAP. *See id.* ¶ 7 (citing 7 U.S.C. § 2012(k)).

FNS also administers SNAP-Ed, a much smaller program which provides nutrition education in a wide variety of settings and for diverse audiences. *See id.* ¶ 9. Unlike SNAP, SNAP-Ed is a grant program and does not distribute funds to individuals or other direct benefits to program participants. *Id.* ¶ 9. Although schools may be implementing agencies or sites for the SNAP-Ed program, FNS's role in relation to the schools is limited strictly to SNAP-ED's nutrition and education purposes and to ensuring that eligible individuals have access to the program. *Id.* Neither SNAP nor SNAP-Ed relates to the regulation of bathrooms, locker rooms, athletics, dress codes, or other areas identified in Plaintiffs' Complaint. *Id.* ¶¶ 8-9.

Although USDA funds and oversees SNAP, it is administered in partnership with state agencies. *Id.* ¶ 6. To participate in SNAP, state agencies must submit a State Plan of Operation, which includes a Federal/State Agreement ("FSA"). *Id.* ¶ 10. The FSA is the legal agreement through which states agree to administer SNAP in accordance with the FNA, the Act's associated regulations, and the FNS-approved State Plan of Operation. *Id.* ¶ 11 (citing 7 C.F.R. § 272(a)(2)). The FSA contains

3

standard nondiscrimination language set forth by regulation, *see* 7 C.F.R. § 272(b)(1), but a State may "propose alternative language to any or all the provisions," *id.* § 272(b)(2); *see also* Kline Decl. ¶ 14. Any proposed alternative language must be approved by both parties. *Id.*

## II. THE UPDATE OF STANDARD FSA LANGUAGE BASED ON *BOSTOCK*

From time to time, USDA updates the standard language proposed for SNAP FSAs. USDA began to do so in late 2016 by publishing a proposed rule in the Federal Register. *See* 81 Fed. Reg. 81,015-01 (Nov. 17, 2016) ("Proposed Rule"). Among other topics, the Proposed Rule addressed the standard non-discrimination language in FSAs. *Id.* USDA proposed modifying the standard language to "incorporate references to additional civil rights legislation," including references to Title IX, the Age Discrimination in Employment Act, and certain parts of the Americans with Disabilities Act, to "codify protections already required by Federal law, regulations and existing policy." *Id.* at 81,015.

Following the comment period, USDA published its Final Rule on June 14, 2022. *See* 87 Fed. Reg. 35,855. The Final Rule updated standard FSA non-discrimination language to include, among other things, an assurance that a state receiving SNAP funds would comply with Title IX. *Id.* at 35,857. The Final Rule also made clear that "gender identity and sexual orientation" discrimination are forms of discrimination on the basis of sex. *See id.* at 35,857. The Final Rule stated that the updated non-discrimination language would "codify protections already required by Federal law and existing policy." *Id.* at 35,855. Under the Final Rule, states retained the option, "[i]f [they did] . . . not wish to sign the FSA with the language as written in 7 C.F.R. § 272.2(b)(1)," to "'propose alternative language to any or all the provisions.'" Kline Decl. ¶ 14 (quoting 7 C.F.R. § 272.2(b)(2)).

The Final Rule became effective as of August 15, 2022, and provided, consistent with 7 C.F.R. § 272.2(e)(1), that each participating state must sign and submit a new SNAP FSA to FNS by December 15, 2022. *Id.* ¶ 13. Once signed, the SNAP FSA is valid until terminated. *Id.* In the interim, the state's currently effective FSAs remain in place. *Id.*

4

As of December 5, 2022, seventeen Plaintiff-States (Alaska, Arizona, Arkansas, Georgia, Kansas, Kentucky, Louisiana, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, Virginia, and West Virginia) have finalized their new SNAP FSA, adopting the exact language promulgated in the Final Rule. *Id.* ¶ 15 & Exs. 2-15. The remaining five Plaintiff-States (Alabama, Indiana, Mississippi, South Dakota, and Texas) do not yet have fully executed SNAP FSAs. State agencies wishing to participate in SNAP-Ed were required to submit their State Plans of Operation by August 15. Kline Decl. ¶ 10 & Ex. 1. All the Plaintiffs did so, and all were allocated SNAP-Ed funds for Federal Fiscal Year 2023. *Id.*

## III.   USDA'S ENFORCEMENT OF NON-DISCRIMINATION REQUIREMENTS

### A.   Enforcement of SNAP FSAs and the FNA

In the hypothetical event a state agency contravenes the assurances in its SNAP FSA, numerous steps need to occur before FNS can bring an enforcement action. *See* 7 U.S.C. §§ 2020(g), 2023; 7 C.F.R. §§ 276.4, 276.7; Kline Decl. ¶ 17. The state agency must first receive written notice of a potential action that provides time to remedy the deficiency. Kline Decl. ¶ 17 (citing 7 C.F.R. § 276.4(d)(1)). Failure to remedy the deficiency within the time allowed results in a formal warning about possible suspension and/or disallowance of federal funds. *Id.* (citing 7 C.F.R. § 276.4(d)(2)). The state agency would then have thirty days to submit either (a) evidence that it complied with the FSA, or (b) a corrective action plan for bringing itself into compliance. *Id.* (citing 7 C.F.R. § 276.4(d)(2)). SNAP funds may be suspended or disallowed only if the state agency were to fail to respond to the formal complaint, submit insufficient evidence of compliance or an unsatisfactory corrective action plan, or disregard an agreed-upon corrective action plan. *Id.* (citing 7 C.F.R. § 276.4(e). Disallowance of SNAP funds may be appealed to the SNAP Appeals Board, and the Board's decision is subject to judicial review. *Id.* ¶ 18 (citing 7 C.F.R. § 276.7).

