# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

STATE OF TENNESSEE, *et al.*,

       Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

          Defendants.

Case No. 3:22-cv-257-TRM-DCP

# DEFENDANTS' REPLY BRIEF
# IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

    I.    THE COURT LACKS JURISDICTION. .........................................................1

        A.    Plaintiffs Do Not Have Standing to Pursue Their Claims. ..........................2

        B.    Plaintiffs' Claims are Not Ripe. ...............................................................7

        C.    Plaintiffs' Claims are Barred by Statute. ..................................................8

    II.   PLAINTIFFS' CLAIMS LACK MERIT................................................................11

        A.    Plaintiffs' Procedural APA Claims Fail...................................................11

        B.    Plaintiffs' Substantive APA Claims Fail. ................................................13

        C.    Plaintiffs' Constitutional Claims Fail. .....................................................17

CONCLUSION.................................................................................................................20

# INTRODUCTION

Defendants moved to dismiss Plaintiffs' complaint because Plaintiffs have failed to establish this Court's jurisdiction to entertain their claims, and because their claims, as alleged in the complaint, lack merit. Nothing in Plaintiffs' opposition brief alters that conclusion. As to jurisdiction, Plaintiffs fail to meet the bare constitutional minimums of standing and ripeness required to proceed in federal court, and their claims are precluded by the exclusive judicial review provisions established under Title IX and the Food and Nutrition Act (FNA). On the merits, their procedural and substantive claims under the Administrative Procedure Act (APA), as well as their scattered constitutional claims, all fail as pleaded. For all the reasons explained herein, as well as in Defendants' prior filings in this case, the Court should grant Defendants' motion and dismiss this case.

# ARGUMENT

## I.  THE COURT LACKS JURISDICTION.

As explained in Defendants' brief in support of their motion to dismiss, *see* ECF No. 71, the Court lacks jurisdiction over this case for at least three reasons. First, Plaintiffs have not identified any certainly impending injury that is traceable to the May 5 Memo or Final Rule and redressable by a court order. Thus, Plaintiffs have not satisfied the constitutional minimum of standing. Second, Plaintiffs assert claims against USDA's non-binding interpretation of the sex-discrimination provisions of Title IX and the FNA that are unmoored from any concrete factual context. Absent that context, Plaintiffs' claims are not ripe. And third, Plaintiffs' complaints about USDA's interpretation of Title IX and the FNA must be ventilated, if at all, through the detailed administrative review schemes Congress established under those statutes. The avenues for judicial review that Congress provided pursuant to those schemes are exclusive and adequate to provide Plaintiffs with appropriate remedies, and so this Court lacks jurisdiction to adjudicate Plaintiffs claims under the APA. Each of these reasons is sufficient to dispose of Plaintiffs' claims, and none of their

1

counterarguments warrants a different result.

### A. Plaintiffs Do Not Have Standing to Pursue Their Claims.

**1.**     Far from rebutting Defendants' arguments on standing, Plaintiffs' response only underscores the specious nature of their claimed injuries. Despite Plaintiffs having opened this case with breathless claims that they faced "an immediate threat that the USDA [would] enforce" the May 5 Memo or Final Rule against them, Compl. ¶¶ 126, 128, and that such enforcement "could cause [them] to lose significant federal funds," *id.* ¶¶ 132, 134, their latest brief omits any discussion of such drastic harms. *See* Pls.' Opp'n at 8–11. Now, rather than styling this as a case about the "federal government . . . trying to take the States' lunch money," Pls.' PI Br. at 1, Plaintiffs primarily emphasize the alleged "costs and burdens" they face as "regulated entities" from "complying" with the May 5 Memo and Final Rule. Pls.' Opp'n at 10 (cleaned up). But Plaintiffs' new focus on regulatory burdens should not alter this Court's conclusion on standing.

For one thing, Plaintiffs' complaints about "cost[s] associated with compliance" and "burden[s] on State autonomy," *id.* at 9 (cleaned up), are not cognizable injuries. In their repeated references to such "costs and burdens," *id.* at 10–11, Plaintiffs appear to refer to the administrative tasks associated with "updat[ing] their complaint-processing procedures," "publish[ing] the new Nondiscrimination Statement," updating the text of relevant "documents, pamphlets, websites, brochures, printing, and posters," and otherwise complying with legal prohibitions on sex discrimination. *Id.* at 10–11. And to be sure, the May 5 memo and related materials make clear that Plaintiffs, like all of USDA's program partners, should review and, if necessary, update relevant public-facing materials and internal procedures to be consistent with the prohibitions on sex discrimination under Title IX and the FNA. *See, e.g.,* May 5 Memo, ECF No. 1-1, at 3 ("State agencies and program operators should expeditiously review their program discrimination complaint procedures and make any changes necessary to ensure complaints alleging discrimination on the basis of gender identity and

