# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| THE STATE OF TENNESSEE, *et al.*, | ) | |
| | ) | Case No. 3:22-cv-257 |
| *Plaintiffs*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## MEMORANDUM OPINION

Do the Food and Nutrition Act of 2008, 7 U.S.C. § 2011, *et seq.* ("FNA"), and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"), permit states to categorically refuse poor people federally funded food-assistance benefits based on gender identity? Do these statutes permit states to conceal from the public that such discrimination may violate federal law? Does a regulation interpreting these statutes to prohibit such food-assistance discrimination upend everything from free speech and religious freedom to living facilities and sports teams? On all counts, Plaintiff States[1] insist they do, but the Court disagrees.

Before the Court are Plaintiff States' motion for preliminary injunction (Doc. 2) and Defendants' motion to dismiss (Doc. 70). For the following reasons, Defendants' motion to

---

[1] Plaintiff States are Tennessee, Indiana, Alabama, Alaska, Arkansas, Georgia, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and West Virginia. Arizona originally joined the complaint as a Plaintiff but subsequently filed a notice of voluntary dismissal (Doc. 81) of its claims.

dismiss (Doc. 70) will be **GRANTED**, and Plaintiff States' motion for preliminary injunction (Doc. 2) will be **DENIED**.

## I.      BACKGROUND

### A.      Executive Order 13,988

In *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), the United States Supreme Court held that Title VII of the Civil Rights Act of 1964's ("Title VII") prohibition on discrimination "because of . . . sex" includes discrimination on the basis of gender identity and sexual orientation.  In light of the Supreme Court's ruling in *Bostock*, on January 20, 2021, President Biden issued an executive order instructing agencies to review their regulations and other agency actions to evaluate whether any such actions may be inconsistent with Title VII or other statutory prohibitions on sex discrimination, including sexual-orientation and gender-identity discrimination.  Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7,023 (Jan. 20, 2021) [hereinafter "Executive Order 13,988"].  Executive Order 13,988 set forth the following review process:

(a) The head of each agency shall, as soon as practicable and in consultation with the Attorney General, as appropriate, review all existing orders, regulations, guidance documents, policies, programs, or other agency actions ("agency actions") that:

(i)  were promulgated or are administered by the agency under Title VII or any other statute or regulation that prohibits sex discrimination, including any that relate to the agency's own compliance with such statutes or regulations; and

(ii) are or may be inconsistent with the policy set forth in section 1 of this order [interpreting statutory prohibitions on sex discrimination to prohibit gender-identity and sexual-orientation discrimination].

(b) The head of each agency shall, as soon as practicable and as appropriate and consistent with applicable law, including the Administrative Procedure Act (5 U.S.C. 551 *et seq.*), consider whether to revise, suspend, or rescind such agency actions, or promulgate new agency actions, as necessary to fully

implement statutes that prohibit sex discrimination and the policy set forth in section 1 of this order.

(c) The head of each agency shall, as soon as practicable, also consider whether there are additional actions that the agency should take to ensure that it is fully implementing the policy set forth in section 1 of this order. If an agency takes an action described in this subsection or subsection (b) of this section, it shall seek to ensure that it is accounting for, and taking appropriate steps to combat, overlapping forms of discrimination, such as discrimination on the basis of race or disability.

(d) Within 100 days of the date of this order, the head of each agency shall develop, in consultation with the Attorney General, as appropriate, a plan to carry out actions that the agency has identified pursuant to subsections (b) and (c) of this section, as appropriate and consistent with applicable law.

*Id.* at 7023–24. Defendant United States Department of Agriculture ("USDA") conducted its review in accordance with Executive Order 13,988 and, therefore, examined the nondiscrimination provisions governing the programs and activities it funds. *See* Memorandum from Roberto Contreras, Director of the Civil Rights Division of the Food and Nutrition Service, CRD 01-2022, Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing – Policy Update (May 5, 2022), https://www.fns.usda.gov/cr/crd-01-2022 (on file with USDA) [hereinafter "May 5 Memo"].

## B. SNAP and SNAP-Ed

One such program, administered and funded by the USDA's subagency, the Food and Nutrition Service ("FNS"), is the Supplemental Nutrition Assistance Program ("SNAP"). 7 U.S.C. §§ 2012(p), 2020. The purpose of SNAP is "[t]o alleviate [] hunger and malnutrition," and it "permit[s] low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. SNAP operates through cooperative grant agreements between the states and the federal government called Federal-State Agreements ("FSAs"). 7 C.F.R. § 272.2(a)(2), (b); 7 U.S.C. § 2020(d)–(e). "The FSA is the legal agreement between the

[USDA] and the State agency by which the State elects to operate SNAP doing so in accordance with the [FNA], SNAP regulations, the State Plan of Operation (State Plan), civil rights laws, and civil rights regulations." Supplemental Nutrition Assistance Program: Civil Rights Update to the Federal-State Agreement, 87 Fed. Reg. 35,855, 35,855 (June 14, 2022) (codified at 7 C.F.R. § 272.2) [hereinafter the "Final Rule"]. USDA requires states to include in their FSAs certain standardized language, which is implemented through statutes and regulations. 7 C.F.R. § 272.2(a)(2), (b); 7 U.S.C. § 2020(d)–(e).

If a state does not include the standardized language required in their FSAs, or otherwise fails to comply with statutory and regulatory SNAP requirements, USDA can follow an enforcement procedure:

> If the State agency does not correct such failure within [the Secretary of Agriculture's] specified period, the Secretary may refer the matter to the Attorney General with a request that injunctive relief be sought to require compliance forthwith by the State agency and, upon suit by the Attorney General in an appropriate district court of the United States having jurisdiction of the geographic area in which the State agency is located and a showing that noncompliance has occurred, appropriate injunctive relief shall issue, and, whether or not the Secretary refers such matter to the Attorney General, the Secretary shall proceed to withhold from the State such funds authorized under sections 2025(a), 2025(c), and 2025(g) of this title as the Secretary determines to be appropriate, subject to administrative and judicial review under section 2023 of this title.

7 U.S.C. § 2020(g).

FNS also administers Supplemental Nutrition Assistance Program Education ("SNAP-Ed"). (Doc. 54-1, at 4.)[2] SNAP-Ed is a much smaller program than SNAP and exists only to

---

[2] In this paragraph, the Court references and relies on information contained in a declaration (Doc. 54-1) attached to Defendants' response to Plaintiff States' motion for preliminary injunction. The Court uses the facts contained in the declaration merely to provide background information on the SNAP-Ed program, these facts are supported by the public record, and Plaintiff States do not dispute these facts. (*See* Docs. 1, 59, 78); Food & Nutrition Serv., U.S. Dep't of Agric., FY 2023 Supplement Nutrition Assistance Program Education (SNAP-Ed) Plan

provide nutrition education in a wide variety of settings.  (*Id.*)  FNS awards grants to states to operate SNAP-Ed, and states sometimes select schools as implementing agencies for the program.  (*Id.*)  Nonetheless, "FNS's concern with any school involved with SNAP-Ed, either as an implementing agency or as a Program site, is limited strictly to the scope of the SNAP-Ed Program and ensuring individuals eligible for participation in SNAP-Ed have access to the program."  (*Id.* at 4–5.)  Indeed, "SNAP-Ed's purpose and scope do not concern school bathrooms, school sports teams, school dress codes, or other such areas of concern referenced in Plaintiffs' complaint."  (*Id.* at 5.)

### C.   The Memoranda

#### *i.   May 5 Memo*

Title IX and the FNA are statutes that condition states' receipt of federal funds, in part, on the states' compliance with their nondiscrimination provisions, and FNS enforces these provisions as to SNAP funding.  7 U.S.C. § 2020(c)(1), (g); 20 U.S.C. §§ 1681(a), 1682.  As a result of USDA's review pursuant to Executive Order 13988, on May 5, 2022, USDA issued a memorandum (the "May 5 Memo") announcing the agency's interpretation of the prohibitions on sex discrimination contained in the FNA and Title IX.  May 5 Memo.

 In the May 5 Memo, USDA interprets the sex-discrimination prohibitions in Title IX and the FNA as analogous to the Title VII prohibition and, relying on *Bostock*, concludes that Title IX and the FNA also prohibit discrimination based on gender identity and sexual orientation.  *Id.*  The May 5 Memo states, "[t]his means that the certification of applicant households for SNAP shall be conducted without discrimination on the basis of gender identity and sexual orientation."

_____

Guidance (2023).  Therefore, the Court need not convert Defendants' Rule 12 motion (Doc. 70) to a Rule 56 motion.  *See Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007).

*Id.* USDA's May 5 Memo directs state agencies to "expeditiously review their program discrimination complaint procedures and make any changes necessary to ensure complaints alleging discrimination on the basis of gender identity and sexual orientation are processed and evaluated as complaints of discrimination on the basis of sex." *Id.*

The May 5 Memo also states that "[s]tate agencies and program operators are advised that the interpretation outlined in this memo does not determine the outcome in any particular case, which will depend on the specific facts and circumstances of that case." *Id.* Further, "[a]ny action taken by USDA in a specific case will take account of all relevant facts and legal requirements, including, where applicable, Title IX's religious exemption, the Religious Freedom Restoration Act, 42 U.S.C. 2000bb et seq., and any other applicable exemptions." *Id.*

### ii. *Cover Letter*

Contemporaneously with the May 5 Memo, USDA issued a cover letter, a "Questions and Answers" document, and a supplemental memorandum regarding timelines and guidelines for implementing the revised nondiscrimination statement and posters. (collectively, with the May 5 Memo, the "Memoranda"). May 5 Memo; Cover Letter to CRD 01-2022, Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing, from Roberto Contreras, Director of the Civil Rights Division of the Food and Nutrition Service, (May 5, 2022), https://fns-prod.azureedge.us/sites/default/files/resource-files/crd-01-2022-letter.pdf (on file with USDA) [hereinafter "Cover Letter"]; Memorandum from Roberto Contreras, Questions and Answers Related to CRD 01-2022 Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing – Policy Update, CRD 02-2022, (May 5, 2022), https://fns-prod.azureedge.us/sites/default/files/resource-files/crd-01-2022-qa.pdf (on file with USDA) [hereinafter "Q&A"]; (Doc. 1-4 ("Supplemental Memo")). The Cover Letter states that USDA's

new policy "applies to prohibitions against discrimination based on sex in all FNS programs[,]" recognizing that "these changes may impact [State and local] operations."  Cover Letter.

### iii.    Q&A Document

The Q&A informs state agencies that they must "update their program discrimination complaint processing procedures for allegations related to services and activities receiving federal financial assistance from [] USDA to ensure discrimination complaints alleging sexual orientation and gender identity discrimination are processed as complaints of prohibited sex discrimination."  Q&A, at 2.  The document also links to a USDA site where the updated nondiscrimination statement was to be posted once USDA made it available.  *Id.*  Following that link, the updated nondiscrimination statement that USDA now requires states to post reads, "*this institution* is prohibited from discriminating on the basis of race, color, national origin, sex (including gender identity and sexual orientation), disability, age, or reprisal or retaliation for prior civil rights activity."  USDA Nondiscrimination Statement, https://www.fns.usda.gov/civil-rights/usda-nondiscrimination-statement-snap-fdpir (Feb. 15, 2023) (emphasis added) [hereinafter "Public-Notification Statement"].