The Final Rule did not change the manner in which FNS enforces prohibitions against sex discrimination in SNAP or SNAP-Ed. States could not consider gender identity or sexual orientation for purposes of SNAP and SNAP-Ed eligibility and participation before the Final Rule was adopted, *see* 7 C.F.R. Part 273; 7 U.S.C. § 2014(b), so even absent the Final Rule, FNS would be able to pursue suspension or disallowance of funds to remedy discrimination. Kline Decl. ¶ 16.

### B. Enforcement of Title IX and Other Civil Rights Laws

Beyond SNAP-specific enforcement mechanisms under the FNA, USDA also may pursue remedies for violations of specific civil rights laws in relation to programs receiving USDA funds. *See* 20 U.S.C. §§ 1682-1683; 42 U.S.C. § 2000d-1; *see also* Decl. of Roberto Contreras ¶¶ 12-29 ("Contreras Decl."), ECF No. 54-2. USDA's internal regulations require USDA employees to ensure programs and activities receiving federal financial assistance from USDA are in compliance with applicable civil rights laws. *See* Contreras Decl. ¶ 12. When USDA receives a complaint of a violation of civil rights laws in a program or activity receiving USDA funds and determines that it has jurisdiction, it notifies the complainant that USDA has accepted the complaint. *Id.* ¶¶ 16-20. USDA then "attempts to resolve the complaint at the lowest possible level through alternative dispute resolution." *Id.* ¶ 22. In the event those attempts are unsuccessful, USDA will assign an investigator, who compiles sworn statements and documents relating to the issues in the complaint. *Id.* Based on the investigation, USDA decides whether the recipient of federal funds has violated relevant civil rights laws. *Id.* If the recipient is found to be out of compliance, USDA seeks voluntary compliance. *Id.* ¶ 24-25. If the recipient does not comply voluntarily, the complaint may then be referred to USDA's Office of the Assistant Secretary for Civil Rights (OASCR) for further action pursuant to 7 C.F.R. § 15.8. Contreras Decl. ¶ 25. Only after completion of all of these steps might USDA refer the matter to the Department of Justice to pursue judicial remedies for unlawful discrimination. *See id.* ¶¶ 25-28.

IV.    THE MAY 5 MEMO ON DISCRIMINATION-COMPLAINT PROCESSING

On January 20, 2021, President Biden issued an executive order that instructed federal agencies to evaluate statutes and regulations prohibiting sex discrimination in light of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).  *See* Executive Order 13988, "Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation," 86 Fed. Reg. 7,023 (Jan. 20, 2021).  In *Bostock*, the Supreme Court held that Title VII's prohibition on discrimination "because of sex" included discrimination based on sexual orientation and gender identity because "[sexual orientation] and transgender status are inextricably bound up with sex."  140 S. Ct. at 1737, 1741–42.  In response to the Executive Order, USDA re-examined the non-discrimination provisions governing USDA-funded programs.

On May 5, 2022, following that re-examination, USDA issued a memorandum to the state and regional directors of FNS programs laying out USDA's interpretation of the non-discrimination provisions of Title IX and the FNA based on *Bostock*.  *See* May 5 Memo, ECF No. 1-1.  In it, USDA concurred with the Departments of Justice and Education that Title VII's prohibition of discrimination "because of sex," 42 U.S.C. § 2000e-2(a), and Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1618(a), were sufficiently similar that *Bostock*'s interpretation should apply to Title IX.  *See* May 5 Memo at 2-3.  USDA likewise indicated the FNA's non-discrimination provision—prohibiting discrimination "by reason of … sex," 7 U.S.C. § 2020(c)(1)—was so similar to Title VII's language that it too was governed by *Bostock*.  The May 5 Memo therefore advised "[s]tate agencies and program operators . . . [to] review their program discrimination complaint procedures and make any changes necessary to ensure complaints alleging discrimination on the basis of gender identity and sexual orientation are processed and evaluated as complaints of discrimination on the basis of sex."  May 5 Memo at 3.  Though the May 5 Memo set out USDA's understanding of Title IX and the FNA, USDA made clear that the Memo "does not determine the outcome in any particular

7

case, which will depend on the specific facts and circumstances of that case," and that it did not address other "legal requirements, including, . . . Title IX's religious exemption, the Religious Freedom Restoration Act . . . and any other applicable exemptions." *Id.*

On the same day, USDA issued two related documents. One document answers anticipated questions about the Memo, including questions about the updating and placement of "*And Justice for All*" posters used in FNS-funded programs. *See* Q&A Memo, ECF No. 1-3. The second document advises state agencies on the process of updating non-discrimination statements in their public-facing materials to comport with the May 5 Memo. *See* May 5 Memo Supplement, ECF No. 1-4. Neither the Q&A Memo nor the May 5 Memo Supplement purports to have any independent legal effect.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on July 26, 2022, alleging that USDA, in issuing the May 5 Memo and the Final Rule, violated the APA and assorted provisions of the Constitution. *See generally* Compl. Plaintiffs moved for a preliminary injunction the same day, requesting preliminary injunctive relief and seeking expedited consideration of the Motion. Mot. for Prelim. Inj. at 3, ECF No. 2. The Court *sua sponte* denied Plaintiffs' request for expedited briefing. *See Tennessee v. USDA*, No. 3:22-cv-257, 2022 WL 5336196 (E.D. Tenn. Aug. 10, 2022). In its order, the Court noted that "Plaintiffs States repeatedly and clearly state that they 'do not deny benefits based on a household member's sexual orientation or gender identity' for purposes of administering SNAP benefits," and that Plaintiffs' had not explained how the challenged documents "would impact their state laws regarding sports participation, restroom use, religious freedom, or free speech." *Id.* at *2. Subsequently, the parties briefed their positions on Plaintiffs' motion, and that motion is now ripe for decision.