2

sexual orientation are processed and evaluated as complaints of discrimination on the basis of sex."). But that obligation is nothing out of the ordinary; Plaintiffs' participation in USDA nutrition assistance programs always has required implementation of programmatic updates at the direction of USDA. *See, e.g.,* Food & Nutrition Service (FNS) Instruction 113-1 § IX.A.4 ("State or local agencies, and their subrecipients, must post the following nondiscrimination statement (or current applicable revision)."), *reproduced at* ECF No. 54-2, at 43; *cf. Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656, 669 (1985) (describing how the requirements of a cooperative grant program "became more specific over time and were explained in materials beyond the statute and its implementing regulations"). Doing so is simply a condition of Plaintiffs' participation as a partner in FNS programs, not a new burden on Plaintiffs' sovereign autonomy. Having complied for years with the routine duties and obligations assigned to USDA's nutrition-program partners, Plaintiffs fail to allege harms sufficient to convert those incidental burdens into the launchpad for a federal case about state bathroom and athletic policies.[1]

Administrative burdens and compliance costs arising from Plaintiffs' partnership with USDA also cannot support Plaintiffs' standing in this case because these burdens and costs are not traceable to the guidance documents Plaintiffs challenge. The policy updates reflected in those documents stem directly from Title IX and the FNA. And Plaintiffs are under an independent obligation, as a condition of receiving federal financial assistance, to operate FNS-funded programs without discriminating on the basis of protected characteristics, including sex. *See, e.g.,* 7 U.S.C. § 2020(c)(1) ("In the certification of applicant households for the supplemental nutrition assistance program, there shall be no discrimination by reason of race, sex, religious creed, national origin, or political affiliation."); 7 U.S.C. § 2014(b) ("[N]o State agency shall impose any other standards of eligibility as a condition for

---

[1] Indeed, were Plaintiffs' theory of standing correct, every minor shift in the implementation of a federal grant program would confer standing to sue on each and every grant recipient. That cannot be.

participating in the program."). Thus, even absent USDA's issuance of the challenged documents, Plaintiffs are prohibited from engaging in sex discrimination (including discrimination on the basis of sexual orientation and gender identity) in USDA-funded programs, processing complaints of sexual orientation and gender identity discrimination improperly, or misinforming the public about the applicability of antidiscrimination laws to the federally funded programs that they operate. A court order enjoining the documents or declaring them invalid would change none of that.

Even accepting that the "costs and burdens" of compliance with programmatic requirements can, in some circumstances, support a plaintiff's standing, Plaintiffs have failed to substantiate them here. In their complaint, Plaintiffs offer little more than conclusory assertions that they face "administrative and compliance costs." Compl. ¶ 22. Moreover, where the complaint does provide scant details as to the scope and nature of these costs, it is clear that those costs are now in the past. *Id.* ¶137 (emphasizing the costs of compliance "just weeks before the beginning of the new school year"). And in responding to Defendants' motion to dismiss, Plaintiffs have failed to adduce any evidence of specific, ongoing or predicted administrative burdens distinct from the burdens they would bear in the ordinary course of operating as a USDA-funded partner. Given how many of Plaintiffs' claimed burdens are self-evidently nominal,[2] the absence of well-pleaded allegations detailing any significant new administrative burdens and compliance costs precludes Plaintiffs from relying on such harms to establish their standing.

**2.** Plaintiffs' other standing theories fare no better. Plaintiffs cannot derive standing from the proposition that, ordinarily, the "object" of an agency's action can establish injury from the agency's action. *See* Pls.' Opp'n at 8 (citing, *e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). That

---

[2] For example, the "new Nondiscrimination Statement," which adds only a handful of words in comparison to the prior version, presumably can be added to a partner's website without substantial cost. And the "And Justice For All" posters that Plaintiffs highlight are provided to partners by USDA.

4

proposition assumes that some independent legal consequences flow from the challenged agency action. Yet as Defendants have explained, neither the May 5 Memo nor the Final Rule has any such effect. *See* Final Rule, 87 Fed. Reg. 35855, 35855 (June 14, 2022) ("These updates do not contain any new requirements and would codify protections already required by Federal law and existing policy."); May 5 Memo, ECF No. 1-1, at 3 ("State agencies and program operators are advised that the interpretation outlined in this memo does not determine the outcome in any particular case, which will depend on the specific facts and circumstances of that case."). Plaintiffs cannot manufacture standing by overreading the challenged documents and ignoring the clear language in each document that disclaims the imposition of any independent and binding legal requirements. *See Phillips v. DeWine*, 92 F. Supp. 3d 702, 712 (S.D. Ohio 2015), *aff'd*, 841 F.3d 405 (6th Cir. 2016) (rejecting claim to standing that depended on misreading of statute).[3]

3. Finally, Plaintiffs cannot establish standing by relying on purported injuries to their sovereign interests in crafting and enforcing state legal codes. Plaintiffs insist that USDA's interpretations of the sex-discrimination prohibitions in Title IX and the FNA, as reflected in the May 5 Memo and Final Rule, "at least arguably conflict" with scattered state laws concerning bathroom access, school athletics, classroom speech, and religious exercise. Pls.' Opp'n at 11; *see also* Compl. ¶¶ 130–131. But as Defendants have demonstrated, whatever hypothetical conflicts might exist between