### iv.    Supplemental Memo

The Supplemental Memo directs states to update all "documents, pamphlets, websites, etc." with a nondiscrimination statement revised to include sexual-orientation and gender-identity discrimination as follows:

1. Websites must be updated within 90 days of the date of this memorandum.

2. Documents, pamphlets, brochures, etc., using 2015 [Nondiscrimination Statement ("NDS")] language must be updated when current supply on hand is exhausted or by September 30, 2023.

3. All new printing must use the 2022 NDS.

7

(Doc. 1-4, at 2.)  The Supplemental Memo also states that USDA will order and ship new "*And Justice for All* posters*,*" referencing gender-identity and sexual-orientation discrimination, which should be posted at all state and local agencies that receive FNS funds.  (*Id.* at 2–3.)

### D.     USDA Final Rule

The challenged Final Rule, 7 C.F.R. § 272.2, updates the SNAP-civil-rights-assurance template language for the states' FSAs.  On November 17, 2016, USDA issued a notice of proposed rulemaking (the "NPRM"), which proposed an update to the language required in the states' FSAs to include the following language:

> The State agrees to: . . .  Comply with . . .  Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), [and] section 11(c) of the Food and Nutrition Act of 2008, as amended (7 U.S.C. 2020), . . . to the effect that, no person in the United States shall, on the grounds of sex . . . be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under SNAP.

Supplemental Nutrition Assistance Program:  Civil Rights Update to the Federal-State Agreement, 81 Fed. Reg. 81,015, 81,017 (Nov. 17, 2016) [hereinafter the "NPRM"].

On June 14, 2022, USDA issued the Final Rule based on the NPRM, but the required FSA language in the Final Rule differed slightly from the NPRM's proposed FSA language:  the Final Rule added the clause "including gender identity and sexual orientation" after the word "sex" in the original language.  87 Fed. Reg. at 35,857 ("[N]o person in the United States shall, on the grounds of sex, *including gender identity and sexual orientation*, . . . be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under SNAP.") (emphasis added).  The Final Rule explained its reasoning for updating the FSA civil-rights assurance language:

> Codifying civil rights protections is vital to the success of SNAP because it supports the Department in providing equitable and superior customer service to all SNAP applicants and recipients.  The protections included in this rule will prevent discrimination and systemic racism in the SNAP program that could

8

negatively impact program access and outcomes.  Integrating additional civil rights language into the FSA ensures a consistent application of these practices across the program.

87 Fed. Reg. at 35,855.

### E.    Procedural History

Plaintiff States filed the complaint, initiating the present action, on July 26, 2022.  (Doc. 1.)  While Plaintiff States acknowledge that they do not "deny SNAP certification of applicant households based on household members' sexual orientation or gender identity," which is the *only* conduct that the Memoranda and Final Rule newly interpret Title IX and FNA to proscribe, they nonetheless insist that the Memoranda and Final Rule will have wide-ranging impacts at the institutional level, from banning sex-separated restrooms to impeding the free-speech rights of state-employed professors.  (*Id.* at 9, 23, 26–28.)  Further, they allege standing on the basis that "[t]he Memoranda and Final Rule impose immediate administrative and compliance costs and burdens on Plaintiffs and other regulated entities."  (*Id.* at 29.)

As such, Plaintiff States claim that:  (1) the Memoranda and Final Rule violated the procedural requirements of the Administrative Procedure Act, 5 U.S.C. § 533, *et seq.* ("APA"); (2) the Memoranda and Final Rule are arbitrary and capricious in violation of the APA; (3) the Memoranda and Final Rule are contrary to Title IX, in violation of the APA; (4) the Memoranda and Final Rule are contrary to the FNA, in violation of the APA; (5) the Memoranda and Final Rule are contrary to the spending clause of the constitution, in violation of the APA; (6) the Memoranda and Final Rule are contrary to the First Amendment, in violation of the APA; (7) the Memoranda and Final Rule are contrary to the Tenth Amendment and the anticommandeering doctrine, in violation of the APA; and (8) the Memoranda and Final Rule are contrary to separation of powers and the nondelegation doctrine, in violation of the APA.  (Doc. 1, at 29–

47.)  Many of these claims turn on Plaintiff States' contention that the Memoranda and Final Rule prohibit all gender-identity and sexual-orientation discrimination "at the institutional level," despite Defendants' express assurances that the Memoranda and Final Rule relate only to the administration of SNAP and do not "bear on issues related to 'maintaining sex separated bathrooms and locker rooms, offering sex-separated athletic teams, or using biologically accurate pronouns[.]'"  (Doc. 1, at 3, 23–28; Doc. 54, at 41; Doc. 78, at 17.)  Contemporaneously with the complaint, Plaintiff States filed a motion for preliminary injunction to enjoin Defendants and their agents from enforcing the Memoranda and Final Rule against Plaintiff States.  (Doc. 2.)

The Court denied Plaintiff States' request for an expedited hearing on the motion for preliminary injunction because Defendants had not received notice and a fair opportunity to oppose the motion for preliminary injunction, and Plaintiffs did not show good cause as to why the hearing should be expedited.  (Doc. 33, at 4–5 ("While Plaintiff States' briefing certainly identifies a general clash of competing cultural norms between agency policies and state laws, it does not explain how incorporating the Rule's language, regarding only SNAP benefits, would impact their state laws regarding sports participation, restroom use, religious freedom, or free speech.").)  Defendants subsequently responded to the motion for preliminary injunction (Doc. 54) and responded to the complaint by filing a motion to dismiss for lack of jurisdiction and failure to state a claim (Doc. 70).  Plaintiff States' motion for preliminary injunction (Doc. 2) and Defendants' motion to dismiss (Doc. 70) are now ripe for the Court's review.

## II.      MOTION TO DISMISS STANDARD OF REVIEW

According to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Though the statement need not contain detailed factual allegations, it

must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion pursuant to Rule 12(b)(6). On a Rule 12(b)(6) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Id*. at 679. For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). This assumption of veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. This factual matter must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III.    MOTION TO DISMISS ANALYSIS

#### A.    Justiciability

##### i.    *Plaintiff States have standing to challenge the Memoranda and Final Rule.*

Defendants first move to dismiss this case for lack of jurisdiction on the basis that Plaintiff States' allegations do not satisfy the requirement of standing.  (Doc. 71, at 16–19.) "Article III of the U.S. Constitution permits federal courts to adjudicate 'cases or controversies,' not any political dispute that happens to arise between the state and federal executive branches." *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022).  The case-or-controversy requirement of Article III, Section 2 mandates that a plaintiff have standing in order to sue.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  An injury, for standing purposes, means the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'"  *Id.* (quoting *Lujan*, 504 U.S. at 560).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Spokeo*, 578 U.S. at 339.  A "concrete" injury-in-fact does not have to be tangible, but it must be "'real,' and not 'abstract.'"  *Id.* at 340.  Further, "[w]here plaintiffs seek to establish standing based on an imminent injury, the Supreme Court has explained 'that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient.'"  *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (first alteration added) (emphasis in original) (quoting *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 409 (2013)).  The plaintiff bears the burden of showing that standing

exists.  *Id*. at 387 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

When sovereign states file suit as plaintiffs in federal court, they are entitled to special

solicitude.  *Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-308, 2022 WL 2791450, at *5 (E.D.

Tenn. July 15, 2022) (citing *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)).  In

*Massachusetts*, the Supreme Court noted that "[i]t is of considerable relevance that the party

seeking review here is a sovereign State and not . . . a private individual."  549 U.S. at 518.

Because "States are not normal litigants for the purposes of invoking federal jurisdiction,"

Plaintiff States are entitled to "special solicitude" in the Court's standing analysis.  *Id.* at 518,

520; *see also Arizona*, 40 F.4th at 385–86 (explaining "States sometimes are entitled to 'special

solicitude' in this area because they may incur 'quasi-sovereign' injuries that private parties

cannot") (citing *Massachusetts*, 549 U.S. at 517–20).  Nonetheless, the "special solicitude"

afforded to states does not eliminate the core standing requirements of an injury-in-fact,

causation, and redressability.  *Massachusetts*, 549 U.S. at 517–20; *Arizona*, 40 F.4th at 385–86.

> a.  The compliance costs Plaintiff States allege they must incur
> to comply with the Memoranda and Final Rule are a sufficient
> injury-in-fact to confer standing.

Plaintiff States allege that they have suffered the following injuries-in-fact from the

challenged agency actions:  (1) an intrusion on Plaintiff States' sovereign ability to enforce their

own legal codes; (2) a credible threat of enforcement[3] under Title IX and the FNA, which could

result in the loss of SNAP funding; and (3) the costs of complying with the challenged rules.

---

[3] In a pre-enforcement suit, "a plaintiff satisfies the injury-in-fact requirement where he alleges
'an intention to engage in a course of conduct arguably affected with a constitutional interest, but
[arguably] proscribed by a statute, and there exists a credible threat of prosecution
thereunder.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v.
United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

(Doc. 78, at 16–19.) Because the third alleged injury, compliance costs, satisfies the injury-in-fact requirement, the Court will not consider whether the alleged intrusion on Plaintiff States' sovereignty or threat of enforcement are independent injuries-in-fact sufficient to confer standing.

Plaintiff States have alleged that "[t]he Memoranda and Final Rule impose immediate administrative and compliance costs and burdens on Plaintiffs and other regulated entities." (Doc. 1, at 29.) While the Sixth Circuit has not directly addressed whether compliance costs associated with a new regulation are sufficient injuries-in-fact to confer standing on regulated entities, the "loss of even a small amount of money is ordinarily an 'injury'" for "standing purposes." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017). Indeed, circuits that have addressed this issue have uniformly held that compliance costs associated with a regulatory regime satisfy the injury-in-fact requirement. *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 121 (2d Cir. 2021) ("A regulated entity may plead an 'injury in fact' by plausibly alleging compliance costs associated with an increased regulatory burden. . . . [T]he decisions of our sister circuits reflect a nearly uniform approach with which we agree.") (collecting cases) (citations omitted), *cert. denied*, 142 S. Ct. 755 (2022); *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 293 (3d Cir. 2015) (referring to compliance costs as "a classic injury-in-fact"); *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013) (holding that the plaintiff suffered an injury-in-fact because "it may well incur additional costs because of the administrative burden of assuring compliance with the employer mandate, or due to an increase in the cost of care"); *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement.") (citation omitted); *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (holding that regulated entities have

standing when they "must incur costs to ensure that they are properly complying with the terms" of a new regulatory regime).  Given this uniform approach and the special solicitude owed to the states, the Court finds that Plaintiff States' allegation that they will incur significant compliance costs under the Memoranda and Final Rule demonstrates an injury-in-fact.

        b.      <u>The injury-in-fact is traceable to the Memoranda and Final Rule because they impose immediate compliance costs.</u>

Plaintiff States' obligation to spend funds to comply with the Memoranda and Final Rule is traceable to the challenged actions of USDA.  USDA's May 5 Memo directs state agencies to "expeditiously review their program discrimination complaint procedures and make any changes necessary to ensure complaints alleging discrimination on the basis of gender identity and sexual orientation are processed and evaluated as complaints of discrimination on the basis of sex." May 5 Memo.  The Q&A similarly informs state agencies that they must "update their program discrimination complaint processing procedures for allegations related to services and activities receiving federal financial assistance from [] USDA to ensure discrimination complaints alleging sexual orientation and gender identity discrimination are processed as complaints of prohibited sex discrimination."  Q&A, at 2.  The Supplemental Memo directs states to update all "documents, pamphlets, websites, etc." with a nondiscrimination statement revised to include sexual-orientation and gender-identity discrimination.  (Doc. 1-4, at 2.)  This requirement includes the following steps:

    1. Websites must be updated within 90 days of the date of this memorandum.

    2. Documents, pamphlets, brochures, etc., using 2015 [Nondiscrimination Statement ("NDS")] language must be updated when current supply on hand is exhausted or by September 30, 2023.