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff bears the burden to establish federal court jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

8

"Both constitutional and statutory requirements . . . must be met before jurisdiction can be found." *Jones v. FBI*, No. 3:21-CV-225, 2021 WL 5239586, at *2 (E.D. Tenn. Nov. 10, 2021). And it is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted).

In evaluating a motion to dismiss under Rule 12(b)(6), a court must assess whether the plaintiff has "state[d] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 678.

## ARGUMENT

## I. THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.

### A. Plaintiffs Do Not Satisfy Article III's Requirement of Standing.

To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Where a plaintiff seeks prospective relief, as Plaintiffs do here, the "threatened injury must be certainly impending to constitute injury in fact"; "[a]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). The prospect of enforcing a purportedly unlawful statute or regulation against a plaintiff must be "sufficiently imminent" to create a concrete injury. *Platt v. Bd. of Comm'rs*, 769 F.3d 447, 451 (6th Cir. 2014) (citation omitted). A "theory of standing [that] relies on a highly attenuated chain of possibilities, does not satisfy" this requirement. *Clapper*, 568 U.S. at 410. Here, Plaintiffs cannot satisfy their burden to demonstrate standing.

Plaintiffs principally claim that their sovereignty will be infringed by the May 5 Memo and

Final Rule.  *See, e.g.*, Compl. ¶¶ 123, 125, 130–131, 138.  But they cannot show any concrete injury to their sovereignty, that any such injury would be traceable to the May 5 Memo and Final Rule as distinguished from Title IX and the FNA, or that the Court could redress such an injury by setting aside those documents.  Plaintiffs assert injury because the Final Rule and May 5 Memo "at least arguably conflict" with some of their state laws.  *See* Compl. ¶¶ 130-31 (identifying state laws for only thirteen of the twenty-two Plaintiff States).  But, as the Court has already noted, that claim is wholly conclusory:  Plaintiffs "do[] not explain how" compliance with USDA's interpretation of sex-discrimination prohibitions "regarding only SNAP benefits, would impact their states laws regarding sports participation, restroom use, religious freedom, or free speech."  *Tennessee*, 2022 WL 5336196, at *2.  Indeed, Plaintiffs affirm that they do not discriminate in the administration of SNAP on the basis of gender identity or sexual orientation, *see* Compl. ¶¶ 12, 40, and they do not allege that their state laws require them to do so.  Thus, Plaintiffs have identified no concrete harm to their sovereign interests from the May 5 Memo or June 14 Final Rule.

Plaintiffs also allege they face an imminent loss of significant federal funds if they fail to adopt new FSAs that mirror the language of the Final Rule, but they have not shown any action that could lead to such an injury is sufficiently imminent for standing purposes.  Indeed, not one Plaintiff alleges that it will refuse to sign the new SNAP FSAs if those agreements contain the Final Rule's updated standard non-discrimination language.  And as of today, twenty-one Plaintiffs have already entered into new SNAP FSAs containing the updated non-discrimination language.  Yet others have the opportunity to negotiate as to the terms of the FSA.  *See* 7 C.F.R. § 272(b)(2).  Accordingly, it is pure speculation to say that Plaintiffs are in imminent danger of losing significant federal funds from failing to sign new FSAs.  *Cf. Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022).

Similarly, Plaintiffs cannot demonstrate a credible threat of imminent enforcement proceedings or show that they will face financial harm.  Again, Plaintiffs have stated that they do not

engage in sex discrimination, even as USDA understands that term, in their administration of SNAP benefits, Compl. ¶ 12, and so there can be no concrete expectation that Plaintiffs will face enforcement proceedings based on instances of such discrimination. And even if enforcement proceedings could be expected, nothing about the May 5 Memo or Final Rule would dictate the outcome of those proceedings. *See, e.g.*, May 5 Memo at 3; *see also Sch. of the Ozarks, Inc.*, 41 F.4th at 998 (holding that plaintiffs did not have standing to challenge an agency memorandum that did not require the agency to "reach [a] specific enforcement decision"). Plaintiffs' abstract disagreement with Defendants' statutory interpretation is thus insufficient to establish standing.

Even if Plaintiffs were able to identify a concrete conflict with their state laws or imminent threat of enforcement proceedings, any injury Plaintiffs' face would be traceable to the FNA and Title IX, not to the Final Rule or May 5 Memo. As the challenged guidance documents clearly state, they have no independent legal significance but, rather, set forth USDA's interpretation of the provisions of Title IX and the FNA that prohibit discrimination on the basis of sex, to include discrimination on the basis of gender identity and sexual orientation, prohibitions that would exist even in the absence of the Final Rule and May 5 Memo. Further, USDA employees have an entirely independent obligation, pursuant to internal USDA regulations, to ensure programs and activities receiving federal financial assistance from USDA comply with applicable civil rights laws. *See* Contreras Decl. ¶ 12. Accordingly, even without the Final Rule and May 5 Memo, USDA would still enforce the prohibitions on sexual orientation and gender identity discrimination pursuant to Title IX and the FNA.