---

[3] To the extent the Court finds there to be any question regarding the binding legal effect of the May 5 Memo or the Final Rule, the appropriate course would be for the Court to await a more concrete dispute between the parties. *See infra* at 7–8 (asserting ripeness arguments). That approach would be consistent with the Supreme Court's caution that courts should not entertain actions for declaratory relief that seek "not for ultimate determination of rights but for preliminary findings and conclusions intended to fortify the litigant against future regulation." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 246 (1952); *see also Cole v. City of Memphis*, 108 F. Supp. 3d 593, 601 (W.D. Tenn. 2015), *aff'd*, 839 F.3d 530 (6th Cir. 2016) (noting that "federal courts 'must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, especially in the field of public law'" (quoting *Pub. Serv. Comm'n of Utah*, 344 U.S. at 243–44)); *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 431 (2d Cir. 2013) (noting the same and finding claims unripe).

those state laws and federal laws prohibiting sex discrimination, those conflicts are tangential at best for purposes of assessing Plaintiffs' standing in this case. The challenged documents do not prejudge any particular case or claim of discrimination, and they do not suggest that Plaintiffs' laws policies are inconsistent with federal law. *Cf. Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (finding no injury to quasi-sovereign interests where case did not involve "regulation of [the plaintiffs] as States or preemption of local lawmaking authority"). Moreover, the documents are addressed only to discrimination in food and nutrition programs funded by USDA. And they do not preempt state law or prevent Plaintiffs from enacting or enforcing the sorts of laws—involving school athletics, for example—that Plaintiffs cite. Indeed, by failing to provide any concrete example of how the challenged documents affect the Plaintiffs' authority to enforce or enact state laws, Plaintiffs reinforce the wisdom of this Court's observation that it is unclear how administering USDA-funded nutrition programs in a manner consistent with USDA's interpretations of Title IX and the FNA "would impact [Plaintiffs'] laws regarding sports participation, restroom use, religious freedom, or free speech." *Tennessee v. USDA*, No. 3:22-cv-257, 2022 WL 5336196, at *2 (E.D. Tenn. Aug. 10, 2022). In the absence of any enforcement action by USDA related to a food or nutrition program that it funds, any such impacts remain hypothetical and speculative and do not support Plaintiffs' standing.

Standing is particularly difficult to establish in a pre-enforcement challenge like this one. There is no "unqualified right to pre-enforcement review," even for claims raising fundamental constitutional rights. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537–38 (2021). Instead, many statutory and constitutional rights "are as a practical matter asserted typically as defenses," not in "pre-enforcement cases." *Id.* at 538. That is because even in cases raising important rights, courts may not "disregard the traditional limits on the jurisdiction of federal courts just to see a favored result win the day." *Id.* Such is the case here; however strenuously Plaintiffs may disagree with Defendants' interpretation of the sex-discrimination provisions of Title IX and the FNA, Article III precludes those disagreements

6

from being aired in this case.

### B. Plaintiffs' Claims are Not Ripe.

Even if Plaintiffs had satisfied the threshold requirement of standing, their claims would still fail for lack of ripeness. *See* Defs.' Br. at 12–14. Plaintiffs' only response—that their claims ripened upon publication of the May 5 Memo and Final Rule because those documents contain final, legislative rules—is unpersuasive. *See* Pls.' Opp'n at 11–12.

To be sure, ripeness may present a low bar in cases that narrowly concern whether an opportunity for public notice and comment was required prior to the promulgation of an agency rule. *See, e.g.*, *Gen. Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) (cited in Pls.' Opp'n at 12). That is because the issues in such cases are typically straightforward and purely legal, and because post-adoption developments rarely shed light on the legal question. *See, e.g.*, *id.* at 380–81.

But the claims in this case are not so straightforward, and they certainly are not purely legal in nature. Plaintiffs have asserted seventeen separate claims—only a fraction of which concern the APA's notice-and-comment requirement—against a loose collection of interpretive documents that clarify USDA's understanding of pre-existing statutory prohibitions on sex discrimination in the administration of federally funded food and nutrition programs. And it is evident that only a "particular application" of the sex-discrimination prohibitions memorialized in the challenged documents, *Texas v. United States*, 523 U.S. 296, 301 (1998), could substantially inform the Court's determination of the validity of Plaintiffs' claims that those documents have a binding effect. *See Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008). Further, in light of Plaintiffs' assurance that they currently implement all federally-funded food and nutrition programs without discriminating on the basis of sex, including on the basis of sexual orientation and gender identity, the limited scope of the legal interpretations set forth in the challenged documents, and the availability of a full opportunity to present defenses in any potential, future enforcement proceeding, Plaintiffs will face

no hardship from withholding judicial review now.  Accordingly, Plaintiffs' claims should be dismissed as unripe.

### C.  Plaintiffs' Claims are Barred by Statute.

Finally, as Defendants have explained, jurisdiction is precluded by two independent, yet related, statutory bars.  *See* Defs.' Br. at 14–15.  First, the APA precludes jurisdiction over Plaintiffs' claims when those claims can simply be asserted as defenses in any possible Title IX or FNA enforcement action.  And second, the elaborate statutory review schemes provided in administrative enforcement proceedings under Title IX and the FNA preclude federal courts from exercising jurisdiction over challenges which, like this one, are brought outside of that scheme.  Either of these statutory bars is sufficient to preclude district court jurisdiction over Plaintiffs' claims in this case.