    3. All new printing must use the 2022 NDS.

(*Id.*)  Plaintiff States plausibly allege that each of these requirements, imposed by USDA's challenged actions, imposes immediate costs to ensure that they comply.  (*See* Doc. 1, at 29.) Therefore, they have shown that their injury-in-fact is fairly traceable to the challenged USDA actions.

c.  Plaintiff States' injury of compliance costs is redressable by a favorable decision setting aside the Memoranda and Final Rule.

Finally, Plaintiff States' injury must be redressable by a favorable decision.  *See Daunt*, 956 F.3d at 417.  Among other relief, Plaintiff States seek:  (1) "a declaratory judgment holding that Plaintiffs are not bound by the Department's Memoranda and Final Rule[;]" (2) "a judgment setting aside the Memoranda and Final Rule[;]" and (3) "a preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons . . . from enforcing the Memoranda and Final Rule."  (Doc. 1, at 49–50.)  This relief, if granted by a favorable decision for Plaintiff States, would redress their injury-in-fact because they would no longer be required to expend funds to comply with the Memoranda and Final Rule that have been held unlawful and enjoined from enforcement.  (*See id.*)  Therefore, Plaintiff States' allegations are sufficient to confer standing.

***ii.  Plaintiff States' claims are ripe because the dispute over compliance costs is concrete and imminent, and States would have to immediately expend funds to comply if the Court withheld consideration.***

Similarly, Plaintiff States have shown that their claims are ripe for review.  Federal courts do not have jurisdiction over claims that are not ripe.  *Norton v. Ashcroft,* 298 F.3d 547, 554 (6th Cir. 2002).  Standing and ripeness "'originate from the same Article III limitation' and may be analyzed together as part of 'standing'" because the inquiries often overlap.  *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d, 447, 451 (6th Cir. 2014). Ripeness is a justiciability doctrine designed "to prevent the courts, through premature

16

adjudication, from entangling themselves in abstract disagreements." *Ky. Press Ass'n v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Id.* (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997)). Courts ask two questions to determine whether a claim is ripe for judicial review: "(1) is the claim 'fit[] . . . for judicial decision' in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration'?" *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (alterations in original) (citations omitted).

Defendants argue that the alleged loss of significant federal funds if Plaintiff States fail to comply is an insufficiently imminent injury that is unlikely to come to pass, and, therefore, Plaintiff States' claims are unripe. (Doc. 54, at 27–29.) While the threat of future enforcement of the Memoranda and Final Rule, resulting in the loss of SNAP funding, is a remote possibility requiring many intermediary contingencies before such a dispute comes to pass, Defendants' argument ignores the immediate injury and concrete dispute over Plaintiff States' compliance costs. *See Magaw*, 132 F.3d at 285 ("[A]ctual or imminent enforcement is not always a prerequisite [to standing and ripeness] in non-First Amendment cases, if the statute creates a 'present harm,' such as substantial economic injury."). Plaintiff States' claims are ripe because they immediately face the obligation to spend funds to comply with the Memoranda and Final Rule, both of which they assert are unlawful. This is a concrete-and-particularized injury that is ripe for adjudication. Additionally, Plaintiff States would face hardship, albeit minor—the expenditure of funds to comply with allegedly unlawful administrative actions—if the Court

were to withhold consideration.  Therefore, Plaintiff States have satisfied the requirement to

show a substantial likelihood that their claims are ripe.

### iii.  The Memoranda are not final agency actions subject to APA review, because they do not determine rights or obligations.

Defendants argue that the Memoranda[4] are not reviewable by this Court because they are

not a final agency action.  (Doc. 54, at 33–36; Doc. 71, at 16.)  The APA "permits federal courts

to review only 'final agency action.'"  *Arizona*, 40 F.4th at 387 (citing 5 U.S.C. § 704).  "To

qualify [as final agency action], the action must (1) 'mark the consummation of the agency's

decisionmaking process' and (2) be an action 'by which rights or obligations have been

determined, or from which legal consequences will flow.'"  *Id.* (quoting *U.S. Army Corps. of

Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016)).  The Sixth Circuit has articulated additional

"guidance and sharpening inquiries" as to whether an agency action determines rights or

obligations:

> Will the agency's action impose liability on a regulated party, create legal rights, or mandate, bind, or limit other government actors in the future?  And will the agency's action have a sufficiently direct and immediate impact on the aggrieved party and a direct effect on its day-to-day business?  If an action maintains officials' independent decisionmaking and can be discretionarily relied on, it likely lacks legal effect.  Through it all, we will not overlook whether the agency's action puts a party to a "Catch-22," stuck between heavy compliance costs or feared liability, neither of which can be undone.

*Id.* at 387 (internal citations and quotation marks omitted).  Further, the Sixth Circuit held that

the "telltale signs [] of a nonbinding policy statement" are:  (1) the labeling of a document as

"guidelines;" (2) couching instructions with "lots of conditional language that preserves

officials' discretion;" (3) providing "a 'not exhaustive' list of factors as 'examples' of what

officials should consider;" (4) allowing "officials to make decisions 'depending on the facts' or

---

[4] The parties do not dispute that the Final Rule is a final agency action subject to judicial review.

leaving open prosecutorial discretion; and (5) stating that the document does not intend to create any right or benefit. *Id.* at 387–88.

In this case, the Memoranda show the "telltale signs [] of a nonbinding policy statement," like the guidance at issue in *Arizona*. *See id*. The May 5 Memo is labeled as merely a "policy update." May 5 Memo. The bulk of the May 5 Memo is dedicated to interpreting the text of existing statutes, and the remainder is couched with conditional language that decisions under those statutes will be made depending on the facts, thereby preserving officials' discretion, and, therefore, does not determine any rights or obligations. *Id.* ("State agencies and program operators are advised that the interpretation outlined in this memo does not determine the outcome in any particular case, which will depend on the specific facts and circumstances of that case. Any action taken by USDA in a specific case will take account of all relevant facts and legal requirements, including, where applicable, Title IX's religious exemption, the Religious Freedom Restoration Act, 42 USC 2000bb et seq., and any other applicable exemptions.").

To escape the conclusion that the Memoranda are unreviewable under the APA, Plaintiff States primarily rely on the notion that the Memoranda create "new law" and obligations, rather than merely announcing USDA's interpretations of Title IX and FNA, because the meaning of sex discrimination under those statutes does not encompass gender-identity and sexual-orientation discrimination. (Doc. 59, at 10; Doc. 78, at 16.) As the Court will find with respect to Plaintiff States' contrary-to-law claims, Title IX and FNA's prohibitions on discrimination on the basis of sex do, in fact, encompass prohibitions on gender-identity and sexual-orientation discrimination, at least insofar as the prohibition applies the administration of nutrition-assistance programs. *See infra* Section III.B. Therefore, Plaintiff States' argument that the Memoranda create "new law," rather than interpreting Title IX and FNA, is unavailing.

While Plaintiff States' argument that the Memoranda are final agency actions rests primarily on the notion that the Memoranda created "new law" with respect to Title IX and FNA's sex-discrimination prohibitions, they also argue that less-significant administrative measures in the Memoranda also render them final agency actions because these administrative tasks are "new" obligations. (Doc. 78, at 24–25.) The Q&A states that "State Agencies and program operators will have to update their program discrimination complaint processing procedures for allegations related to services and activities receiving federal financial assistance from [] USDA to ensure discrimination complaints alleging sexual orientation and gender identity discrimination are processed as complaints of prohibited sex discrimination." Q&A, at 2. Further, "State Agencies and program operators will need to update their Nondiscrimination Statements and order new *And Justice for All* posters that reference gender identity and sexual orientation discrimination." *Id.* The Memoranda did not create these obligations; they are not new.

The FNA directs that "[t]he Secretary shall issue such regulations consistent with this chapter as the Secretary deems necessary or appropriate for the effective and efficient administration of the supplemental nutrition assistance program and shall promulgate all such regulations in accordance with the procedures set forth in [the APA]." 7 U.S.C. § 2013(c). Pursuant to this statutory authority, the Secretary of USDA, through notice-and-comment rulemaking, promulgated the following regulation:

> (b) Right to file a complaint. Individuals who believe that they have been subject to discrimination as specified in paragraph (a) of this section may file a written complaint with the Secretary or the Administrator, FNS, Washington, DC 20250, and/or with the State agency, if the State agency has a system for processing discrimination complaints. The State agency *shall explain both the FNS and, if applicable, the State agency complaint system* to each individual who expresses an interest in filing a discrimination complaint and *shall advise the individual of the right to file* a complaint in either or both systems. . . .

> (f) Public notification. The State agency shall: (1) Publicize the procedures
> described in paragraphs (b) and (c) of this section, and, if applicable, the State
> agency's complaint procedures; (2) insure that all offices involved in
> administering the program and that also serve the public *display the
> nondiscrimination poster provided by FNS*; and (3) insure that participants and
> other low-income households have access to information regarding
> *nondiscrimination statutes and policies*, complaint procedures, and the rights of
> participants, within 10 days of the date of a request.

7 C.F.R. § 272.6(b), (f) (emphasis added). Plaintiff States' obligations to update their complaint-processing procedures and public-notification posters to conform to current FNS standards derives from this previously promulgated regulation and the authority to promulgate such a rule in the FNA.[5] The Memoranda do not impose new obligations or command regulated parties—they simply reiterate obligations under preexisting law, both as to their articulation of what Title IX and FNA's sex-discrimination prohibitions protect and as to smaller administrative tasks. Accordingly, the Memoranda are not "final agency action[s]" subject to review under the APA.

> **iv.    *Plaintiff States lack an adequate alternative remedy through administrative
> review of an enforcement proceeding under Title IX and FNA because they
> challenge not only the threat of such future enforcement but also the
> immediate imposition of compliance costs.***

Defendants contend that Section 704 of the APA also precludes review in this case. Agency actions are only reviewable under this provision when "there is no other adequate remedy in a court." 5 U.S.C. § 704. "The essential inquiry is whether another statutory scheme

---

[5] The Court found that Plaintiff States demonstrated standing through their injury-in-fact of compliance costs, which it also found were traceable, in part, to the Memoranda. *See supra* Section III.A.i. While the Court now finds the obligations causing those compliance costs derive from a different, preexisting regulation, the compliance costs are still traceable to the Memo for standing purposes because, but for FNS announcing its updated interpretation of Title IX and FNA's nondiscrimination provisions through the Memoranda, Plaintiff States would not have had to expend the administrative costs of updating websites, posters, brochures, etc.

of judicial review exists so as to preclude review under the more general provisions of the APA." *Bangura v. Hansen*, 434 F.3d 487, 501 (6th Cir. 2006) (citation omitted).