Prohibiting enforcement of the Final Rule and May 5 Memo also would not redress Plaintiffs' alleged injuries. *See* Compl. at 49 (Prayer for Relief ¶¶ A, I). USDA does not "enforce" the Final Rule or May 5 Memo; USDA enforces Title IX and the FNA. And courts may not "enjoin" an agency's view of the law. *See Whole Women's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) ("[A] federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions.

11

But . . . no court may . . . purport to enjoin challenged 'laws themselves.'").

Finally, Plaintiffs' fear that the Final Rule and May 5 Memo "could trigger Title IX enforcement action by the Department of Education, which enforces Title IX," Compl. ¶ 133, is not traceable to USDA, and would not be redressed by an order of this Court. Plaintiffs fail to identify any actual, impending Title IX enforcement action by the Department of Education, never mind a causal connection between such an enforcement action and USDA's Final Rule and May 5 Memo. And in any event, the Department of Education resolves matters by informal means where possible, 20 U.S.C. § 1682; 34 C.F.R. § 100.7(d), allowing Plaintiffs to remedy issues before any loss of federal funds. Finally, the federal government may enforce Title IX regardless of the existence of USDA's Final Rule and May 5 Memo, so Plaintiffs' fears of enforcement are neither traceable to nor redressable by the invalidation of USDA's documents. *Cf. Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941 (9th Cir. 2006) (existence of another agency's unchallenged regulation made injury unredressable).

### B. Plaintiffs' Claims are Not Ripe.

For similar reasons, Plaintiffs' claims in this case are not ripe. Ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation omitted). The ripeness test comprises two elements: (1) the fitness of the matter for adjudication, and (2) the hardship to the plaintiffs in withholding relief. *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008). In a pre-enforcement challenge to a statutory scheme, where a court has "no idea whether or when" the statute will be enforced against the plaintiff and "no idea what" the particular factual circumstances of any ultimate dispute will be, a claim is not ripe. *Id.* at 526 (citation omitted).

12

Here, Plaintiffs' claims are not fit for adjudication. A matter is "'fit for judicial decision" when "it arises in a concrete factual context and concerns a dispute that is likely to come to pass." *Id.* at 525. But it is far from clear that Plaintiffs will ever face any sanction from Defendants that relates to their compliance with the May 5 Memo's interpretive guidance, or that stems from any (as yet unstated) refusal to adopt the Final Rule's language proposed for use in FSAs. And the factual context of any potential enforcement action or penalty is even less certain, especially given that Plaintiffs' disclaim any present or future intent to deny USDA benefits based on sexual orientation or gender identity. *See* Compl. ¶ 12. It is apparent, then, that the issues that Plaintiffs seek to raise in this case will be "better grasped when viewed in light of a particular application" of the sex-discrimination prohibitions in Title IX and the FNA. *Texas v. United States*, 523 U.S. 296, 301 (1998).

Additionally, Plaintiffs will face no hardship from withholding judicial review now, as the highly reticulated enforcement processes that channel USDA's enforcement efforts would afford them a full opportunity to present their claims in any future enforcement proceeding. In particular, FNS's suspension and disallowance process provides multiple opportunities for an offending state agency to come into compliance. *See* Kline Decl. ¶ 17. Indeed, only after a state agency fails to respond satisfactorily to an Advance Notification, Formal Warning, or corrective action proposal does FNS consider suspending or disallowing federal funds, *id.*, and the extent of such suspension or disallowance is subject to the Secretary's discretion. *Id.*; *see also* 7 U.S.C. § 2020(g). Even then, disallowance is appealable to the State SNAP Appeals Board, and to a court. *See* Kline Decl. ¶ 18.

FNS's Civil Rights Division ("CRD") likewise has an elaborate enforcement process that aims to resolve complaints at the lowest possible level. Contreras Decl. ¶¶ 22, 25. If the process does not resolve the complaint, CRD proceeds through an investigative stage, produces a report, and then issues a Final Agency Decision, which is appealable to USDA's OASCR. *Id.* ¶ 23. If OASCR affirms the Final Agency Decision, USDA may seek compliance through procedures set forth at 7 C.F.R.

§ 15.8 or through other means, including referral to the Department of Justice. *See* Contreras Decl. ¶¶ 26-28 (citing 7 C.F.R. § 15.8). FNS has never sought to suspend, terminate, or refuse to grant or to continue financial assistance to a State under 7 C.F.R. § 15.8. Contreras Decl. ¶ 30. Given all the procedures available prior to the imposition of any penalty by Defendants, Plaintiffs "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729–30 (1998); *see also id.* 733–34 (case was not ripe where there would be an administrative process before plaintiffs would face any "practical harm").

### C. Title IX and the FNA Provide Plaintiffs with Adequate and Exclusive Remedies

This Court also lacks jurisdiction over Plaintiffs' claims for two additional reasons: First, the APA's alternative remedy provision precludes Plaintiffs from bringing this action when they can raise their arguments as defenses in any future Title IX or FNA enforcement action. Second, Congress created exclusive avenues through which Plaintiffs may challenge the enforcement actions they fear will be brought under Title IX and the FNA. *See* Compl. ¶ 126 (alleging that "Plaintiffs . . . face an immediate threat that the USDA will enforce the Final Rule"); *id.* ¶ 133 (claiming that "USDA's actions could trigger Title IX enforcement action by the Department of Education").