1.  Plaintiffs cannot obtain the relief they seek pursuant to the APA without demonstrating that they have "no other adequate remedy in court."  5 U.S.C. § 704; *see also Beamon v. Brown*, 125 F.3d 965, 967 (6th Cir. 1997) (noting this requirement is a component of the APA's waiver of sovereign immunity).  "[R]elief will be deemed adequate where a statute affords an opportunity for de novo district-court review of the agency action."  *Rimmer v. Holder*, 700 F.3d 246, 262 (6th Cir. 2012) (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)).  And that standard is met here:  In any enforcement action brought against a Plaintiff based on the interpretations of Title IX and the FNA articulated  in the challenged documents, those interpretations will be subject to de novo review by a court.  *See, e.g.*, 7 U.S.C. §§ 2023(a)(13), (a)(16) (providing that the action for judicial review under the FNA "shall be a trial de novo" in which the district court "shall enter such judgment or order as it determines is in accordance with the law and the evidence"); 20 U.S.C. § 1683 (providing for judicial review of agency "termination of or refusal to grant or to continue assistance" under Title IX); *see also id.* § 2023(a)(17) (authorizing a court to "temporarily stay[]" the challenged action "pending disposition of such trial or appeal").  Courts in this Circuit have found as much before.  *See, e.g., Alhalemi, Inc. v.*

*United States of Am.*, 224 F. Supp. 3d 587, 592 (E.D. Mich. 2016) (finding the FNA "precludes APA review by providing a special and adequate review process"); *A.N.A. v. Breckenridge Cnty. Bd. of Educ.*, No. 3:08-cv-4-S, 2009 WL 899441, at *3 (W.D. Ky. Mar. 30, 2009) (remedies in litigation against non-governmental parties precluded APA action).

Plaintiffs offer no counterarguments that warrant a different conclusion. Contrary to Plaintiffs' suggestion, this conclusion does not leave them "risking potential liability in the interim." Pls.' Opp'n at 14 (quoting *Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-308, 2022 WL 2791450, at *18 (E.D. Tenn. July 15, 2022)). For one thing, the challenged documents do not themselves impose any obligations or consequences on Plaintiffs beyond those that already flow from other preexisting legal sources, namely the statutes themselves. *See* Final Rule, 87 Fed. Reg. at 35855; May 5 Memo, at 3. For another, as Defendants have explained, Plaintiffs face no immediate consequences from the challenged documents that would justify reviewing their claim in a pre-enforcement challenge. *See, e.g., supra* at 2–8. In particular, Plaintiffs have not identified any specific action arising from the documents or the interpretations announced therein that is likely to result in a determination that any Plaintiff has violated its obligations under Title IX or the FNA.[4] And far from leaving Plaintiffs "helpless[,]"waiting until the initiation of any potential enforcement proceedings could well leave Plaintiffs in a more favorable position: At least with respect to the FNA, the standard of review in judicial enforcement proceedings is often more generous than that available in a case brought under the APA. *See Wong v. United States*, 859 F.2d 129, 132 (9th Cir. 1988) (contrasting the *de novo* and arbitrary-and-capricious standards"). And comparable remedies to those often sought in APA cases

---

[4] This context distinguishes the instant case from *Sackett v. EPA*, 566 U.S. 120 (2012), where the agency had already issued a compliance order to the plaintiffs, forbidden them from undertaking a proposed construction project, informed them that the compliance order represented the final word on the matter, and indicated that noncompliance would result in significant penalties measured from the date of the compliance order. *See id.* at 124–125.

9

remain available to any Plaintiff in enforcement proceedings. *See, e.g.*, 7 U.S.C. § 2023(a)(17) (authorizing a court to "temporarily stay[]" the challenged action "pending disposition of such trial or appeal").

**2.** Plaintiffs must also show that this Court's exercise of jurisdiction in this case is consistent with the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994) (quotation omitted). It is not. To the contrary, it is "fairly discernible" that Congress did not intend to permit judicial review of pre-enforcement claims under Title IX and the FNA because it provided elaborate procedural schemes for administrative enforcement proceedings under those statutes that culminate in the opportunity for judicial review. *See* 7 U.S.C. § 2023 (FNA administrative process and judicial review); 20 U.S.C. § 1682 (Title IX administrative process); *id.* § 1683 (Title IX judicial review); *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) ("Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action.").

It makes no difference that Plaintiffs purport to challenge the "prospective" and "general" operation of "regulations" rather than agency determinations made in the course of an "adjudication." Pls.' Opp'n at 13. Just recently, the Sixth Circuit had occasion to reject a very similar contention in *Polyweave Packaging, Inc. v. Buttigieg*, 51 F.4th 675 (6th Cir. 2022). There, a plaintiff involved in administrative proceedings before the Pipeline and Hazardous Materials Safety Administration (PHMSA) sued in federal district court for injunctive and declaratory relief to prevent the rescission of a set of regulations governing procedures for Department of Transportation (DOT) enforcement actions. Like Plaintiffs here, the *Polyweave* plaintiff raised both substantive and procedural challenges to the rescission under the APA. But the Sixth Circuit found that those challenges could not be litigated as APA claims and instead were required under *Thunder Basin* and its progeny to be raised as a defense in the agency's enforcement proceedings or in an appeal from those proceedings to a federal court. *See id.* at 683–86. It was immaterial that the plaintiff had "drafted its lawsuit without seeking

10

directly to enjoin" a specific ongoing enforcement proceeding. *Id.* at 684. So too here.