Similarly, Defendants also contend that this Court does not have jurisdiction to hear a pre-enforcement challenge of USDA's actions under the *Thunder Basin* doctrine, because Congress intended the extensive administrative-enforcement schemes in Title IX and the FNA to be the exclusive remedies for challenges pursuant to those statutes. (Doc. 54, at 32–33 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994).) *Thunder Basin* stands for the proposition that when a statute provides for "delayed judicial review of final agency actions[]" after an administrative enforcement process, courts "shall find that Congress has allocated initial review to an administrative body where such intent is 'fairly discernible in the statutory scheme.'" 510 U.S. at 207 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)). "Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, purpose, legislative history, and the opportunity provided for meaningful review of the claims." *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 861 (S.D. Ohio 2016) (citing *Thunder Basin*, 510 U.S. at 207) [hereinafter "*Highland*"]. At least one other district court within the Sixth Circuit has held that the *Thunder Basin* doctrine precluded a pre-enforcement challenge to administrative actions by the Department of Education changing its interpretation of how it would enforce Title IX. *Id.* at 864.

The alleged injuries in *Thunder Basin* and *Highland*, however, consisted *only* of a threat of future enforcement of the statutes at issue against the plaintiffs. *Id.*; *Thunder Basin*, 510 U.S. at 204–05. As the *Highland* court noted, the administrative actions in that case "impose[d] no immediate penalties for non-compliance[,]" and, therefore, the plaintiffs would have the

opportunity for review in the administrative enforcement process, which also amounts to an

adequate alternative remedy, prior to suffering an injury. 208 F. Supp. 3d. at 864.

This case is distinguishable. While this case contemplates the threat of future

enforcement of Title IX and/or the FNA, Plaintiff States also allege the immediate injury of

compliance costs. (Doc. 1, at 29.) This case is not solely a preemptive challenge to a possible

future agency enforcement like *Highland* and *Thunder Basin* but also a direct challenge to the

imposition of new compliance costs through agency actions. Therefore, even assuming the Title

IX and FNA enforcement schemes constitute adequate alternative remedies or were intended by

Congress to be the exclusive enforcement schemes for pre-enforcement challenges, neither

Section 704 of the APA nor the *Thunder Basin* doctrine presents obstacles to Plaintiff States'

challenge of the immediate imposition of compliance costs.

**B.  APA Claims**

**i.  *USDA's promulgation of the Final Rule complied with the notice-and-
comment requirements of the APA because the Final Rule is a logical
outgrowth of the NPRM.***

Plaintiff States claim that the Final Rule is invalid because it did not comply with the

procedural requirements of the APA.[6] (Doc. 1, at 30–31.) "The APA establishes the procedures

federal administrative agencies use for 'rule making,' defined as the process of 'formulating,

amending, or repealing a rule." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (quoting

5 U.S.C. § 551(5)). A "rule" is defined as a "statement of general or particular applicability and

future effect" that is designed to "implement, interpret, or prescribe law or policy." *Id*. (quoting

---

[6] Plaintiff States also claim that the Memoranda violated the APA's procedural requirements, in
addition to other causes of action under the APA as to the Memoranda. (Doc. 1, at 29–33, 35–
36.) However, in light of the Court's ruling that the Memoranda were not final agency actions
subject to judicial review under the APA, *see supra* Section III.A.iii, the Court will not consider
Plaintiff States' APA claims as they pertain to the Memoranda.

5 U.S.C. § 551(4)).  "Rules" issued by agencies without abiding by the APA's notice-and-comment procedural requirements are invalid.  *Tenn. Hosp. Assoc. v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018).

The APA requires that agencies engaged in notice-and-comment rulemaking publish a "[g]eneral notice of proposed rule making" that must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b).  The Supreme Court has stated that, to satisfy this procedural requirement, the final rule the agency adopts "must be a logical outgrowth of the rule proposed."  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (internal quotation marks omitted) (quoting *Nat'l Black Media Coal. v. F.C.C.*, 791 F.2d 1016, 1022 (2d Cir. 1986)).  "The object, in short, is one of fair notice."  *Id.*

Plaintiff States contend that the inclusion of the clause "including gender identity and sexual orientation" in the Final Rule is not a logical outgrowth of the NPRM's language prohibiting discrimination "on the grounds of sex," and, therefore, the Final Rule is invalid. (Doc. 3, at 18–19; Doc. 78, at 22–24.)  In *Bostock*, the Supreme Court considered three cases in which "[a]n employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender."  140 S. Ct. at 1737.  The Supreme Court described its task in that case:

> We must determine the ordinary public meaning of Title VII's command that it is "unlawful . . . for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

*Id.* at 1738 (quoting 42 U.S.C. § 2000e–2(a)(1)).  To interpret this command, the Supreme Court applied Title VII's contemporaneous meaning of the term "sex":  "status as either male or female

[as] determined by reproductive biology." *Id.* at 1739 (alteration in original). Then, it examined

the meaning of the statute's prohibition on employers taking certain actions "because of" sex:

> [A]s this Court has previously explained, "the ordinary meaning of 'because of' is
> 'by reason of' or 'on account of.'" In the language of law, this means that Title
> VII's "because of" test incorporates the "'simple'" and "traditional" standard of
> but-for causation. That form of causation is established whenever a particular
> outcome would not have happened "but for" the purported cause. In other words,
> a but-for test directs us to change one thing at a time and see if the outcome
> changes. If it does, we have found a but-for cause.
>
> This can be a sweeping standard. Often, events have multiple but-for causes. So,
> for example, if a car accident occurred both because the defendant ran a red light
> and because the plaintiff failed to signal his turn at the intersection, we might call
> each a but-for cause of the collision. When it comes to Title VII, the adoption of
> the traditional but-for causation standard means a defendant cannot avoid liability
> just by citing some other factor that contributed to its challenged employment
> decision. So long as the plaintiff's sex was one but-for cause of that decision, that
> is enough to trigger the law.

*Id.* (internal citations omitted). The *Bostock* Court concluded that the "ordinary public meaning"

of Title VII's prohibition on discrimination "because of sex" in employment decisions inherently

includes sexual-orientation and gender-identity discrimination "because it is impossible to

discriminate against a person for being homosexual or transgender without discriminating

against that individual based on sex." *Id.* at 1741.

Similar to the Title VII command at issue in *Bostock*, the language of the NPRM requires

that states agree to comply with Title IX and the FNA "to the effect that, no person in the United

States shall, *on the grounds of* sex, race, color, age, political belief, religious creed, disability, or

national origin, be excluded from participation in, be denied the benefits of, or be otherwise

subject to discrimination under SNAP." 81 Fed. Reg. at 81,017 (emphasis added) (first citing 20

U.S.C. 1681 ("No person in the United States shall, *on the basis of* sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance . . . .") (emphasis added); and then

citing 7 U.S.C. § 2020 ("In the certification of applicant households for the supplemental nutrition assistance program, there shall be no discrimination *by reason of* race, sex, religious creed, national origin, or political affiliation.") (emphasis added)). Just as the Title VII command at issue in *Bostock* created a causation standard in which sex need only be a "but-for" cause of discrimination, here, the language of the command against discrimination in the NPRM, and the incorporation by reference of Title IX and FNA's commands, also strongly suggests a but-for causation standard. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1016 (2020) (reaffirming that a federal remedy against discrimination "on the basis of" was "strongly suggestive" of a but-for causation standard); *Bostock*, 140 S. Ct. at 1739 (defining "because of" as synonymous with "by reason of"); American Heritage Dictionary of the English Language 775 (4th ed. 2006) (defining "ground" as "a basis[, o]ften used in the plural"); *see, e.g.*, *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 359 (8th Cir. 2020) ("Title IX is understood to bar the imposition of university discipline where sex is a motivating factor in the decision to discipline.") (cleaned up) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)). Under the but-for causation standard of the NPRM, "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," a prohibition on gender-identity and sexual-orientation discrimination is inherent in the language of the NPRM's command against sex discrimination. *See Bostock*, 140 S. Ct. at 1741.

The Supreme Court concluded in *Bostock* that a prohibition against discrimination on the basis of gender identity and sexual orientation was not merely a logical outgrowth of a prohibition against discrimination because of sex but inherent in the ordinary public meaning of the language since its inception. *Id.* It would defy this legal analysis for the Court to hold that

the inclusion of the clause "including gender identity and sexual orientation" in the Final Rule—a mere reiteration of what is inherent in the ordinary language of Title IX and the FNA—was not a "logical outgrowth" of the NPRM's prohibition on sex discrimination. The Final Rule was, at a bare minimum, a logical outgrowth of the NPRM and satisfied the procedural requirements of the APA.

> ii.     *USDA did not act arbitrarily and capriciously by not considering Plaintiff States' interests in sex-separated living facilities, because the Final Rule does not impact those interests in any way.*

Plaintiff States also claim that the Final Rule should be set aside as "arbitrary and capricious," pursuant to the APA. (Doc. 1, at 33–35.) The APA states that, when reviewing agency actions, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "Under what [the Supreme Court has] called this 'narrow' standard of review, . . . an agency [must] 'examine the relevant data and articulate a satisfactory explanation for its action.'" *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). But "a court is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 513–14 (cleaned up) (quoting *Bowman Transp., Inc. v. Ark.– Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). The Supreme Court has held "[i]t would be arbitrary and capricious to ignore such matters[]" as "when [an agency's] prior policy has engendered serious reliance interests." *Id.* at 515–16 (citing *Smiley v. Citibank (S.D.), N. A.*, 517 U.S. 735, 742 (1996)).

The Final Rule provides a clear explanation for its action:

Codifying civil rights protections is vital to the success of SNAP because it supports the Department in providing equitable and superior customer service to all SNAP applicants and recipients. The protections included in this rule will prevent discrimination and systemic racism in the SNAP program that could negatively impact program access and outcomes. Integrating additional civil rights language into the FSA ensures a consistent application of these practices across the program.

87 Fed. Reg. at 35,855.

Plaintiff States argue that the Final Rule is nonetheless arbitrary and capricious because USDA "failed to consider the reliance interests associated with banning sex-separated facilities." (Doc. 78, at 25.) Despite its express limitation to discrimination "under SNAP," Plaintiff States insist that the Final Rule's prohibition against gender-identity and sexual-orientation discrimination applies at the "institutional level." (*Id.* at 17.) But the Final Rule says no such thing: "[N]o person in the United States shall, on the grounds of sex, including gender identity and sexual orientation, race, color, age, political belief, religious creed, disability, or national origin, *be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under SNAP*." 7 C.F.R. 272.2 (emphasis added).

To detect any language addressing sexual-orientation and gender-identity discrimination at the "institutional level" requires a journey far outside the Final Rule. One first must reference the nonbinding Memo, which USDA issued separately from the Final Rule; second, open the nonbinding Q&A Document attached to the Memo; third, navigate to a USDA site linked in the Q&A document; and fourth, read the nondiscrimination statement that state and local SNAP agencies must post, which exists merely to inform the public of their right to file discrimination

28

complaints.[7]  Q&A, at 2.  The Public-Notification Statement reads, in part, "*this institution* is

prohibited from discriminating on the basis of race, color, national origin, sex (including gender

identity and sexual orientation), disability, age, or reprisal or retaliation for prior civil rights

activity."  Public-Notification Statement.