The APA conditions judicial review on the requirement that there be "no other adequate remedy in a court." *See* 5 U.S.C. § 704. "The essential inquiry is whether another statutory scheme of judicial review exists so as to preclude review under the more general provisions of the APA." *Bangura v. Hansen*, 434 F.3d 487, 501 (6th Cir. 2006). Where "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action" a court lacks subject matter jurisdiction over APA claims. *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Here, for example, if the United States filed suit against one of the Plaintiffs for having violated Title IX or the FNA, that State would "[a]lmost by definition [] have an adequate remedy in a court, that is, the remedy of opposing the . . . motion in . . . court." *NAACP v. Meese*, 615 F. Supp. 200, 213 (D.D.C. 1985).

That would afford a judicial forum that would "obviat[e] the need for resort to the APA." *Id.*

Even beyond the APA's restrictions, it is clear that Congress did not intend for pre-enforcement judicial review of any USDA action seeking to remedy violations of Title IX or the FNA because it mandated extensive administrative enforcement proceedings culminating in the opportunity for judicial review. *See* 20 U.S.C. § 1682-1683 (Title IX); 7 U.S.C. §§ 2020(g), 2023 (FNA). Where it is "fairly discernable" that an elaborate statutory review scheme was intended to create an exclusive remedy, parallel jurisdiction outside that scheme is precluded. *See Thunder Basin*, 510 U.S. at 207, 216 (citation omitted); *see also Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012). As in *Thunder Basin*, this Court does not have jurisdiction to consider Plaintiffs' challenge to USDA's interpretation of Title IX or the FNA before the United States has initiated any enforcement proceedings. Plaintiffs style their complaint as challenging the statutory interpretation announced in Defendants' documents, but the same was true in *Thunder Basin.* 510 U.S. at 205 (describing plaintiff's pre-enforcement "challenge [to] the [agency's] interpretation of" a statute). Courts have long refused to allow funding recipients to circumvent the civil rights laws' administrative enforcement processes in this manner. *See, e.g., Taylor v. Cohen*, 405 F.2d 277 (4th Cir. 1968) (en banc); *Sch. Dist. of City of Saginaw v. U.S. Dep't of Health, Educ., & Welfare*, 431 F. Supp. 147 (E.D. Mich. 1977). Indeed, in *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 859-64 (S.D. Ohio 2016), another district court in the Sixth Circuit concluded that it lacked jurisdiction over a school district's challenge to an agency's guidance documents discussing Title IX's application to discrimination against transgender students because there was an adequate remedy through Title IX's administrative process. In light of the extensive administrative review scheme Congress established in that statute, *see* 7 U.S.C. §§ 2020(g), 2023, it is more than "fairly discernable" that Congress intended to preclude pre-enforcement challenges in federal court. *Thunder Basin*, 510 U.S. at 216; *Highland*, 208 F. Supp. 3d at 861.

## II.     PLAINTIFFS' CLAIMS LACK MERIT.

### A.  The May 5 Memo Is Not a Final Agency Action Subject to Judicial Review.

To the extent that Plaintiffs challenge the May 5 Memo as being contrary to law, arbitrary and capricious, and procedurally deficient, those claims fail.  The APA permits judicial review only of "final agency action," 5 U.S.C. § 704, which is agency action that is (1) "the consummation of the agency's decisionmaking process" and that (2) also determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted).  The May 5 Memo does not determine anyone's "rights or obligations"; it merely announces USDA's interpretation of Title IX and the FNA.

With respect to the May 5 Memo, only an action to enforce compliance with that interpretation under particular facts and circumstances could determine, as a final matter, a party's rights or obligations regarding the laws.  *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 246 (1980).  USDA would have to take numerous steps aimed at achieving compliance before it could even bring an enforcement action.  The unquantifiable and speculative "risk" that these steps will occur does not constitute a legal consequence sufficient to make something final agency action.  Rather, "[a]s long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm." *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 594–97 (5th Cir. 1995) (citation omitted).

Merely "advis[ing] the public prospectively of the manner in which the agency proposes to exercise a discretionary power" does not create new obligations for the public.  *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted).  Rather, doing so "create[s] no new legal obligations beyond those the [statute] already imposed," *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016); *Mann Constr. Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022), and "simply states what the administrative agency thinks the statute[s] mean[,]" *First Nat'l Bank of Lexington v. Sanders*, 946 F.2d 1185, 1188 (6th Cir. 1991); *see also Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018)

16

(defining interpretive document as one that "simply states what the administrative agency thinks the statute means" and "only reminds affected parties of existing duties"). Because the May 5 Memo does nothing more, Plaintiffs' claims regarding it lack any merit.

**B. USDA Has Complied with Applicable Notice-and-Comment Requirements.**

Because the May 5 Memo creates no legal obligations, it is an interpretive rule that "does not require notice and comment procedures prior to its adoption." *See Michigan v. Thomas*, 805 F.2d 176, 183 (6th Cir. 1986). Plaintiffs have not established it should have been subject to notice and comment.