Likewise, Plaintiffs cannot evade the *Thunder Basin* rule by branding their case as a "broadscale attack" on a government regulation. *See* Pls.' at 13. As the Sixth Circuit has noted, "[t]o conclude otherwise would prove too much," permitting plaintiffs to opt out of a congressionally created administrative review scheme just by framing their challenge at a higher level of generality or at an earlier stage in proceedings. *Polyweave*, 51 F.4th at 684 (warning that a different rule would permit parties to "circumvent an exclusive-jurisdiction provision applicable to agency action by challenging the promulgation/rescission" of rules to be applied in an agency proceeding). Moreover, that is just the kind of argument that the Supreme Court rejected in *Thunder Basin* itself. *See* 510 U.S. 216. As in that case, there is nothing in the language and structure of Title IX or the FNA to suggest that a plaintiff can evade the statutory-review process simply by suing to enjoin USDA from seeking to enforce the requirements applicable to the agency's food and nutrition programs. *See id.* Because Plaintiffs have attempted to do so here, the Court should dismiss for lack of jurisdiction.[5]

## II. PLAINTIFFS' CLAIMS LACK MERIT.

### A. Plaintiffs' Procedural APA Claims Fail.

Plaintiffs' arguments in support of their procedural APA claims falter on several counts. Concerning the Final Rule, Plaintiffs fault USDA for omitting the terms "gender identity" and "sexual

---

[5] As discussed above, the Court need not be concerned that this leaves Plaintiffs to risk potential liability in the interim. Plaintiffs concede that they "do not deny [SNAP] benefits based on a household member's sexual orientation or gender identity," Compl. ¶ 12, and so there can be no expectation that Plaintiffs are at imminent risk of any enforcement action premised on the interpretation articulated in the challenged documents. Moreover, as detailed in Defendants' prior filings, USDA must take numerous steps before taking any coercive enforcement action. And so, as in *Thunder Basin*, "neither compliance with, nor continued violation of, the [challenged documents] will subject [Plaintiffs] to a serious prehearing deprivation." *See* 510 U.S. 216.

orientation" in an early draft of the rule presented for public comment. Pls.' Opp'n 14. In Plaintiffs' view, this deprived the public of fair notice of the agency's intent. *See id.* at 15. But by clarifying in the Final Rule that it understands "gender identity" and "sexual orientation" to be characteristics of sex, USDA went no further than it had promised: "updat[ing] FSA language [to] emphasize *existing* non-discrimination protections for SNAP households to the effect that no person in the United States shall, on the grounds of sex" or other protected traits be the "subject of discrimination under SNAP." 81 Fed. Reg. at 81,016-17 (emphasis added). In insisting that "gender identity" and "sexual orientation" sprang from nowhere into the Final Rule, Plaintiffs ignore how those terms appear in the Final Rule itself—as concepts included within and inextricably intertwined with the pre-existing term "sex." *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1742 (2020) (noting that "to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex") *see also id.* ([U]nlike . . . other traits or actions, [sexual orientation] and transgender status are inextricably bound up with sex"). And in any event, even if it had been unclear that USDA intended to memorialize its understanding of the antidiscrimination requirements applicable to USDA-funded programs, USDA was not required to subject its conclusions regarding its own legal obligations to public comment. *See Dismas Charities, Inc. v. U.S. Dep't of Just.*, 401 F.3d 666, 681 (6th Cir. 2005) ("Notice and comment rulemaking procedures are simply not designed as a means for agencies to improve their legal analysis.").

Plaintiffs' procedural attack on the May 5 Memo fares no better. *See* Pls.' Opp'n at 15–16. As Defendants have already explained, Plaintiffs' claims concerning that document are not subject to judicial review because it does not determine anyone's "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). Rather it simply "reminds" relevant parties of their "existing duties," *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018), and offers guidance on how to comply with requirements applicable to USDA partners, including those referenced by Plaintiffs. May

5 Memo, at 3 (noting that, because *Bostock*'s analysis applies, "the certification of applicant households for SNAP shall be conducted without discrimination on the basis of gender identity and sexual orientation," and "State agencies and program operators should expeditiously review their program discrimination complaint procedures" to ensure consistency). In other words, the May 5 Memo merely prompts such USDA partners to heed the antidiscrimination obligations that are imposed in already existing statutes and laws. *See generally* FNS Instruction 113-1 (discussing the processing of discrimination complaints). The fact that certain materials supporting the May 5 Memo indicate that USDA's partners will likely need to update certain procedures and public-information materials does not alter the analysis about its effect.

### B. Plaintiffs' Substantive APA Claims Fail.

Plaintiffs' substantive challenges under the APA are similarly without merit.