Reliance on the Public-Notification Statement as the basis for arguing the Final Rule

prohibits sex-separated bathrooms in all state-run facilities abandons intellectual honesty.[8]  Even

---

[7] Plaintiff States brazenly ignore this context.  It seems incredibly unlikely that a member of the public would complete this journey, read a poster in a public-benefits office, or visit a SNAP-application website in search of information about a restroom.  Instead, that citizen almost certainly seeks information about food benefits.  In such a context and with an eye toward informing the public—rather than making a political statement—this language efficiently, even if imperfectly, conveys important information consistent with the thrust of the Final Rule and the governing statute.  There is a reason USDA would not require states to simply post the text of Title IX and the FNA to notify the public of the states' obligations:  the statutory language is not easily digestible for the layperson.  Language in agency brochures, posters, manuals, informational webpages, and the like is nonbinding, *see infra*, because it would be entirely unworkable to demand linguistic perfection, hewing to a robust body of law on textual interpretation, while also informing the public in an accessible way.

[8] Certainly, this case is part of a lineage of cases challenging agency actions that arose from the Executive Order 13,988 review process, and some of those challenges, including another one before this Court, have been successful on the merits and/or in obtaining a preliminary injunction.  *See*, *e.g.*, *Tennessee*, 2022 WL 2791450 at *3; *Texas v. EEOC*, No. 2:21-cv-194, 2022 WL 4835346 (N.D. Tex. Oct. 1, 2022).  The Court does not cast doubt on those decisions; rather, it emphasizes the distinctly imaginative allegations and strained reasoning Plaintiff States rely on in *this* case.

In *Tennessee*, this Court considered purported guidance documents from the Department of Education and the Equal Employment Opportunity Commission ("EEOC") that were issued in light of Executive Order 13,988.  2022 WL 2791450 at *2–3.  As the Court will discuss in further detail in Section III.B.iii.b., the guidance documents at issue in *Tennessee* created obligations to allow transgender individuals' access to the bathrooms and locker rooms of their choice, but Title IX contains a specific carve-out to permit sex-separated living facilities.  *Id.* at *20–22.  In *Texas*, the Northern District of Texas considered EEOC and HHS guidance that imposed obligations on how employers and healthcare providers may treat transgender people with respect to dress codes, bathroom access, use of their preferred pronouns, and receipt of gender-affirming care.  *Texas*, 2022 WL 4835346, at *1–2.  "[T]he crux of the parties' disagreement distill[ed] down to one question:  is the non-discrimination holding in *Bostock* cabined to 'homosexuality and transgender *status*' or does it extend to correlated *conduct* —

if a school received SNAP-Ed funding from the state, the school posted the Public-Notification

Statement on its website, a parent saw it, the family filed a complaint against the school for

preventing their trans child from using the bathroom of her choice, the state refused to resolve

the issue by informal means, and USDA commenced an adjudication, such an adjudication

would not be bound in any way by the Public-Notification Statement's language. *See supra*

III.A.iii.; 7 C.F.R. § 15.8 (setting forth USDA discrimination-complaint-processing procedures,

which require, first, informal efforts to secure voluntary compliance, then an opportunity for

hearing, and an express finding on the record). The Public-Notification Statement is nonbinding;

it lacks the force of law. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (Here, . . .

we confront an interpretation contained in an opinion letter, not one arrived at after, for example,

a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in

opinion letters—like interpretations contained in policy statements, agency manuals, and

enforcement guidelines[—]all . . . lack the force of law . . . ."); *see also Davenport v. Astrue*,

417 F. App'x 544, 547 (7th Cir. 2011) ("[The plaintiff] contends that . . . the agency violated due

process by ignoring procedures in the 'Unfair Treatment Complaint' brochure. . . . But an

agency's brochure does not itself create a due-process command; the brochure is a nonbinding,

informal policy statement that the agency can alter at will as it was not adopted through

rulemaking procedures.") (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981)) (concluding

---

specifically, the sex-specific: (1) dress; (2) bathroom; (3) pronoun; and (4) healthcare practices underlying the Guidances and the Amended Complaint?" *Id.* at *2 (emphasis added).

The Final Rule at issue here does not purport to prohibit sex-separated living facilities, as specifically permitted by Title IX, nor does it create or alter states' obligations related to conduct such as dress, bathrooms, pronoun use, or healthcare practices. Rather, it simply prohibits discrimination *under SNAP*, "cabined to 'homosexuality and transgender *status*.'" 7 C.F.R. § 272.2 ("[N]o person in the United States shall, on the grounds of sex . . . be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under SNAP.").

that manual rules promulgated for claims representatives do not bind the Social Security Administration).

Rather, in such an adjudication, USDA would only be substantively bound by the Final Rule, Title IX, the FNA—all of which clearly limit the discrimination prohibitions to the administration of SNAP and SNAP-Ed.  7 C.F.R. § 272.6 ("State agencies shall not discriminate against any applicant or participant *in any aspect of program administration*, including, but not limited to, the certification of households, the issuance of coupons, the conduct of fair hearings, or the conduct of any other program service for reasons of age, race, color, sex, disability, religious creed, national origin, or political beliefs.  Discrimination in any aspect of program administration is prohibited by these regulations [and] the Food and Nutrition Act of 2008 . . . .") (emphasis added); 7 C.F.R. § 272.2 ("no person in the United States shall, on the grounds of sex, including gender identity and sexual orientation, race, color, age, political belief, religious creed, disability, or national origin, *be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under SNAP*") (emphasis added); 7 U.S.C. § 2020(c)(1) ("*In the certification of applicant households for the supplemental nutrition assistance program*, there shall be no discrimination by reason of race, sex, religious creed, national origin, or political affiliation.") (emphasis added); 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education *program or activity* receiving Federal financial assistance.") (emphasis added).  Further, Defendants explicitly acknowledge that neither the Memoranda nor the Final Rule "bear[s] on issues related to 'maintaining sex separated bathrooms and locker rooms, offering sex-separated athletic teams, or using biologically accurate pronouns,' . . . and

neither does the FNA."  (Doc. 54, at 41 ("Plaintiffs have conjured up a fear of their own imagining, ignoring the reality of what the May 5 Memo and Final Rule do and do not do.").)

No matter how many times Plaintiff States insist otherwise, protecting poor people's access to the benefit of food stamps does nothing to redefine access to a school restroom.  And Plaintiff States acknowledge they have no reliance interest that is inconsistent with the actual effect of the Final Rule, because they do not "deny SNAP certification of applicant households based on household members' sexual orientation or gender identity."  (Doc. 1, at 9.)  Accordingly, Plaintiff States have failed to state a claim that the Final Rule should be set aside as arbitrary and capricious.

### iii.    *Title IX and the FNA unambiguously prohibit gender-identity and sexual-orientation discrimination in the administration of SNAP, so Plaintiff States fail to state a claim that the Final Rule is contrary to law under the APA.*

#### a.    Statutory language prohibiting discrimination "on the basis of sex" bans all discrimination in which sex is a but-for cause, including gender-identity and sexual-orientation discrimination.

Plaintiff States also claim that the Final Rule's interpretation of the phrases "on the basis of sex" in Title IX, 20 U.S.C. § 1681(a), and "by reason of . . . sex" in the FNA, 7 U.SC. § 2020(c)(1), is contrary to those laws.  (Doc. 1, at 36–37.)  Under the APA, a federal agency action is invalid if it is "not in accordance with the law."  5 U.S.C. § 706(2)(A).  As the Court has explained, the Supreme Court in *Bostock* concluded that the "ordinary public meaning" of Title VII's prohibition on discrimination "because of sex" in employment decisions inherently includes sexual-orientation and gender-identity discrimination "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  140 S. Ct. at 1741; *supra* Section III.B.iii.  With respect to whether *Bostock* swept beyond Title VII to other laws that prohibit sex discrimination such as

Title IX, the Supreme Court gave the caveat that "none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today." *Id.* at 1753. Further, "[u]nder Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* Considering these disclaimers, *Bostock* is not dispositive of whether Title IX and the FNA are contrary to the Final Rule's prohibition on gender-identity and sexual-orientation discrimination in the administration of SNAP. *See id.*; *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("*Bostock* . . . was limited only to Title VII itself."), *cert. denied sub nom. Pelcha v. Watch Hill Bank*, 142 S. Ct. 461 (2021). But in the absence of any other binding precedent that determines the meaning of sex discrimination under Title IX and the FNA, the reasoning in *Bostock* certainly informs the Court's analysis in this case. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ("Although *Bostock* interprets Title VII . . . , it guides our evaluation of claims under Title IX.") (citations omitted), *cert. denied*, 141 S. Ct. 2878 (2021) ("Although *Bostock* interprets Title VII . . . , it guides our evaluation of claims under Title IX.") (citations omitted); *see also Smith v. Astrue*, 639 F. Supp. 2d 836, 842 (W.D. Mich. 2009) ("Non-binding decisions can have great utility when binding decisions on the contested issue are scarce . . . .").

Following the reasoning in *Bostock*, the language of the prohibitions on sex discrimination in Title IX and the FNA supports the notion that the statutes ban discrimination against an individual that would not have occurred "but for" a person's sex. *See supra* Section III.B.i. Such prohibitions necessarily prohibit gender-identity discrimination "because the discriminator is necessarily referring to the individual's sex to determine incongruence between

33

sex and gender, making sex a but-for cause for the discriminator's actions." *Grimm*, 972 F.3d at 616 (citing *Bostock*, 140 S. Ct. at 1741–42).

Plaintiff States contend that the phrase "on the basis of sex" in Title IX is substantively distinct from Title VII's "because of . . . sex" because the use of the definite article "the" in the former phrase "makes clear biological sex must be the *sole* reason for the discrimination."[9] (Doc. 78, at 20 (emphasis added); *see* Doc. 3, at 25–26.) While the Court has found Title IX and the FNA incorporate a simple but-for causation standard rather than the "sole basis" standard Plaintiff States suggest, *supra* Section III.B.i., the Final Rule would not be contrary to Title IX even under such a "sole basis" standard. Inherent in Plaintiff States' argument is the assumption that sex and gender identity are completely separate, distinct reasons for discrimination; as such, a state should be able to avoid liability for sex discrimination, where sex must be the sole reason for discrimination, by citing an additional reason: gender identity. But gender-identity discrimination and sex discrimination are not distinct reasons for discrimination. This is the

---

[9] The FNA's general sex-discrimination prohibition contains no such definite article. 7 U.S.C. § 2020(c)(1) ("In the certification of applicant households for the supplemental nutrition assistance program, there shall be no discrimination by reason of . . . sex . . . ."). A far narrower provision of the FNA states that "the State agency . . . shall be responsible for conducting [SNAP administration on an Indian reservation] unless the Secretary determines that the State agency . . . is failing . . . properly to administer such program . . . and further determines that the [tribal organization] is capable of effectively and efficiently conducting such program, in light of . . . the adequacy of measures taken by the trial organization to ensure that there shall be no discrimination in the operation of the program on the basis of . . . sex." *Id.* § 2020(d). Plaintiff States argue that this narrower provision "indicates 'on the basis of sex' is the relevant requirement" by which the Court should analyze FNA's sex-discrimination prohibition. (Doc. 3, at 16.) However, the narrower provision plainly is not even a sex-discrimination prohibition but rather a criterion by which to measure the capability of a tribal organization to administer its own SNAP funds, while the general provision *is* a binding prohibition against sex discrimination. *See* 7 U.S.C § 2020(c)–(d). Plaintiff States' conclusion that the narrower provision is "the relevant requirement" is, frankly, confounding. Nonetheless, because the Court will conclude that even a prohibition against discrimination "on the basis of sex" includes a prohibition against gender-identity and sexual-orientation discrimination, the distinction in the two provisions is inapposite. *See infra* Section III.B.iii.a.

precise issue that *Bostock* answered: "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741.