The Final Rule, however, was put through notice and comment and, therefore, Plaintiffs' notice-and-comment challenge to it also fails. Plaintiffs argue that the notice-and-comment process was defective as to the updated discrimination statement in the Final Rule because that statement is purportedly not a logical outgrowth of the Proposed Rule on which the public commented. *Id.* ¶ 157. But USDA's Proposed Rule gave "a description of the subjects and issues involved" in the rulemaking, as required by 5 U.S.C. § 553(b)(3). The Proposed Rule made clear that it was intended to "update[] FSA language [to] emphasize existing non-discrimination protections for SNAP households to the effect that no person in the United States shall, on the grounds of sex" or other protected traits be the "subject of discrimination under SNAP." 81 Fed. Reg. at 81,016-17. To do this, the anticipated final rule "would incorporate references to additional civil rights legislation[, including Title IX,] into the standard FSA language," which already prohibited sex discrimination. *Id.* at 81,015, 81,017.

At the time, significant litigation was already pending regarding the meaning of Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681, especially in relation to discrimination on the basis of gender identity in schools. *See G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-CV-943-PP, 2016 WL 5239829 (E.D. Wis. Sept. 22, 2016); *Highland*, 208 F. Supp. 3d at 859-64; *Texas v. United States*, 201 F. Supp. 3d 810, 826–27 (N.D. Tex. 2016). The public was on notice that USDA

was contemplating making the non-discrimination statement in the FSA explicitly incorporate Title IX's non-discrimination provision and providing more detail about the "existing non-discrimination protections for SNAP households." 81 Fed. Reg. at 81,016. Accordingly, that USDA might incorporate judicial decisions regarding the meaning of Title IX's non-discrimination language related to gender identity and sexual orientation was entirely foreseeable.

### C. Plaintiffs' Contrary-to-Law Claim Is Unlikely to Succeed

Plaintiffs' complaint centers on the contention that USDA's interpretations of the phrases "on the basis of sex" in Title IX, 20 U.S.C. § 1681(a), and "by reason of . . . sex" in the FNA, 7 U.S.C. § 2020(c)(1), are unlawful. *See* Compl. ¶¶ 178-97. But that can hardly be the case in light of *Bostock*. Courts have recognized that "Title IX's language closely resembles Title VII's." *Peltier v. Charter Day Sch., Inc.*, 8 F.4th 251, 273 (4th Cir. 2021) (explaining that although *Bostock* involved Title VII rather than Title IX, its reasoning "is consistent with the broadly applicable text of Title IX"), *aff'd in part and vacated in part*, 37 F.4th 104 (4th Cir. 2022); *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011) (holding that the "Supreme Court's interpretation of Title VII properly informs our examination of Title IX"). The resemblance is particularly notable with respect to the language at issue in *Bostock*. Just as Title VII prohibits discrimination "because of" sex, Title IX prohibits discrimination against that individual "on the basis of sex." *See, e.g.*, *Bostock*, 140 S. Ct. at 1753 (holding "that employers are prohibited from firing employees *on the basis* of [sexual orientation] or transgender status") (emphasis added). And though there are practical and linguistic differences in Title VII's "because of," Title IX's "on the basis of," and FNA's "by reason of," the Supreme Court in *Bostock* relied on iterations of all these terms in reaching its decision. *See, e.g.*, 140 S. Ct. at 1740–41 (stating that an employer may not intentionally treat "a person worse *because of* sex," and that "it is impossible to discriminate against a person" for reasons related to gender identity or sexual preference "without

discriminating *based on* sex") (emphasis added); *id.* at 1739 (Court noted that "the ordinary meaning of because of is by reason of or 'on account of.'" (internal quotation marks omitted)).

Indeed, because of the similar meaning of the standards, many courts have recognized that *Bostock*'s reasoning regarding Title VII extends to Title IX. *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020); *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*, 557 F. Supp. 3d 224, 244 (D. Mass. 2021) (holding that "[t]hough *Bostock* was a Title VII case, the Supreme Court's reasoning applies equally outside of Title VII."); *Doe v. Univ. of Scranton*, No. 3:19-cv-01486, 2020 WL 5993766, at *5 n.61 (M.D. Pa. Oct. 9, 2020) (finding "persuasive" the argument that *Bostock* extends to Title IX); *see also Walker v. Azar*, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 64 (D.D.C. 2020).

The absence of any substantial practical, linguistic, or structural distinction between the non-discrimination mandates in Title VII, Title IX or the FNA renders Plaintiffs' claims meritless. Nevertheless, Plaintiffs argue that *Bostock*'s reasoning was unlawfully applied by USDA to Title IX because Title IX "expressly permit[s] distinctions based on biological sex in certain circumstances." Compl. ¶ 182. But the Fourth Circuit rejected a similar argument in *Grimm,* where it held that the violation of Title IX is not in maintaining sex-separated facilities but in excluding transgender students from sex-separated facilities or programs consistent with their gender identity. 972 F.3d at 618.