**1.** With respect to their arbitrary-and-capricious claims, Plaintiffs rest their argument on USDA's purported "fail[ure] to consider the reliance interests associated with banning sex-separated facilities" prior to issuing the May 5 Memo and the Final Rule. Pls.' Opp'n at 17.[6] But Plaintiffs' concerns about how USDA's interpretation of the federal prohibitions on sex discrimination would apply to states' sex-separated facilities are unrelated to the limited object of those documents—the administration of federally funded food and nutrition programs. *See, e.g.*, Final Rule, 87 Fed. Reg. 35855, 35855 ("The protections included in this rule will prevent discrimination and systemic racism in the SNAP program that could negatively impact program access and outcomes."). And even if the interpretations reflected in the challenged documents might suggest that some state laws regarding sex-segregated facilities could run afoul of federal antidiscrimination laws, *cf.* Pls.' Opp'n at 17, that

---

[6] To the extent Plaintiffs purport to merge the merits of their procedural notice-and-comment claims with the merits of their arbitrary-and-capricious claim, *see* Pls.' Opp'n at 17, that effort is unavailing for all the reasons given *supra* at 11–13.

13

possibility would not provide a basis for USDA to interpret Title IX and the FNA differently from each other. *See Bostock*, 140 S. Ct. at 1753–54 (noting that these such potential conflicts can be resolved in future cases and declining to consider them in interpreting statutory text). Questions about the interaction of various laws and which ones supersede others "are nothing new," *id.*, and Plaintiffs' reliance on an otherwise improper interpretation of those laws could not have altered USDA's independent assessment of the law.

**2.** Plaintiffs' statutory arguments are equally unavailing and, if the Court ultimately confronts the statutory questions in this case, it should reject them. At the broadest level, Plaintiffs' contention that the plain text of Title IX and the FNA do not prohibit discrimination based on sexual orientation and gender identity, *see* Pls.' Opp'n at 18, is wrong. Both statutes prohibit discrimination on the basis of sex, and in construing materially identical language in Title VII, the Supreme Court has explained that discrimination based on sexual orientation or gender identity "necessarily entails discrimination based on sex." *Bostock*, 140 S. Ct. at 1747.[7] Thus, it is "ineluctably" clear that Title IX and the FNA forbid discrimination based on sexual orientation or gender identity as forms of sex discrimination. *Id.* at 1750; *see also Soule by Stanescu v. Conn. Ass'n of Sch., Inc.*, No. 21-1365-CV, 2022 WL 17724715, at *8 (2d Cir. Dec. 16, 2022) (citing, among other cases, *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016), as "establish[ing] that discrimination based on transgender status is generally prohibited under federal law").[8]

---

[7] In addition to prohibiting discrimination on the basis of sex, the FNA prohibits consideration of any factor other than program criteria for determining eligibility. *See* 7 U.S.C. 2014(b). Neither the FNA nor SNAP regulations allow for the consideration of an applicant's gender identity or sexual orientation when determining eligibility for participation.

[8] Elsewhere in their brief, Plaintiffs dismiss the Sixth Circuit's decision in *Dodds* as a "divided, pre-*Bostock* motions panel decision" that "said nothing about the meaning of Title IX." Pls.' Opp'n at 22 n.10. That is technically true, at least in the sense that the *Dodds* majority did not use the term "Title IX." But Plaintiffs are wrong to diminish its relevance here. *Dodds* involved an appeal from a district court decision holding that Title IX requires federally funded schools to permit transgender

Faced with the persuasive force of *Bostock*, Plaintiffs strive in vain to distinguish it. In particular, Plaintiffs make much of the minor distinctions in language establishing the various statutes' causation standards. *See* Pls.' Opp'n at 20 ("While Title VII uses the phrase "because of . . . sex," 42 U.S.C. § 2000e-2(a)(1), Title IX uses distinct "on the basis of sex" language . . . ."); *id.* at 21 (noting the FNA's language "by reason of . . . sex"). But they provide no support for their conclusion, regarding causation standards, that Title IX and the FNA "make[] clear biological sex must be the sole reason for the discrimination." *Id.* at 20. In fact, that conclusion is inconsistent with *Bostock*, which drew no distinction between such similar causal phrases, and observed that Congress uses the adjectives "'solely' to indicate that actions taken 'because of' the confluence of multiple factors do not violate the law," and "'primarily' . . . to indicate that the prohibited factor had to be the main cause of the defendant's" action. *Bostock*, 140 S. Ct. at 1739. And in any event, Plaintiffs offer no convincing explanation of why a different causation standard would change the critical fact that sexual orientation and gender identity "are inextricably bound up with sex." *Id.* at 1742.

At bottom, Plaintiffs' position boils down to an argument that *Bostock*'s reasoning concerning Title VII's sex-discrimination provision cannot be reasonably extended to the similar sex-discrimination prohibitions codified in Title IX and the FNA because *Bostock* did not itself analyze

---

students to use the public bathrooms consistent with their gender identity. 845 F.3d at 220. On review, the *Dodds* court found that the appellants were unlikely to prevail on the ultimate merits of their appeal. *Id.* 221. In doing so, it considered and cited approvingly the same longstanding principles that later led the *Bostock* majority to conclude that Title VII's prohibition on sex discrimination includes discrimination on the basis of sexual orientation and gender identity. *Compare Dodds*, 845 F.3d at 221 (noting that discrimination based on gender nonconforming behavior is impermissible discrimination) *with Bostock*, 140 S. Ct. at 1741 (summarizing that the simple test: "if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred"). *Dodds'* treatment of those principles continues to hold significant weight, as this Court recently reaffirmed. *See Am. Coll. of Pediatricians v. Becerra*, No. 1:21-cv-195, 2022 WL 17084365, at *13 (E.D. Tenn. Nov. 18, 2022) (relying on *Dodds'* conclusion that "Title IX prohibits discrimination based on sex-stereotyping and gender nonconformity").