Justice Gorsuch's example from *Bostock*, substituting SNAP applicants for the example's references to employees, illuminates how sex would still be "*the* basis" of gender-identity discrimination in the Title IX context.

> Consider, for example, [a state with two SNAP applicants,] both of whom are attracted to men. The two individuals are, to the [state], materially identical in all respects, except that one is a man and the other a woman. If the [state denies SNAP access to] the male [applicant] for no reason other than the fact he is attracted to men, the [state] discriminates against him for traits or actions it tolerates in [the] female [applicant]. Put differently, the [state] intentionally singles out an [applicant to deny] based in part on the [applicant's] sex, and the affected [applicant's] sex is a but-for cause of his discharge. Or take [a state that denies SNAP access to] a transgender person who was identified as a male at birth but who now identifies as a female. If the [state approves] an otherwise identical [applicant] who was identified as female at birth, the [state] intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an [applicant] identified as female at birth. Again, the individual [applicant's] sex plays an unmistakable and impermissible role in the [SNAP-access] decision.

*Id.* at 1741–42. Just as courts recognize sexual harassment, sex stereotyping, and pregnancy discrimination as forms of discrimination "on *the* basis of sex" under Title IX, gender-identity and sexual-orientation discrimination are forms of sex discrimination under the statute, too. *See, e.g.*, *id.*; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998) ("[S]exual harassment can constitute discrimination on the basis of sex under Title IX"); *Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 351 (6th Cir. 2020) ("Outside of these traditional applications of Title VII and Title IX, a plaintiff can also demonstrate sex discrimination by showing that he or she was mistreated for failing to conform to traditional sex stereotypes."); *Chipman v. Grant Cnty. Sch. Dist.*, 30 F. Supp. 2d 975, 977 (E.D. Ky. 1998) ("Regulations promulgated under Title IX unequivocally apply its prohibition against sex discrimination to

discrimination on the basis of pregnancy and parental status . . . .") (citing 34 C.F.R. §

106.40(a)); *Stanford v. Fox Coll.*, No. 18 C 3703, 2020 WL 814865, at *6 (N.D. Ill. Feb. 19,

2020) ("Discrimination 'on the basis of sex' includes pregnancy discrimination.").

Plaintiff States urge that, if a state denied an otherwise-qualified individual access to

SNAP funds because she was transgender, the denial would not violate Title IX or the FNA

because the state *primarily* penalized her based on her "transgender status," even though the state

still "intentionally penalize[d]" the SNAP applicant because of her sex.  (*See* Doc. 3, at 16);

*Bostock*, 140 S. Ct. at 1741.  This argument also fails.  First, just as in Title VII cases, federal

circuit courts of appeals have uniformly held that an individual's sex need only be a "motivating

factor" of the discrimination in order to constitute discrimination "on the basis of sex" under

Title IX.  *Columbia Univ.*, 831 F.3d at 4 53  ("Because Title IX prohibits (under covered

circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ]

the imposition of university discipline where gender is a motivating factor in the decision to

discipline.'") (citation omitted); *Doe v. Princeton Univ.*, 30 F.4th 335, 343 (3d Cir. 2022)

(holding that Title IX's prohibition against discrimination "on the basis of sex" bars

discrimination "when sex is a motivating factor in the decision"); *Doe v. Purdue Univ.*, 928 F.3d

652, 667–68 (7th Cir. 2019) ("We see no need to superimpose doctrinal tests on the statute.  All

of these categories simply describe ways in which a plaintiff might show that sex was a

motivating factor in a university's decision . . . .  We prefer to ask the question more directly:  do

the alleged facts, if true, raise a plausible inference that the university discriminated . . . 'on the

basis of sex'?"); *Rowles*, 983 F.3d at 359 ("Title IX is understood to bar the imposition of

university discipline where sex is a motivating factor in the decision to discipline.") (cleaned up)

(citation omitted); *Schwake v. Az. Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020)

("Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.") (internal quotation and citations omitted); *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021) (adopting a motivating-factor standard for Title IX claims); *Doe v. Samford Univ.,* 29 F.4th 675 (11th Cir. 2022) (same); *Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 90 (1st Cir. 2018) (same). As such, Title IX prohibits all discrimination where sex is a but-for cause, even if there is another motivating factor.

Further, Plaintiff States' reading would lead to absurd results. It would call into question the well-settled law that sexual-harassment, pregnancy, and sex-stereotyping discrimination constitute discrimination "on the basis of sex" under Title IX by enabling litigants to construe these types of discrimination as based primarily on sexual *desire*, the "status" of pregnancy, or the failure to conform to a preferred stereotype, rather than sex in and of itself. *See, e.g.*, *Gebser*, 524 U.S. at 283; *Chisholm*, 947 F.3d at 351; *Chipman*, 30 F. Supp. 2d at 977; *Stanford*, 2020 WL 814865, at *6. Even in the case of classic discrimination "based on sex," states could escape liability under Plaintiff States' reading. Consider, for example, a state that decided to deny SNAP benefits to all males. Such a decision would unquestionably violate Title IX and the FNA under the statutes' but-for causation standards. But, if the Court accepted the causation standards Plaintiff States argue should apply, the state could escape liability for such blatant sex discrimination by arguing that the sex is not the "sole" reason for its discrimination; rather, because males generally earn higher incomes than similarly situated females, the state could proclaim that it discriminated against the males for their "income-advantaged status." Under Plaintiff States' reading, it would not matter that the state could not create such a classification without referring to sex; the status would be "distinct" from sex, and sex must be the "sole" reason for the discrimination. Circumvention of Congress's edicts in Title IX and the FNA

would require only a bit of crafty framing and wordsmanship.  Congress could not have intended

such a result, so the Court must not accept such a reading.  Scalia & Garner, *Reading Law* § 4, at

63 ("A textually permissible interpretation that furthers rather than obstructs the document's

purpose should be favored.").

Because Title IX incorporates a but-for, motivating-factor causation standard for sex

discrimination, the same kind of sex-discrimination-causation standard at issue in *Bostock*, the

plain text of Title IX's sex-discrimination prohibition also bars gender-identity and sexual-

orientation discrimination.

  b. The entire text and structure of Title IX and FNA support the interpretation of their sex-discrimination prohibitions to ban gender-identity and sexual-orientation discrimination under SNAP.

While the plain texts of Title IX and FNA's sex-discrimination prohibitions, in a vacuum,

cover the concepts of gender-identity and sexual-orientation discrimination, they are not

conclusive.  The Court must consider the entire text and structure of the statutes, not just the text

of the nondiscrimination provisions alone.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451

U.S. 1, 18 (1981) ("In expounding a statute, we must not be guided by a single sentence or

member of a sentence, but look to the provisions of the whole law, and to its object and policy.")

(citations and internal quotation omitted); *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184,

1192 (11th Cir. 2019) ("The whole-text canon refers to the principle that a 'judicial interpreter

[should] consider the entire text, in view of its structure and of the physical and logical relation

of its many parts,' when interpreting any particular part of the text.") (alteration in original)

(quoting Scalia & Garner, *Reading Law* § 24, at 167).

The Sixth Circuit, since *Bostock*, has stated that

Title VII differs from Title IX in important respects:  For example, under Title IX, universities must consider sex in allocating athletic scholarships, 34 C.F.R.

§ 106.37(c), and may take it into account in "maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Thus, it does not follow that principles announced in the Title VII context automatically apply in the Title IX context.

*Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021); *see also* 20 U.S.C. § 1686; 34 C.F.R. § 106.37(c) (requiring universities to consider sex in allocating athletic scholarships).

Some of the courts that have considered whether the reasoning in *Bostock* extends to the sex-discrimination prohibition in Title IX, including this Court, have found that the provisions of Title IX that expressly allow sex-separated living facilities and sports teams squarely conflict with any reading of the statute that would prohibit such sex separation or consider it to be discrimination. *Tennessee*, 2022 WL 2791450, at *21; *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 813 (11th Cir. 2022) (en banc) ("Title IX explicitly provides a statutory carve-out for 'maintaining separate living facilities for the different sexes.' 20 U.S.C. § 1686. So, if 'sex' were ambiguous enough to include 'gender identity,' . . . then this carve-out, as well as the various carveouts under the implementing regulations, would be rendered meaningless."). In *Tennessee*, this Court considered Department of Education ("DOE") and EEOC guidance documents related to its interpretation of Title IX's sex-discrimination prohibition, one of which stated that DOE "can investigate a principal barring a high school transgender girl (i.e., a biological male) from entering the girls' restroom and a coach turning her away from an all-girls sports tryout as unlawful sex discrimination under Title IX." 2022 WL 2791450, at *21. The Court held, based in part on Title IX's carveout for sex-separated facilities, that the plaintiffs were likely to succeed on the merits of their claim that the guidance documents violated the notice-and-comment requirements of the APA because the purported guidance altered the rights and obligations from those existing under the text of Title IX. *Id.* at *21–22.

Similarly, in *Adams*, the Eleventh Circuit held that, even after *Bostock*, a school board's policy separating bathrooms based on biological sex and its directive that a transgender boy must not use the male bathrooms did not violate Title IX's prohibition on sex discrimination, because the statute expressly allows sex-separated living facilities. *Adams*, 57 F.4th at 811. Further, the Title IX carveouts at issue in these cases are supported by the Supreme Court's definition that "[t]o 'discriminate against' a person[] . . . mean[s] treating that individual worse than others who are similarly situated," because sex-separated living facilities and sports teams do not, in general, subject anyone to a disadvantage. *Bostock*, 140 S. Ct. at 1740; *see also* Transcript of Oral Argument at 12–13, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) (Nos. 17-1618, 17-1623,18-107) (counsel for the Department of Justice arguing that sex-separated bathrooms are "not discriminatory because" no one is "subjected to a disadvantage"). Importantly, these cases only considered policies related to sex separation of bathrooms, which fall directly within the scope of Title IX's carveout. *Tennessee*, 2022 WL 2791450, at *21; *Adams*, 57 F.4th at 811.

In this case, by contrast, the Final Rule does not attempt to prohibit sex-separated living facilities. *See supra* Section III.B.ii., n.8. Rather, the Final Rule prohibits sex discrimination, interpreted to include gender-identity and sexual-orientation discrimination, *in the administration of SNAP*. 87 Fed. Reg. at 35,857. There is no statutory carveout from the general sex-discrimination prohibitions in Title IX or the FNA for treating the sexes differently for the purposes of administering SNAP, so the Final Rule does not conflict with the statutes on the basis of such a carveout. *See* 7 U.S.C. § 2020; 20 U.S.C. § 1681. Further, if Congress intended to carve out gender-identity and sexual-orientation discrimination as permissible under these statutes, it certainly could have written a provision saying as much, just as it did in 20 U.S.C. § 1686 to permit sex-separated living facilities. *See* Scalia & Garner, *Reading Law* § 27, at 181–

82 ("For Congress knows—who would not?—how to prevent such [an outcome]. A short sentence would have done the trick. The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation has full force here. The silence of Congress is strident.") (quoting *Comm'r of Internal Revenue v. Beck's Est.*, 129 F.2d 243, 245 (2d Cir. 1942)); *see also* 20 U.S.C. § 1686 ("Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.").