Similarly, Plaintiffs cannot plausibly distinguish the text of the FNA from Title VII. It is true, as Plaintiffs point out, that in *Bostock*, the Supreme Court assumed, "for argument's sake, . . . that 'sex' signified . . . biological distinctions between male and female." 140 S. Ct. at 1739; *see* Compl. ¶ 58. But that was "just a starting point. The question isn't just what 'sex' meant, but what the [statute] says about it." 140 S. Ct. at 1739. The Supreme Court explained that the statute prohibited discrimination against individuals "based on sex." *Id.* at 1741. The Supreme Court placed great significance on the fact that Title VII's anti-discrimination provision was focused on individuals—it meant that the law

19

was focused on preventing employers from treating an "individual worse than others who are similarly situated," *id.* at 1740, and was not written so as to focus "on differential treatment between the two sexes as groups," *id.* at 1741. With that focus in mind, the Court concluded that "it is impossible to discriminate against a person for being [gay] or transgender without discriminating against that individual based on sex." *Id.* Likewise, the FNA's anti-discrimination language "focuses on protecting individuals from discrimination." May 5 Memo. at 2. The Act "focuses on individual households . . . as opposed to program applicants as a whole," *id.* at 2-3 (citing 7 U.S.C. § 2020(c)(1)). As USDA explained, "the focus on individual households and the prohibition of discrimination 'by reason of' sex under the [FNA] is sufficiently similar to Title VII such that the *Bostock* analysis applies to the [FNA]." *Id.* at 3.

### D. Plaintiffs' Arbitrary-and-Capricious Claim Fails.

Plaintiffs' arbitrary-and-capricious argument is likewise unfounded. Compl. ¶¶ 160–177. The Final Rule and May 5 Memo clearly explain USDA's rationale for interpreting Title IX and the FNA to include prohibitions on discrimination on the basis of sexual orientation or gender identity. *See* May 5 Memo at 1-3; 87 Fed. Reg. at 35,855-56. USDA's reasoning follows that of the Court in *Bostock*, and accounting for and interpreting the application of the Supreme Court's rationale in connection with USDA's implementation of the statutes cannot be arbitrary and capricious. *Cf. Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1 (D.D.C. 2020) (finding Title IX rule arbitrary and capricious where agency failed to consider *Bostock*'s reasoning); *see generally FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (an agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one," but only that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better.").

### E. Plaintiffs' Assorted Constitutional Claims Fail

Plaintiffs also set forth a smorgasbord of constitutional arguments under the Spending Clause,

the Tenth Amendment, the First Amendment, and various doctrines such as the Anti-Commandeering Doctrine, the Non-Delegation Doctrine, and the Major Questions Doctrine. All lack merit because USDA's Final Rule and May 5 Memo are based on a straightforward interpretation of Title IX and the FNA in light of the Supreme Court's decision in *Bostock*.

### 1. *Spending Clause*

The Supreme Court has long acknowledged that "Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare" and "to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare." *Sabri v. United States*, 541 U.S. 600, 605 (2004). That power to impose conditions on the receipt of federal funds applies regardless of whether Congress legislates "in an area historically of state concern." *Id.* at 608 n.*.

Plaintiffs contend they lacked constitutionally adequate notice of the Final Rule and May 5 Memo because neither of the statutes interpreted therein "unambiguously notify the States of any conditions attached to the" appropriated funds. Compl. ¶ 211. This claim is meritless. As the Supreme Court made clear in *Bostock* after reviewing analogous language in Title VII, the "express terms of [the] . . . statute give us [the] . . . answer," 140 S. Ct. at 1737, that "it is impossible to discriminate against a person for being [gay] or transgender without discriminating against that individual based on sex." 140 S. Ct. at 1741. The Court noted "Title VII's broad language," *id.* at 1747, encompasses other forms of discrimination, including "sexual harassment" and "motherhood discrimination," *id.* (internal quotation marks omitted), and "all forms of discrimination because of sex, however they may manifest themselves or whatever labels might attach to them." *Id.* It has been two years since the *Bostock* decision was issued, and six years since the Sixth Circuit's decision in *Dodds v. Department of Education*, 845 F.3d 217, 221-22 (6th Cir. 2015) (per curiam), which found that Title IX prohibits discrimination based on sex stereotyping and gender nonconformity. Plaintiffs cannot say that they lacked notice that USDA, which already had conditioned its SNAP and SNAP-Ed funding

on compliance with Title IX and the FNA, would inform states that the agency would assess compliance in a manner consistent with its interpretation of those statutes in light of *Bostock*.

Plaintiffs further argue that the Final Rule and May 5 Memo are improperly coercive under *Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519, 584 (2012) ("*NFIB*"). In that case, the Supreme Court held that Congress could not make the entirety of a State's traditional Medicaid funding contingent on participation in a new program to provide health coverage for all low-income adults. But here, the Secretary is not "enlisting the States in a new . . . . care program." *Id. See Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 184 (5th Cir.), *cert. denied*, 141 S. Ct. 901 (2020) ("The problem in *NFIB* was that Congress had conditioned all of a state's Medicaid funding on accepting significant obligations that created a new program entirely different than the original one the state had opted in to."); *see also Tennessee v. U.S. Dep't of State*, 329 F. Supp. 3d 597, 629 (W.D. Tenn. 2018), a*ff'd sub nom. State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499 (6th Cir. 2019), *cert. denied*, 141 S. Ct. 549 (2020) ("The State must also show that Congress has created a new condition that is different from the original program Congress is purporting to modify and is using that program's funding as leverage to force the states to accept the new condition."). The Secretary is simply applying the existing provisions of Title IX and the FNA to its longstanding nutrition programs, including SNAP and SNAP-Ed, based on an interpretation of those statutes that has been recognized as valid under analogous circumstances in *Bostock*. This does not constitute unlawful coercion under *NFIB*. Thus, Plaintiffs' Spending Clause claim lacks merit.

### 2. *Tenth Amendment and Anticommandeering Doctrine*

Because the Final Rule and May 5 Memo are permitted under the Spending Clause, they do not constitute an impermissible "commandeering" of state-run institutions. As the Supreme Court has explained, valid conditions on the receipt of federal funds do not constitute commandeering. *See New York v. United States*, 505 U.S. 144, 167, 173 (1992) (contrasting conditions with commandeering).