15

those statutes. *See* Pls.' Opp'n at 20–21.[9] To be sure, the Sixth Circuit has noted that "principles announced in the Title VII context" may not "automatically apply" in other contexts. *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). But the judicial method of reserving judgment on questions that are not squarely presented does not deprive *Bostock* of its analytical force. Rather, in executing its statutory duty to interpret and enforce the (nearly identical) prohibitions against sex-discrimination contained in Title IX and the FNA, USDA is authorized to follow the logical implications of *Bostock*'s reasoning. *Cf. Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 349–50 (6th Cir. 2020) ("In crafting our framework for analyzing Title IX claims, we have looked to the Title VII landscape for guidance, as both statutes prohibit discrimination on the basis of sex.").

Unable to distinguish *Bostock*, Plaintiffs caricature USDA's interpretive documents as "an attempt to convert Title IX's prohibition of discrimination 'on the basis of sex,' 20 U.S.C. § 1681(a), into a prohibition of all forms of sexual orientation or gender identity discrimination," that "essentially erases" allowances for the maintenance of "separate living facilities for the different sexes." Pls.' Opp'n at 19 (citing 20 U.S.C. § 1686). But as Defendants have consistently pointed out, nothing in the challenged documents addresses sex-segregated living facilities or similar policies. Indeed, there is no evidence in the record to suggest that USDA considers (or has ever considered) Plaintiffs' continued maintenance of such policies a violation of the commitments made in their FSAs or otherwise inconsistent with their statutory obligations as recipients of federal funding. And Plaintiffs'

---

[9] Plaintiffs make much of the fact that, in a prior case, a judge in this District previously adopted many of their arguments at the preliminary-injunction stage of a similar case brought by Plaintiffs against the Department of Education and the EEOC. *See, e.g.*, Pls.' Opp'n at 1, 18 (citing *Tennessee*, 2022 WL 2791450). The federal government has appealed the *Tennessee* decision and continues to respectfully disagree with its conclusions. But in any event, that decision has no direct relevance in this case, which involves different Defendants, different agency documents, and a separate statutory scheme. *Cf. United States v. Alaska*, 521 U.S. 1, 13 (1997) ("[T]he doctrine of nonmutual collateral estoppel is generally unavailable in litigation against the United States."); *United States v. Mendoza*, 464 U.S. 154, 163 (1984) (noting that the "interests underlying a broad application of collateral estoppel are outweighed by the constraints which peculiarly affect the government").

16

insistence to the contrary should make no difference to this Court's statutory analysis, especially given that Plaintiffs would be able to argue in any future hypothetical agency action related to their USDA-funded programs that, for all the reasons they state here, that agency action should not be based on *Bostock*'s reasoning.

## C. Plaintiffs' Constitutional Claims Fail.

Plaintiffs' response also confirms the absence of any merit to their scattershot constitutional claims.

Spending Clause. To defend their Spending Clause claim, Plaintiffs first try winding back the clock. According to Plaintiffs, USDA's guidance documents run afoul of the Spending Clause because they reflect an interpretation of Title IX and the FNA's antidiscrimination provisions that was not apparent at the time those provisions were first enacted and when each Plaintiff first accepted funding under those provisions. *See* Pls.' Opp'n at 21. But this argument fails on at least two counts. First, Plaintiffs' argument improperly treats the prohibition on sex discrimination under Title IX and the FNA as a "new" condition on Plaintiffs' receipt of funds from USDA. That prohibition is in fact a longstanding feature of USDA's food and nutrition programs. Indeed, *Bostock* makes clear that, however unexpected the application to sexual orientation and gender identity might be, that prohibition was in the statute all along. *See Bostock*, 140 S. Ct. at 1753 ("This elephant has never hidden in a mousehole; it has been standing before us all along."). Thus, it cannot be said that the challenged documents impose any new conditions on program participants. *Cf. Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 n.18 (4th Cir. 2020) (rejecting Spending Clause challenge to Title IX "because *Bostock* forecloses that 'on the basis of sex' is ambiguous as to discrimination against transgender persons"), *cert. denied*, 141 S. Ct. 2878 (2021). Agency actions to clarify, highlight, or better implement pre-existing conditions on federal funding simply are not the sort of "retroactive conditions" that give rise to Spending Clause concerns. *See NFIB v. Sebelius*, 567 U.S. 519, 584–85 (2012) (explaining that

17

routine amendments and expansions to the scope of the Medicaid program did not trigger notice concerns because they were consistent with the program's original purposes). Second, Plaintiffs' argument ignores Plaintiffs' executions of the FSAs through which they agree to administer USDA's SNAP program in accordance with the requirements of the FNA and related regulations and policies. Those executions mark the point from which notice of conditions and the scope of a State's consent to the terms of federal funding should be assessed. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570–71 (2022) (evaluating consent based on notice at the time a prospective funding recipient "engaged in the process of deciding whether [to] accept federal dollars").