And gender-identity and sexual-orientation discrimination under SNAP, unlike sex-separated bathrooms, generally, *would* subject individuals to disadvantages based on their sex. For example, if a state denied a household access to SNAP benefits due to a household member's gender identity, it would be subject to a disadvantage, *i.e.*, it would not have access to crucial nutrition assistance that its peers could access, and "because the discriminator is necessarily referring to the individual's sex to determine incongruence between sex and gender, [] sex [is] a but-for cause for the discriminator's actions." *Grimm*, 972 F.3d at 616 (citing *Bostock*, 140 S. Ct. at 1741–42).

Therefore, considering the plain text of the but-for, motivating-factor causation standard, the inapplicability of any statutory carveouts for differing treatment of the sexes, and that discrimination based on gender identity or sexual orientation in the administration of SNAP would subject individuals to a disadvantage, the Court finds that the Final Rule is consistent with Title IX and the FNA. Accordingly, Defendants' motion to dismiss will be **GRANTED** as to Plaintiff States' contrary-to-law APA claim.

## C.     Constitutional Claims

Plaintiff States also claim that the Final Rule violates the APA for being contrary to several constitutional provisions, namely, the spending clause, the First Amendment, the Tenth Amendment, the anticommandeering doctrine, separation of powers, and the nondelegation doctrine. (Doc. 1, at 39–47.)

> ### i.      *The Final Rule is permissible under the spending clause because Congress unambiguously conditioned SNAP funds on states' agreement not to use the funds to engender gender-identity or sexual-orientation discrimination.*

Plaintiff States allege that the Final Rule violates the clear-notice requirement of the spending clause by conditioning SNAP funds on a State's acceptance of a prohibition on sexual-orientation and gender-identity discrimination without notice. (*Id.* at 39–40.) "Under the Spending Clause, 'Congress has broad power to set the terms on which it disburses federal money to the States.'" *Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 268 (6th Cir. 2009) (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)); U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States[.]"). "But when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" *Id.* (cleaned up) (quoting *Murphy*, 548 U.S. at 296). "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Sch. Dist. of Pontiac*, 584 F.3d at 268 (cleaned up) (quoting *Arlington*, 548 U.S. at 296). "'By insisting that Congress speak with a clear voice,' the Supreme Court enables States 'to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id.* (quoting, 451 U.S. at 17).

Case 3:22-cv-00257-TRM-DCP   Document 82   Filed 03/29/23   Page 42 of 56   PageID #: 985

The statutes at issue expressly state that they condition the receipt of federal funds on acceptance of their nondiscrimination provisions, and those provisions unambiguously prohibit discrimination in which sex is a but-for cause and which subjects someone to a disadvantage, unless such discrimination is permitted by a statutory carve-out. 7 U.S.C. § 2020(g) ("If the Secretary determines[] . . . that in the administration of the supplemental nutrition assistance program there is a failure by a State agency without good cause to comply with any of the provisions of this chapter . . . the Secretary shall immediately inform such State agency of such failure and shall allow the State agency a specified period of time for the correction of such failure. If the State agency does not correct such failure within that specified period, . . . the Secretary shall proceed to withhold from the State such funds authorized under sections 2025(a), 2025(c), and 2025(g) of this title . . . ."); *id.* at § 2020(c)(1) ("In the certification of applicant households for the supplemental nutrition assistance program, there shall be no discrimination by reason of . . . sex . . . ."); 20 U.S.C. § 1682 ("Compliance with any requirement adopted pursuant to this section may be effected [] by the termination of or refusal to grant or to continue assistance under such program or activity . . . ."); 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."); *see supra* Section III.B.

In *Bostock*, the Supreme Court held that "no ambiguity exists" in Title VII's prohibition against discrimination "because of . . . sex" such that the statute is incapable of any interpretation that excludes sexual-orientation and gender-identity employment discrimination from its sex-discrimination prohibition. 140 S. Ct. at 1749. "The fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it

simply demonstrates the breadth of a legislative command." *Id.* (cleaned up) (citations omitted). "And 'it is ultimately the provisions of' those legislative commands 'rather than the principal concerns of our legislators by which we are governed.'" *Id.* (citations omitted).

The command that states provide equal access to SNAP funds to transgender and homosexual people is unambiguous in this statutory language and always has been. When a state denies SNAP access to a transgender person who was identified as a male at birth but who now identifies as a female but approves an otherwise identical applicant who was identified as female at birth, the state intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an applicant identified as female at birth—that is discrimination "on the basis of sex"[10] and "because of . . . sex." *Id.* at 1741–42; 20 U.S.C. § 1681(a); 7 U.S.C. § 2020(c). As such, the statutes plainly convey notice that SNAP funds are conditioned on the states' acceptance of a prohibition against "all forms of discrimination because of sex, however they may manifest themselves or whatever labels might attach to them" in the administration of SNAP. *Bostock*, 140 S. Ct. at 1741. Therefore, the Court will **GRANT** Defendants' motion to dismiss with respect to Plaintiff States' claim that the Final Rule is contrary to the clear-notice requirement of the spending clause.

Plaintiff States next allege that the Final Rule also violates the spending clause by using the threat of withholding substantial federal funding to coerce them into adopting USDA's preferred policies. (Doc. 1, at 39–40.) "Congress may use its spending power to create

---

[10] Even with the carveouts for sex-separated living facilities and sports teams in Title IX, the statutory command against discrimination "on the basis of sex" is unambiguous at least insofar as it applies to the administration of SNAP and SNAP-Ed. Because the Final Rule only conditions funding on nondiscrimination under SNAP, the Court need not reach the question of whether the statute gives clear notice that funds are conditioned on the states' abstention from other forms of sexual-orientation or gender-identity discrimination.

incentives for States to act in accordance with federal policies[, b]ut when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012) [hereinafter "*NFIB*"] (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)). "Spending Clause programs do not pose this danger when a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds"; therefore, the key inquiry is "whether the financial inducement offered by Congress was so coercive as to pass the point at which pressure turns into compulsion" or is "more than a relatively mild encouragement" and instead is "a gun to the head." *Id.* at 578, 580– 81 (quoting *S. Dakota v. Dole*, 483 U.S. 203, 211 (1987)).

In *NFIB*, the Supreme Court considered a spending-clause challenge to the Patient Protection and Affordable Care Act, Pub. L. No. 111–148, 124 Stat. 119 (2010) (the "ACA"). *Id.* at 576–88. "As originally drafted, the ACA provided substantial federal funds to states to expand their Medicaid programs, but, if states chose not to accept the additional funds, they would not only forgo those funds but lose all existing federal funds as well." *Tennessee v. U.S. Dep't of State*, 329 F. Supp. 3d 597, 626 (W.D. Tenn. 2018), *aff'd sub nom. on other grounds State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499 (6th Cir. 2019). "In order to receive that funding, States [had to] comply with [new] federal criteria governing matters such as who receives care and what services are provided at what cost." *NFIB*, 567 U.S. at 541–42. As an additional condition on receipt of the new Medicaid funds, the ACA "require[d] state programs to provide Medicaid coverage to adults with incomes up to 133 percent of the federal poverty level, whereas many States [at the time] cover[ed] adults with children only if their income [was] considerably lower, and [did] not cover childless adults at all." *Id.* at 542.

A plurality of the Supreme Court in *NFIB* held that this provision of the ACA was unduly coercive because the conditions did not "govern the use of the funds" but rather took "the form of threats to terminate other significant independent grants" if the states did not implement a new regulatory system, accepting the federal government's preferred policies. *Id.* at 580, 585. Thus, the expansion "pass[ed] the point at which 'pressure turns into compulsion'" because it was, in reality, "a new health care program." *Id.* at 580, 583–84. The existing Medicaid funds threatened were particularly critical in that, at the time, "[f]ederal funds received through the Medicaid program [had] become a substantial part of state budgets, [] constituting over 10 percent of most States' total revenue." *Id.* at 542.

Unlike the ACA, the Final Rule does not condition the states' receipt of federal SNAP funds on their implementation of an entirely new regulatory program; it merely elucidates and confirms the condition against sex discrimination set forth by Congress in the statute's longstanding language. *See id.*; 7 C.F.R. § 272.2. The Final Rule's condition—that states agree not to engage in gender-identity and sexual-orientation discrimination in the administration of SNAP—directly governs the use of SNAP funds such that states do not use these federal nutrition-assistance funds to engender discrimination. 7 C.F.R. § 272.2. Indeed, the condition at issue here actually requires nothing more than what because Plaintiff States allege they are already doing, not surprisingly, based on longstanding statutory language prohibiting sex discrimination in making SNAP certification decisions. (Doc. 1, at 9.) As a practical matter, a condition on the receipt of federal funds that simply enforces the status quo of nondiscrimination can hardly be said to be "in reality a new program," a "gun to the head," or "so coercive as to pass the point at which 'pressure turns into compulsion.'" *NFIB*, 567 U.S. at 581–82; *Dole*, 483 U.S. at 211 (quoting *Steward Mach.*, 301 U.S. at 590). Therefore, the Court will **GRANT**

Defendants' motion to dismiss as to Plaintiff States' claim that the Final Rule was unduly coercive under the spending clause.

### ii. The Final Rule is permissible under the Tenth Amendment and the anticommandeering doctrine because it does not supersede powers historically reserved to the states or command the states to enact a regulatory program.

Plaintiff States also claim that the Final Rule runs afoul of the Tenth Amendment and the anticommandeering doctrine. (Doc. 1, at 44–45.) The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Accordingly, when Congress legislates in a way that supersedes powers historically reserved to the states, it must make "clear and manifest" its purpose to do so. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Plaintiff States' contention that the Final Rule runs afoul of this principle arises from their unfounded fear that the Final Rule impedes on the states' "management of their public schools" and "risk[s] the entire country as a laboratory for novel social experiments" without a "clear and manifest" pronouncement from Congress to do so. (Doc. 3, at 31.) As the Court has explained, the Final Rule only prohibits sexual-orientation and gender-identity discrimination in the administration of SNAP; it does not prohibit all such discrimination at the "institutional level" as Plaintiff States contend. *See supra* Sections III.A.iii, III.B.ii. The Final Rule merely conditions the use of federal funds on the states' agreement that they maintain the status quo of not using those federal funds to engender discrimination on the basis of sex, *see supra* Section III.C.i.; it does not supersede powers historically reserved to the states, such as the management of public schools, nor does it create "novel social experiments." Further, Congress's intent to prohibit sex discrimination under Title IX and the FNA is indeed "clear and

manifest" in the plain text of those statutes. *See supra* Sections III.B.iii, III.C.i. Therefore, the Court finds the Final Rule is not contrary to the Tenth Amendment.

Under the anticommandeering doctrine, "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts[]" or "command a state government to enact *state* regulation." *New York v. United States*, 505 U.S. 144,166, 178 (1992) (emphasis in original). Accordingly, "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id.* at 161 (alteration in original) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)). Rather, "[w]here a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *Id.* at 178. However, the Supreme Court clarified that "[t]his is not to say that Congress lacks the ability to encourage a State to regulate in a particular way, or that Congress may not hold out incentives to the States as a method of influencing a State's policy choices." *Id.* at 166. "Where the recipient of federal funds is a State, . . . the conditions attached to the funds by Congress may influence a State's legislative choices" without amounting to "commandeering." *Id.* at 167 (citations omitted).