22

### 3. *Separation of Powers and Non-Delegation Doctrine*

Plaintiffs further claim that USDA's Final Rule and May 5 Memo violate the major questions doctrine and the non-delegation doctrine. Compl. ¶¶ 246–257. Neither contention has any merit. This is not one of those rare, extraordinary cases that raises the major questions doctrine. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (explaining that such cases are ones "in which the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority" (citations omitted)). USDA is not exercising any vast new authority to implement policies that Congress could not have intended. Congress clearly intended to prohibit sex discrimination against individuals under both Title IX and the FNA. Even if the drafters "weren't thinking about many of the [statutes'] consequences, . . . the limits of the drafters' imagination supply no reason to ignore the law's demands." *Bostock*, 140 S. Ct. at 1737. The Supreme Court made clear in *Bostock* that "Title VII's prohibition of sex discrimination in employment is a major piece of federal civil rights litigation," written in "starkly broad terms," that encompasses conduct in which employers "fir[e] employees *on the basis of* [sexual orientation] or transgender status." *Id.* at 1753 (emphasis added). This was why the Supreme Court found that opponents of this reading of Title VII could not "hide behind the no-elephants-in-mouseholes cannon," *id.*; the expanse of the prohibition "has been standing before us all along." *Id. See also West Virginia*, 142 S. Ct. at 2622 (Gorsuch, J., concurring) (identifying the elephants-in-mouseholes canon as part of the major questions analysis).

Plaintiffs' nondelegation challenge is equally deficient. A "nondelegation inquiry always begins (and often almost ends) with statutory interpretation. The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). "[T]he answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* Here, as in *Bostock*, "the express terms

of [the statutes] give us one answer," 140 S. Ct. at 1737, which is that administrators of USDA-funded programs may not discriminate against individuals "on the basis of [sex, including. . .sexual orientation] or transgender status." *Id.* at 1753. Nothing more is required under the nondelegation inquiry.

### 4. First Amendment

Plaintiffs' First Amendment arguments are unlikely to succeed because they are based on unsupported speculation. For example, Plaintiffs contend that USDA is forcing "Plaintiffs and their employees to engage in biologically inaccurate speech and to forbid biologically accurate speech." Compl. ¶ 222. But neither the Final Rule nor the May 5 Memo says anything of the sort. Plaintiffs suggest that the Final Rule and the May 5 Memo violate the free speech rights of teachers and professors, citing, for example, *Meriwether v. Hartop*, 992 F.3 492 (6th Cir. 2021). But *Meriwether* involved an individual's free speech rights, not a state's, and USDA has not addressed pronoun usage in the challenged documents. Nor does this case present the sort of fact-intensive dispute that was at issue in *Meriwether*. USDA FNS has not received a program discrimination complaint, has not conducted a specific program investigation, and has not made any case specific determination finding that an individual's use of incorrect pronouns constitutes discrimination in its programs (further underscoring how unripe Plaintiffs' challenge is).

Next, Plaintiffs inaccurately contend that the Final Rule and May 5 Memo conflict with religious liberty guarantees under the First Amendment. Compl. ¶ 217. Whatever those guarantees may be, they do not belong to the States, and the States lacks standing to assert them on behalf of religious employers and employees. *See, e.g.*, *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("While the state, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government."); *Kentucky v. Biden*, 23 F.4th 585, 597 (6th Cir. 2022) (same); *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1208 (D.N.M. 2020) (noting general consensus "that the First Amendment

works in one direction: it protects people and private entities, not governments").

Moreover, the States fail to acknowledge that Title IX and USDA's own regulations contain a religious exemption. Since its enactment, Title IX has exempted educational institutions that are controlled by religious organizations from complying with Title IX's prohibitions which conflict with their religious tenets. *See* 20 U.S.C. § 1681(a)(3). Since April 1979, USDA's Title IX regulations have made clear that they do "not apply to an educational institution which is controlled by a religious organization to the extent application of this part would not be consistent with the religious tenets of such organization." *See* 44 Fed. Reg. 21,610, 21,613 (Apr. 11, 1979). On October 6, 2017, USDA updated its Title IX regulations but the language relating to the religious exemption in the new regulation, 7 C.F.R. § 15a.205, is similar to the 1979 regulatory language ("This part does not apply to any operation of an educational institution or other entity that is controlled by a religious organization to the extent that application of this part would not be consistent with the religious tenets of such organization."). *See* 82 Fed. Reg. 46,655, 46,659 (Oct. 6, 2017); 7 C.F.R. § 15a.205(a). The States do not identify any specific religious employer or employee who will be harmed by the Final Rule or May 5 Memo, nor do they discuss how the religious exemptions would apply.

Finally, the States argue USDA's actions violate their own First Amendment rights. Compl. ¶ 220. But, of course, States do not have First Amendment rights. *See Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 139 (1973) (Stewart, J., concurring); *New Mexico,* 450 F. Supp. at 1208. The First Amendment protects the rights of individuals against the government, not the rights of States against the federal government. That work is done by the Tenth Amendment, under which, as described above, the States' arguments also fail.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6) and close this case.

Dated: December 5, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA WELLS
Assistant Branch Director
Federal Programs Branch

*/s/ Cody T. Knapp*
CODY T. KNAPP
Trial Attorney (NY Bar # 5715438)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*