Plaintiffs also raise the specter of impermissible coercion, complaining that USDA is leveraging "billions of dollars in SNAP and SNAPEd funding to coerce States into adopting USDA's newly preferred policies." Pls.' Opp'n at 22. But the Supreme Court's decision in *NFIB* squarely forecloses Plaintiffs' argument. There, the Court reaffirmed "Congress's authority to condition the receipt of funds on the States' complying with restrictions" on their use, 567 U.S. at 580 (plurality opinion)—for example, to condition a State's receipt of SNAP funding on a commitment to distribute those funds in a nondiscriminatory fashion. Concerns about coercion do not arise in that context, but rather may be present when Congress imposes conditions that seek to leverage a grant of federal funds for one program to require a State to undertake, or not take, actions in another sphere. *See Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 178 (D.C. Cir. 2015) (noting the factors that trigger a coerciveness inquiry). Because Plaintiffs' obligation to refrain from sex discrimination in the operation of USDA-funded nutrition programs is, and has been, a condition on the use of USDA-provided funds, Plaintiffs' coercion arguments fail.

<u>First Amendment</u>. Plaintiffs' First Amendment arguments fare no better. As a threshold matter, state governments cannot invoke the protections of the First Amendment in litigation against the federal government. *See Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139

18

(1973) (Stewart, J., concurring); *cf. South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) ("[C]ourts have consistently regarded the Bill of Attainder Clause of Article I and the principle of the separation of powers only as protections for individual persons and private groups."); *but see* Pls.' Opp'n at 23–24. As Defendants have stated, the First Amendment protects the rights of individuals against governments, not the rights of one sovereign against another. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), and *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700 (2d Cir. 2022), are not to the contrary. Each of those cases involved the speech interests of individuals, and neither was a case in which a state government purported to assert speech claims against the federal government.

To the extent Plaintiffs are attempting to assert speech claims on behalf of their own citizens and employees, those arguments fail too. *See Katzenbach*, 383 U.S. at 324 ("Nor does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government, the ultimate parens patriae of every American citizen."). On this front, Plaintiffs' emphasis on compelled pronoun usage is particularly misplaced. *See* Pls.' Opp'n 22. The challenged documents do not address topics like proper pronouns. Plaintiffs' bare insistence that they "at least arguably" "say [some]thing" about pronoun use, *id.*—Plaintiffs do not say what—does not make it so.

In any event, because the challenged documents simply reflect pre-existing sex discrimination prohibitions contained within Title IX and the FNA, Plaintiffs First Amendment concerns are clearly exaggerated. Similarly, to the extent other superseding legal provisions allow for certain sex-based distinctions, *see, e.g.*, 20 U.S.C. § 1686, the interpretations reflected in the challenged documents pose no obstacle to them. Thus, there should be no concern that Plaintiffs will be required to "engage in conduct that would violate the . . . rights of their students and employees." Pls.' Opp'n at 24.

<u>Tenth Amendment</u>. Plaintiffs' discussion of their Tenth Amendment and Anticommandeering Doctrine claim fails to bolster their opposition. Because the rule against commandeering is a structural constitutional principle, Plaintiffs are correct that "State consent cannot

19

justify federal commandeering." Pls.' Opp'n at 25. But Defendants have not argued otherwise. Instead, Defendants have simply explained, *see, e.g. supra* at 17–18, that Congress has validly conditioned Plaintiffs' receipt of federal funds for the SNAP program on compliance with certain conditions, namely that Plaintiffs agree to operate the SNAP program in a manner consistent with federal antidiscrimination laws. Those conditions do not compel Plaintiffs "to implement, by legislation or executive action, any federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). There is no commandeering problem here.

Separation of Powers and Non-Delegation Doctrine. Plaintiffs' passing discussion of the major questions and non-delegation doctrines cannot rescue their final claim. The major questions doctrine calls for "clear congressional authorization" for agency action of vast economic and political significance, even where, "under more 'ordinary' circumstances," standard principles of statutory interpretation would provide a "plausible textual basis" to sustain the agency's action. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). But USDA's May 5 Memo and Final Rule are addressed only to the operation of SNAP programs. That is a far cry from being actions of vast economic and political significance, and so the major questions doctrine has no application in this case. Finally, Title IX and the FNA's clear prohibitions on sex discrimination (construed, in light of *Bostock*, to include discrimination on the basis of sexual orientation and gender identity) provide all the guidance needed for USDA to conform its actions to the will of Congress. That is sufficient to end the nondelegation inquiry.

## CONCLUSION

For these reasons, and those in Defendants' prior briefs, the Court should grant Defendants' motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6) and close this case.

20

Dated: January 17, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA WELLS
Assistant Branch Director
Federal Programs Branch

*/s/ Cody T. Knapp*
CODY T. KNAPP
Trial Attorney (NY Bar # 5715438)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*