In this case, the Final Rule's prohibition against sex discrimination under SNAP is a valid condition on receipt of federal SNAP funds rather than a "command . . . to enact *state* regulation." *See supra* Section III.C.i. Plaintiff States allege that "[t]he Final Rule commandeers Plaintiffs and their employees into enforcing federal policy by threatening Plaintiff States' SNAP funding." (Doc. 1, at 45.) Even the language of this allegation reveals that the Final Rule does not actually "command"; it merely *conditions* (or "threaten[s]," as Plaintiff States prefer to say)

48

the states' receipt of SNAP funding on their agreement not to engender sexual-orientation and gender-identity discrimination with those funds. *See New York*, 505 U.S. at 167. While the incentive of access to federal nutrition-assistance funds may "influenc[e] a State's policy choices" to accept the nondiscrimination condition it would not otherwise, the federal government did not "command" it to do so. *See id.* Therefore, the Court finds that the Final Rule is not contrary to the anticommandeering doctrine, and, accordingly, it will **GRANT** Defendants' motion to dismiss as to Plaintiff States' Tenth-Amendment and anticommandeering claim.

> ### iii. *The Final Rule is permissible under the First Amendment because it does not regulate state-employed professors' speech and because states do not have a cause of action against the federal government to assert religious-liberty or free-expression rights.*

Plaintiff States next argue that the Final Rule violates the First Amendment in three ways: (1) by requiring teachers and professors to use a student's preferred pronouns, (2) by "conflict[ing] with religious liberty," and (3) by forcing the states to express messages they do not want to express. (Doc. 1, at 42–43; Doc. 3, at 29–31, Doc. 78, at 31–33.) As an initial matter, the Court once again notes that Final Rule only prohibits sexual-orientation and gender-identity discrimination "*under SNAP.*" 7 C.F.R. 272.2 (emphasis added); *see supra* Section III.B.ii. Therefore, nothing in the Final Rule can be read to impact teachers' and professors' free-speech rights because the use of a student's preferred pronouns is not implicated in the administration of SNAP. *See* 7 C.F.R. 272.2; (*see generally* Doc. 1).

Next, with respect to its religious-liberty claim, Plaintiff States only allege that "[t]the Final Rule also conflicts with the First Amendment's protection of religious liberty[,]" without any further detail. (Doc. 1, at 42.) While Congress may use its spending power to "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient

with federal statutory and administrative directives[,] . . . the power may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 206, 210. "In a case challenging free exercise of religion, a plaintiff must show 'the coercive effect of the enactment as it operates against him in the practice of his religion.'" *Burnett v. Hall*, No. 3:11-0279, 2011 WL 4436515, at *3 (M.D. Tenn. Sept. 22, 2011) (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963), *report and recommendation approved*, No. 3:11-00279, 2011 WL 5102446 (M.D. Tenn. Oct. 27, 2011)). To satisfy the pleading standard under Rule 8, a plaintiff must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, and the Court is not "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan*, 478 U.S. at 286. Plaintiff States' cursory briefing in support of this claim also sheds no light on whether any other factual allegations substantiate this claim. (Doc. 3, at 29 ("Second, the Final Rule and Memoranda also conflict with religious liberty. . . . USDA did not even acknowledge in the Final Rule the potential conflict between its interpretation of the statutes and the religious-freedom rights of the entities and individuals that the statutes regulate. That conflict provides an additional reason to set aside the unlawful actions.").) Plaintiff States' conclusory allegation is insufficient to support a claim that the Final Rule is contrary to the free-exercise clause of the First Amendment because they do not allege what "coercive effect," if any, the States' compliance with the Final Rule would have on any individual's "practice of [] religion." *See Schempp*, 374 U.S. at 223.

Finally, Plaintiff States argue that because the "Final Rule would force Plaintiffs to post posters, rewrite policies, enforce policies, and otherwise engage in actions that express messages Plaintiffs do not agree with[,]" it violates the states' own free-expression rights. (Doc. 1, at 43.) Underlying this claim is the legal conclusion that the First Amendment protects a state

government from any federal interference with the state's speech. However, the Sixth Circuit

recognizes no such conclusion; rather, "the question of whether a state actor may have some First

Amendment rights protected from federal action" is "not clearly settled." *Oakstone Cmty. Sch. v.*

*Williams*, 615 F. App'x 284, 289 (6th Cir. 2015) (citations omitted); *see also New Mexico v.*

*McAleenan*, 450 F. Supp. 3d 1130, 1207–10 (D.N.M. 2020) ("It is an open question whether

States and municipalities have First Amendment rights against the United States."). The

Supreme Court has expressly declined to answer this question:

> The Government [argues that] Government entities [such as States] do not have
> First Amendment rights. *See Columbia Broadcasting System, Inc. v. Democratic*
> *National Committee*, 412 U.S. 94, 139 [] (1973) (Stewart, J., concurring) ("The
> First Amendment protects the press from governmental interference; it confers no
> analogous protection on the government"); *id.*, at 139, n.7 [] (" 'The purpose of
> the First Amendment is to protect private expression' " (quoting T. Emerson, The
> System of Freedom of Expression 700 (1970))). . . . We need not decide this
> question . . . .

*United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 210–11 (2003).

"The majority of courts that have considered the issue, however, have answered that the

First Amendment works in one direction:  it protects people and private entities, not

governments." *McAleenan*, 450 F. Supp. 3d at 1208 (collecting cases). "The minority position

is that, at least in some contexts, it makes functional sense to recognize First Amendment

protections for States and municipalities, or at least extend certain First Amendment defenses

like those defenses against defamation claims." *Id.* "At a minimum, there is an absence of the

First Congress' clear intent to decide this constitutional issue." *Id.* at 1209 (citing David

Fagundes, *State Actors as First Amendment Speakers*, 100 NW. U. L. Rev. 1637, 1652 (2006)

("The debates over the Bill of Rights provide no direct evidence indicating whether the framers

intended government speech to be included in the Constitution's speech protections.")).

In this case, the Court agrees with the majority position and further notes that, even if it applied the minority position, it does not make functional sense in this case to recognize First Amendment protections for the states. "That no federal court has expressly found such a right in 250 years also indicates that the First Congress did not intend for the First Amendment to be read so broadly," and, if this Court were to expressly find such a right here, it would represent an unprecedented deviation from those 250 years of jurisprudence. *See id.* "Instead, the Constitution, and its State counterparts, act as a whole to limit governmental powers. The Constitution, accordingly, already binds the federal government in myriad ways." *Id.* at 1210. Particularly relevant here are the Tenth Amendment and the spending clause. As the Court has found, the Final Rule does not run afoul of these limits on the federal government's powers. *See supra* Sections III.C.i.–ii. If the Court found that it violated states' free-expression rights to condition the receipt on federal funds on states engaging in any expressive conduct, such as displaying a poster, Congress's power under the spending clause would be completely gutted. "Further, recognizing governmental First Amendment protections would muddle the bulk of First Amendment caselaw that provides that individual speech trumps the government's speech." *McAleenan*, 450 F. Supp. 3d at 1210 (citing *Wooley v. Maynard*, 430 U.S. 705 (1977)). For example, in the context of compelled association, "[d]issenters would be hard-pressed to avoid such compelled association were their governments endowed with constitutional rights to express majority opinion[]" because "[w]hen government stifles or regulates individual speech, the government engages in speech; by suppressing one view, it necessarily expresses a contrary view." *Id.*

"In short, extending First Amendment protections to governments flips the Constitution on its head. Rights belong to people, whereas governments have powers. Instead of protecting

individual liberty at government's expense, a First Amendment cause of action for government would protect government's powers at the expense of individual liberty." *Id.* Therefore, the Court will not stake out the novel and constitutionally dangerous position in this case that the states enjoy their own First-Amendment protections. Accordingly, the Court will **GRANT** Defendants' motion to dismiss with respect to Plaintiff States' First-Amendment claim.

> **iv.** **The Final Rule does not run afoul of separation of powers or the nondelegation doctrine, because Title IX and the FNA set forth clear instructions to condition SNAP funds on states agreeing not to use the funds to engender sexual-orientation or gender-identity discrimination.**

Plaintiff States' final constitutional claim turns on the allegation that the Final Rule "is so removed from any reasonable reading of Title IX and the Food and Nutrition Act that it amounts to an unconstitutional exercise of legislative power." (Doc. 1, at 47.) "[A] statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (alteration in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). "[T]he answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* (citations omitted). Additionally, courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (citations and internal quotation marks omitted). In such "extraordinary cases," "the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such

authority." *W. Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (alteration in original) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)).

In this case, the Final Rule does not run afoul of either of these standards. As the Court has found, a plain reading of the but-for, motivating-factor causation standards in Title IX and the FNA supports the notion that the statutes prohibit gender-identity and sexual-orientation discrimination in the context of SNAP administration. *See supra* Sections III.B.i, III.B.iii. Therefore, the "instructions" the statutes provide plainly support the interpretation in the Final Rule. *See Gundy*, 139 S. Ct. at 2123. Further, the Final Rule does not "exercise powers of vast economic and political significance." *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. Instead, it merely requires states to agree to maintain the status quo of nondiscrimination in the administration of SNAP. *See supra* Section III.C.i. Accordingly, the Court will also **GRANT** Defendant's motion to dismiss (Doc. 70) as to Plaintiff States' separation-of-powers and nondelegation-doctrine claim.

## IV. PRELIMINARY INJUNCTION ANALYSIS

The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). When reviewing motions for preliminary injunctions, Courts must balance the following factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State*

54

*AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997); *see Mich. State AFL-CIO*, 103 F.3d at 1249) ("While, as a general matter, none of these four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.")); *Monsanto Co. v. Manning*, 841 F.2d 1126 (6th Cir. 1988) (unpublished table decision) (citing *Centurion Reinsurance Co. v. Singer*, 810 F.2d 140, 145 (7th Cir. 1987)) ("No matter how strongly the balance of irreparable harms may include in favor of the party asking for a preliminary injunction, it is error to grant the injunction if the party has no chance or a very slight chance of prevailing on the merits.").

    As a result of the Court's analysis on Defendants' motion to dismiss, the Court will dismiss all of Plaintiff States' claims on their merits. Therefore, there is no likelihood of success on the merits. Accordingly, the Court need not engage with the remaining preliminary-injunction factors and, instead, must **DENY** Plaintiff States' motion for a preliminary injunction (Doc. 2). *See Gonzales*, 225 F.3d at 625.

## V.    CONCLUSION

    For the foregoing reasons, Defendants' motion to dismiss (Doc. 70) is **GRANTED**, and Plaintiff States' motion for preliminary injunction (Doc. 2) is **DENIED**. This case is about food stamps and nutrition education, not bathrooms, sports teams, free speech, or religious exercise. Other cases have necessarily examined LGBTQIA+ individuals' interests in nondiscrimination juxtaposed with others' interests relating to restrooms, sports teams, free speech, or religious exercise. *See supra* n.8. But this case entails none of those latter interests; it is about whether, in administering food benefits, Plaintiff States can ignore a federal statute and discriminate against poor people who do not to conform to traditional conceptions of sex. Plaintiff States' insistence

to the contrary is no more than an invitation to join a political discussion untethered to applicable statutes and precedent. The Court will, instead, simply apply the law.

The Court's task was to determine whether Title IX and the FNA protect LGBTQIA+ people's access to federally funded food-assistance benefits and nutrition education. And the answer is clear: states cannot discriminate based on gender identity and sexual orientation in the administration of SNAP and SNAP-Ed. While Plaintiff States' claims were unsuccessful, their ostensible fears should be assuaged by the fact that the status quo—states providing their low-income families equal access to federal food-assistance funds—shall persist.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**